# APPENDIX 1

# Simonds Industries Inc.

| | Section (SUB) | Page(s) | Dated |
|---|---|---|---|
| Supersedes | 1996-2001 | Bus. Plan | |
| Current | 14.4.1 | 1 of 1 | 2/1/00 |



Ron Owens
Sr. VP Manufacturing

**Ken Myer**
Director of Materials

- Purchasing
  R. Juszo
  J. Page
- P & IC Coordinators
  D. Manczelow
  P. Thomas
  R. Muselic
- Ship/Rec/Raw Mat &
  Weld Center
  D. Stewart
  Shipping
  Raw & Rec.

**John Jordan**
Plant Manager

- J. Ciniwale
  H.R. Manager
  Betty Schofield
  HR/Training
- J. Schutt
  Gen. Fore. Wood
  D. Bourgeois
  Unit Mgr. Metal
  T. Darling
  Unit Mgr. Metal
  W. Dahorn
  Unit Mgr. Metal
  K. Edmunds
  Unit Mgr. 3+1
  B. Marion
  Unit Mgr. 11-7
  W. Fletcher
  Unit Mgr. Rolc
  C. Mansfield
  Unit Mgr. Maint.
- T. Stock
  Facilities Mgr.
  Don Hagelberg
  Methods Eng.

**Ray Edson**
Director of Engineering

- S. Netni
  Supervisor Mfg. Eng.
  - B. Brown
    Prin. Eng.
  - E. Evancic
    Chief Mot.
  - W. Logan
  - L. Altoogian
    Project Eng.
  - J. Dexter
    Project Eng.
- Bill Baker
  Q. A. Manager
  - Q.C. Function
    6

# APPENDIX 2

1          UNITED STATES DISTRICT COURT
2            DISTRICT OF MASSACHUSETTS
                 CENTRAL DIVISION
3                    Civil Action No. 01-40059-NMG

4     RONALD LARSEN,
                    Plaintiff,              )
5                                           )                **ORIGINAL**
      VS.                                   )
6                                           )
7     SIMONDS INDUSTRIES, INC.,             )
                    Defendant.              )
8

9              DEPOSITION OF RONALD W. OWENS, taken at
10   the request of the Defendant pursuant to the
     applicable provisions of the Federal Rules of
11   Civil Procedure before Julie A. Bates, a
     Notary Public in and for the Commonwealth of
12   Massachusetts, on Tuesday, April 5, 2005, at
     the offices of Bowditch & Dewey, 311 Main
13   Street, Worcester, Massachusetts.  Also
     present:  Attorney David Witman.

14

15   A P P E A R A N C E S:

16   FOR THE PLAINTIFF:
     ELLIOTT LAW OFFICE P.C.
17   307 Central Street
     Gardner, MA  01440
18   (978) 632-7948
       BY: MARCIA L. ELLIOTT, ESQ.
19         JILL A. ROMER, ESQ.
           JOHN M. FLICK, ESQ.
20

21   FOR THE DEFENDANT:
     BOWDITCH & DEWEY, LLP
22   311 Main Street
     Worcester, MA  01615
23   (508) 791-3511
       BY: DAVID FELPER, ESQ.
24         JONATHAN R. SIGEL, ESQ.
           KATHRYN ABARE-O'CONNELL, ESQ.

1          A.    I don't recall.

2          Q.    Was he there in 2000?

3          A.    I really don't recall.  I do not

4    recall the date that he left the company or

5    retired from the company.

6          Q.    Didn't he participate in union

7    negotiations in 2000?

8          A.    I really do not remember

9    specifically the year.

10         Q.    Now, if Mr. Souliere had not been

11   on this disability leave or early retirement

12   as you called it, he would have been

13   terminated as well, correct, in January of

14   2000?

15              MR. FELPER:  Object.  It's asking

16   for a hypothetical.

17              STENOGRAPHER:  I didn't hear your

18   answer.

19              THE WITNESS:  I'm sorry?

20              STENOGRAPHER:  I didn't hear your

21   answer.

22         A.    I said I really can't say that.  I

23   don't know.

24         Q.    Well, you indicated that you were

1    eliminating that level of management, correct?

2         A.    When the reduction in force

3    occurred, that level of management was already

4    gone.

5         Q.    When did you eliminate the level of

6    management that included Mr. Larsen?

7              MR. FELPER:  Objection to the form

8    of the question.  He didn't say he eliminated

9    that level of management.

10        A.    Say it again, please?  I'm --

11        Q.    When did you terminate Mr. Larsen,

12   Mr. Alberghini, and Mr. Bourque?

13             MR. FELPER:  Objection.  The

14   witness never said he terminated those

15   individuals.

16        A.    I was aware of their termination,

17   and I believe it was in January of

18   two-thousand-and -- January of 2000.

19        Q.    You and Mr. Jordan and Mr. Martino

20   discussed that you were eliminating the level

21   of management that included Ronald Larsen;

22   isn't that right?

23        A.    Yes, we did discuss it.

24        Q.    And Mr. Souliere was in that level

09/14/2005  11:32   19786303703          ELLIOT LAW OFFICE                    PAGE  01/03
Case 4:04-cv-40092-FDS    Document 24-2    Filed 09/19/2005    Page 7 of 22

179

1        Q.    And were you aware of those who
2    participated in the bonus plan in your
3    position as senior VP?
4        A.    Yes, in a broad scale.
5        Q.    And Mr. Larsen was one of those
6    members who participated?
7        A.    I believe he was, yes.
8        Q.    And so was Mr. Jordan?
9        A.    As plant manager, yes.
10       Q.    And you're aware that Mr. Larsen
11   received his bonus for the performance of
12   1999?
13       A.    I don't remember it specifically.
14       Q.    You have no independent
15   recollection of that?
16       A.    No.
17       Q.    And you remember that Mr. Jordan
18   received his bonus for the year 2000?
19       A.    I recall that bonuses were achieved
20   in 2000.
21       Q.    And you're aware that Mr. Jordan
22   received an $18,000 bonus for the year 2000?
23       A.    I don't recall the specific number.
24       Q.    Now, did you get a bonus?

BAY STATE REPORTING AGENCY

```
 1          A.    Yes.
 2          Q.    And did you get a bonus in 1999?
 3          A.    I don't think so.
 4          Q.    Did you get a bonus in 2000?
 5          A.    I think so, yes.
 6          Q.    And how much was that?
 7                MR. FELPER:  Objection.  Based on
 8    relevance.
 9          A.    Yeah.  I mean, I don't -- I don't
10    know why that's -- I guess I don't know why
11    that's important.
12          Q.    Well --
13          A.    I'd rather not say.  And it's
14    also -- it must be understood that there
15    weren't a great number of people who had a
16    bonus plan.  The numbers were limited.
17          Q.    Okay.  But the question, sir, is
18    how much your bonus was, not anything else.
19          A.    I said I'd rather not say.
20                MR. FELPER:  Same objection.
21    Mr. Owens, if I just may, my --
22                MS. ELLIOTT:  I'm going to --
23                MR. FELPER:   -- my suggestion is
24    that you respond to the question so in case
```

BAY STATE REPORTING AGENCY

09/14/2005 11:32 19786303703   ELLIOTT LAW OFFICE   PAGE 03/03
Case 4:04-cv-40092-FDS   Document 24-2   Filed 09/19/2005   Page 9 of 22

181

1    the Court rules against you, you don't have to

2    make a return trip to Massachusetts.  But

3    that's your call.

4         A.    Somewhere north of $50,000, if I

5    remember.  I don't remember the specific

6    amount.

7         Q.    You had Ms. Thibodeau call

8    Mr. Larsen to arrange this interview with him

9    for the plant manager position in Ohio?

10        A.    Yes.

11        Q.    Did you also have Mr. Carnivale

12   call him?

13        A.    Not that I recall.

14        Q.    Did Mr. Carnivale -- I'm sorry.

15        A.    I really don't recall for certain.

16        Q.    Did Mr. Carnivale tell you that

17   Mr. Larsen might be interested in that

18   position?

19        A.    Yes.

20        Q.    And you had Ms. Thibodeau call him

21   to arrange that interview after Mr. Carnivale

22   made this known to you?

23        A.    Yes.

24        Q.    Ms. Thibodeau was present at the

# APPENDIX 3

2-1

1
2
3
4
5
6
7
.8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


RONALD LARSEN,                   )
              Plaintiff,         )
                                 )
                                 )
vs.                              )    CA No. 01-40059
                                 )
                                 )
SIMONDS INDUSTRIES, INC.,        )
              Defendant.         )


BEFORE:   The Honorable Nathaniel M. Gorton


DAY TWO OF JURY TRIAL


John Joseph Moakley United States Courthouse
Courtroom No. 4
One Courthouse Way
Boston, MA 02210
Tuesday, May 10, 2005
9:08 A.M.


Cheryl Dahlstrom, RPR, RMR
James P. Gibbons, RMR
Official Court Reporters
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 3209
Boston, MA 02210
Mechanical Steno - Transcript by Computer

APPEARANCES:

    ELLIOTT LAW OFFICE, P.C.
    By:  Marcia L. Elliott, Esq.,
         Jill Romer, Esq., and
         John Martin Flick, Esq.
    307 Central Street
    Gardner, Massachusetts 01440
    On Behalf of the Plaintiff.

    BOWDITCH & DEWEY LLP
    By:  David M. Felper, Esq.,
         Jonathan R. Sigel, Esq., and
         Kathryn Abare-O'Connell, Esq.
    311 Main Street
    P.O. Box 15156
    Worcester, Massachusetts 01615
    On Behalf of the Defendant.

* * * * * *

I N D E X

| Testimony of: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| RONALD LARSEN | | | | |
| by Ms. Romer | 4 | | 97 | |
| by Mr. Felper | | 23 | | |
| JOHN JORDAN | | | | |
| by Ms. Elliott | 100 | | | |
| by Mr. Felper | | 179 | | |
| RAYMOND MARTINO | | | | |
| by Mr. Felper | 128 | | | |
| by Ms. Elliott | | 168 | | |
| ILDA THIBODEAU | | | | |
| by Ms. Elliott | 198 | | | |

1    observations of the Simonds Industries company in October 29,

2    1999, shortly after you became the chief operating officer?

3    A.    Yes.

4    Q.    In that -- in your early observations, you observed that

5    one of the negatives of the company was that it promoted

6    people from within and it had resulted in some conventional

7    wisdom mentality and lack of diversity in the management

8    ranks?

9    A.    That's correct.

10   Q.    You are aware that the Fitchburg facility was

11   predominately an age-protected work force at that time?

12   A.    I was not.

13   Q.    You were aware, after January 7, 2000, that the Fitchburg

14   facility was predominately an age-protected work force?

15   A.    No, I was not.

16   Q.    Well, you conducted -- you indicated that you conducted

17   disparate impact analysis in and about January 7, 2000, with

18   regard to the layoff of those individuals, correct?

19   A.    That's correct, that the company conducted that analysis,

20   and I typically only see the analysis by exception.  If it

21   passes the appropriate tests, then it, by default, is accepted

22   as a part of the process.

23   Q.    So you had no involvement yourself in the disparate

24   impact analysis?

25   A.    Correct.  That's a human resource function.

1    Q.   In fact, you never saw any documents with regard to that

2    analysis if one was conducted for the January 7, 2000, layoff?

3    A.   To the best of my recollection, that's correct.

4    Q.   Now, Fitchburg met its plan goals for the year 2000, is

5    that right?

6    A.   Not that I recall.  The company did not meet its

7    objectives for the year 2000.  I don't remember specifically

8    whether Fitchburg did.  Typically, we measure our company

9    based on a number of areas, sales performance, plant

10    performance.  We don't typically view it just as a location

11    performance but more of a business performance.

12    Q.   But the Fitchburg facility paid a bonus in 2000, did it

13    not?

14    A.   That's correct.

15    Q.   Which means that they made their plan numbers for that

16    particular year?

17    A.   They either made the plan or a portion of the plan to

18    receive a bonus.  It's a graduated scale.

19    Q.   Now, in fact, the plan that you made for 2000 was more

20    aggressive than it was for 1999, isn't that right?

21    A.   That's correct.

22    Q.   And the net sales in 1999 were $127 million, roughly,

23    correct?

24    A.   Correct.

25    Q.   And the net sales in 1998 were 126 million, correct?

1    A.    I believe they were about 125 and a little bit, not quite

2    $2 million less year over year.

3    Q.    The net sales for the year of 2000 were approximately 125

4    million?

5    A.    Yes, as I stated, about two million less or so than the

6    previous year.

7    Q.    In fact, you projected a metal sales increase for 2000,

8    correct?

9    A.    I believe we did, yes.

10   Q.    And you projected an increase in sales for the wood

11   products as well?

12   A.    Yes, we did.

13   Q.    And you projected an increase for 2000 for the rule

14   products?

15   A.    To the best of my recollection, we did.

16   Q.    And, in fact, as of July 25, 2000, you were 5 percent

17   over the 1999 plan numbers, isn't that right?

18   A.    I can't say specifically with respect to that particular

19   point in time during the year.  I can speak to the full-year

20   numbers.

21   Q.    As of July 25th, you were 3.6 percent over the plan

22   numbers?

23   A.    I can't say honestly, as of that particular point in

24   time, where we stood with respect to our plan.  As I

25   mentioned, we'd had a recession develop in the second half of

1    2000.  The first half was reasonably strong and the second

2    half was weak.

3    Q.    Were you at a July 25, 2000, board meeting of the

4    company?

5    A.    If it was a board meeting, I was there.  I don't remember

6    the date specifically, but I attend every board meeting.

7    Q.    It's your testimony that you don't remember what the

8    numbers were on July 25, 2000, is that correct?

9    A.    That's correct.

10             MS. ELLIOTT:  May I approach?

11             THE COURT:  Yes.

12   Q.    Mr. Martino, could you take a moment and review this

13   document to yourself, please.

14   A.    Sure, uh-huh.

15   Q.    Does that refresh your memory about the fact that the

16   sales were 5 percent over 1999?

17   A.    Yes.

18   Q.    2000, excuse me.

19   A.    Yes.

20   Q.    Does it refresh your memory that you were 3.6 percent

21   over plan for 2000?

22   A.    Correct.  That would have been through June even though

23   the date of the documents would have been at the board

24   meeting, is for the first two quarters of the year, the first

25   six months of the year.

1    Q.   Sir, isn't it true that the cash flow as of July 1, 2000,

2    was nearly equal to what the cash flow was of the company on

3    January 1, 2000?

4    A.   Again, I didn't look at that specifically.  I was looking

5    at the sales numbers and I don't recall specifically.

6    Q.   Your testimony is you don't remember that, correct?

7    A.   I don't specifically remember that, that's correct.

8             MS. ELLIOTT:  May I approach, your Honor?

9             THE COURT:  Yes.

10   Q.   Could you take a moment to review this document, Mr.

11   Martino, to yourself?

12   A.   This would indicate that there was no change in cash over

13   the first six months of the year.  That's what that cash flow

14   statement says.  Cash remained the same.

15   Q.   And, in fact, in July -- excuse me.  In fact, in 2000,

16   the metal demand and production were at historic heights,

17   isn't that true?

18   A.   They were at very strong.  I'm not sure, compared to

19   history, whether they were as high as they've ever been, but

20   they certainly were strong, as I mentioned, and the first half

21   of 2000 was still a very robust business for us.

22   Q.   You never implemented any recessionary cost measures in

23   2000, correct?

24   A.   In the first half of 2000, we did not.

25   Q.   And you never forecasted any academic slowdown until

09/13/2005 14:11 19786303703 ELLIOTT LAW OFFICE PAGE 07/11
Case 4:04-cv-40092-FDS    Document 24-2    Filed 09/19/2005    Page 18 of 22

2-174

1    Q.    Now, your salary in 2000 was 289,000-plus dollars, wasn't

2    it? I'm sorry, 389,000-plus dollars?

3    A.    That's correct.

4    Q.    Sir, isn't it true that only five persons were laid off

5    from the Fitchburg facility in 2000?

6    A.    I don't remember specifically. I do know, as I

7    mentioned, that we had a reduction in force of 60 people

8    company-wide in the first six months, that is, the fourth

9    quarter of 1999 and the first quarter of 2000. I don't

10   recollect exactly how many from each facility, but it was a

11   company-wide reduction in force.

12   Q.    Well, isn't it true, sir, that you only reduced 24 people

13   in total in the year 2000 from all facilities?

14   A.    That sounds about right, but, again, I don't have the

15   numbers in front of me.

16   Q.    Do you not remember what the number was?

17   A.    I remember the number at the time I started, and I

18   remember the numbers at the -- that the reduction in force of

19   about 60 people in the first six months and additional

20   changes. But, remember, we also had some acquisitions during

21   that period, so we added some people with the acquisitions,

22   and we had some reductions in force.

23   Q.    Sir, you must remember, then, that there were only five

24   people from the Fitchburg facility that were laid off?

25   A.    As I said, I don't remember exactly how many per

1    facility.

2    Q.    Do you remember whether the Portland, Oregon, facility

3    had 17 terminations?

4    A.    I do know the Portland facility was impacted fairly

5    heavily.  I don't remember, again, exactly the right number.

6    Q.    Do you remember that four people were terminated from Big

7    Rapids?

8    A.    As I said, I don't remember any of the numbers

9    specifically by facility.  I just remember the number in

10   total.

11            MS. ELLIOTT:  Your Honor, may I approach?

12            THE COURT:  Yes.

13   Q.    Take a moment to review that to yourself.

14   A.    Sure.

15   Q.    Does that refresh your memory that in 2000 the layoffs

16   were 24 from all facilities?

17   A.    I'm not sure where I see that number.  I see 24

18   reductions in force; 41 resignations replaced.

19   Q.    Sir, the question is just reductions in force.

20   A.    Twenty-four is the number I see here.

21   Q.    Isn't it true, sir, that there were only five people laid

22   off from the Fitchburg facility?

23   A.    I can't construct that number from these data.  I see a

24   long list of Fitchburg employees here, but I can't say whether

25   it was five or not.

1    Q.    Are you familiar with the RIF and what that stands for?

2    A.    Yes.

3    Q.    Does that stand for reduction in force?

4    A.    It does.

5    Q.    Does that assist you in remembering how many people were

6    laid off in the reduction in force?

7    A.    If I go through the list, there are five that are

8    classified reduction in force, yes.

9    Q.    And isn't it true, sir, that there were 17 reductions in

10   force in Portland?

11   A.    Approximately, yes.

12   Q.    Isn't it true that, I believe, 14 of those that were laid

13   off from the Portland facility were hourly workers, not

14   salary?

15   A.    That looks about right.

16   Q.    Isn't it true that there were four persons reduced in

17   force from the Big Rapids facility?

18   A.    Yes.

19   Q.    Isn't it true, sir, that two people were rehired?

20   A.    Two people --

21   Q.    I'm sorry, rehired at the Fitchburg facility.

22   A.    At least that I can recall.

23   Q.    With those two rehires, that totals the 24 reductions in

24   force, correct?

25   A.    I can't say whether that's a gross number or a net number

09/13/2005 14:04 18785303703    ELLIOTT LAW OFFICE    PAGE 10/11
Case 4:04-cv-40092-FDS    Document 24-2    Filed 09/19/2005    Page 21 of 22

2-177

1    after the rehires by this document.

2    Q.    Well, I guess if we added five, seventeen and four,

3    that's twenty-six, correct?

4    A.    Uh-huh.

5    Q.    And minus two rehires, equals twenty-four, correct?

6    A.    Uh-huh.    That's domestic only, as you recall.

7    Q.    Yes.

8    A.    Does not include international reductions in force.

9    Q.    Now, you hired several executives in 2000, correct?

10   A.    Two in particular.

11   Q.    Well, you hired a Henry Botticello, correct?

12   A.    This is a replacement for the previous chief financial

13   officer.    That was just a direct replacement which, in the

14   course of business, is customary.

15   Q.    And his salary was $192,000 when you hired him, correct?

16   A.    Sounds about right, but, again, I don't recall the

17   specific number.

18   Q.    What did you pay the person who was there before him, if

19   you know?

20   A.    I don't know.

21   Q.    And you hired a Susan Caselli as vice president of

22   information technology, correct?

23   A.    That's correct.

24   Q.    And her salary was $138,000?

25   A.    That sounds about right.

2-178

1   Q.   And you hired a Paul Benoit?

2   A.   That's correct.

3   Q.   And he was vice president supply chain management?

4   A.   Correct.

5   Q.   And he garnered a salary of $135,000, isn't that correct?

6   A.   That sounds about right.

7   Q.   And you never saw these documents in which you claim

8   there was a disparate impact analysis done regarding the 2000

9   layoff?

10  A.   As I mentioned, not that I recall.  Typically, I'll only

11  see something by exception.

12          MS. ELLIOTT:  No further questions, your Honor.

13          THE COURT:  Any redirect?

14          MR. FELPER:  No, your Honor.

15          THE COURT:  Thank you, Mr. Martino.  You may step

16  down.  And now we will resume the plaintiff's case.  The

17  direct examination had been completed, correct?

18          MS. ELLIOTT:  Yes, your Honor.

19          THE COURT:  Then Mr. Jordan will be recalled for

20  cross-examination.

21          Just for your information, jurors, now we're through

22  with the insert.  That was defendant's case.  We're going back

23  to the plaintiff's case now.  And as you'll recall, Mr. Jordan

24  had direct examination completed, so he is now being made

25  available for cross-examination by defendant's lawyer.