# APPENDIX 11

## AFFIDAVIT OF JOHN JORDAN



I, John Jordan, hereby depose under oath as follows:

1.  I was employed by Simonds Industries, Inc. for seventeen (17) years. I resigned my employment effective September 2001.

2.  In 1999, I was the Plant Manager of the Fitchburg facility. In January of 2001, I was demoted to Product Group Manufacturing Manager by Ray Martino, President. I was 53 years old at the time.

3.  In October and November of 1999, my duties as Plant Manager required that I prepare an operating budget for the next year. Mr. Martino required that I cut my operating budget by eliminating Ron Larsen (age 61), Lou Alberghini (age 60), Jim Bourque (age 48), and Dick Souliere (age 59). Ron Owens, Vice President of Manufacturing, was present at the time Mr. Martino stated in words to the effect that they all had to go. All of these employees were over 40 years of age at the time and had significant years of service with the company. However, Tom Scozik (age 52), who had only five years with the company was retained in the facilities manager position. Mr. Alberghini's and Mr. Scozik's positions and skills overlapped, but Mr. Scozik was chosen to remain in that position. Although Mr. Souliere was on long-term disability and Mr. Bourque and Mr. Alberghini (demoted to project engineer) were able to obtain positions within the company, Mr. Alberghini was later terminated again in May of 2001. Just prior to that, Mr. Martino had recently hired Paul Benoit (age 51), Susan Caselli (age 46) and Henry Botticello (age 48), for Vice President positions within the company.

4.  In 1999 and 2000 and even up to mid-2001, the company was doing fine financially. It was not until I left after September 2001 that I had heard the company had some financial issue with repaying a bond. In fact, in April of 2001, the company was still making acquisitions of other companies.

5.  After my demotion, I began to be frozen out of the loop of communication with Mr. Martino. Chip Holm, who is 46 years old, and had been employed for only a few months as Vice President of Manufacturing, became my new supervisor. After six weeks in his position, Mr. Holm issued me a written warning after seventeen years of employment with a clean work record. I felt that he was trying to make a paper trail to terminate me and told him so. I resigned because I felt that I would be next on the termination list due to my demotion and the fact that I was no longer being involved in management decisions.

6.  Although I was not directly involved in a second set of lay offs in mid-2001, Steve Gruytch, who was 64 years old at the time, was also let go. This came after Mr. Gruytch had been demoted from a management position in service and sales to Senior Sales representative. In or about May 2001, I learned that Barry Brown (54), Lou Alberghini, Bill Baker (age 50), and Dave Manktelow (age 57) were also laid off.

7.  For the seventeen years of my employment, I was aware of Lou Alberghini's performance and at the time that I supervised him, I had no problem with his performance. He was very good at doing what needed to be done in production and was very flexible when asked to perform different tasks. Lou Alberghini was integral to manufacturing and production. In fact, he was on the Manufacturing staff and was a manager involved in labor negotiations, personnel decisions, employee reviews, preparation of budgets, capital expenditure proposals, labor-management disputes and other management responsibilities. He knew the products well and was involved in machine design, installations and trouble-shooting problems. In fact, he was responsible for knowing and understanding all of the product lines and the quality expected in those lines. I can think of no reason why Mr. Alberghini could not have performed any manager of engineering position or Product Engineer or Manufacturing Engineer position, which would be centered on one product line utilizing design techniques and his other specialized engineering knowledge to assist in producing a quality product. It is basically what he did for his 20 years of employment at the company.

Signed under the pains and penalties of perjury this 21 $^{st}$ day of June 2002.

_John Jordan_
John Jordan

COMMONWEALTH OF MASSACHUSETTS

_Worcester_ ,ss.                                 June 21, 2002

Subscribed and sworn before me by John Jordan.

_Ann M. Dias_
Notary Public Ann M. Dias
My Commission Expires: 3/4/05

# APPENDIX 12

3-1

1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
2

3

4     RONALD LARSEN,                    )
                    Plaintiff,          )
5                                       )
                                        )
6     vs.                               )     CA No. 01-40059
                                        )
7                                       )
      SIMONDS INDUSTRIES, INC.,         )
8                   Defendant.          )

9

10    BEFORE:  The Honorable Nathaniel M. Gorton

11

12                    DAY THREE OF JURY TRIAL

13

14

15         John Joseph Moakley United States Courthouse
                        Courtroom No. 4
16                     One Courthouse Way
                        Boston, MA 02210
17                   Wednesday, May 11, 2005
                          9:52 A.M.
18

19

20

                     Cheryl Dahlstrom, RPR, RMR
21                     Official Court Reporter
           John Joseph Moakley United States Courthouse
22               One Courthouse Way, Room 3209
                        Boston, MA 02210
23           Mechanical Steno - Transcript by Computer

24

25

1   your name for the record, spelling your last.

2          THE WITNESS:  Patricia A. Jearman.  That's spelled

3   J-E-A-R-M-A-N.

4   DIRECT EXAMINATION BY MS. ELLIOTT:

5   Q.   Miss Jearman, what is your age?

6   A.   My age is 39.

7   Q.   And where do you live?

8   A.   I live at 112 Saunders Street in Gardner, Massachusetts.

9          THE COURT:  You actually don't need to be that close

10  to the microphone.

11         THE WITNESS:  Okay.  Just want to make sure they can

12  hear me.

13  Q.   What is your -- what are you currently employed as?

14  A.   A human resources manager.

15  Q.   Where do you work at?

16  A.   I work at Spectro Coating Corp. in Leominster,

17  Massachusetts.

18  Q.   How long have you worked there?

19  A.   I've worked there since January 29th of 1996, so a little

20  over nine years.

21  Q.   And what are your duties at that company?

22  A.   A variety.  I could summarize it.  If you want me to go

23  into greater detail, let me know.  I do recruiting;

24  compensation; benefits, which requires a deal of benefit

25  administration for plans.  I do training; I do employee

1   Q.   During your employment at Simonds, were you ever involved

2   in any kind of a RIF analysis?

3   A.   Yes, I was.

4   Q.   Or reduction in force?

5   A.   I believe I was, yes, yes.

6   Q.   What was the nature of that?

7   A.   I was asked to provide, on two different occasions, some

8   information regarding some of the employees, their names and

9   their date of birth.

10   Q.   And was there any other information requested?

11   A.   No.  That was the only information that was requested.

12   Q.   And who requested that of you?

13   A.   That came from my supervisor, Ilda Thibodeau.

14   Q.   Did you do anything in response to that information being

15   requested of you?

16   A.   I questioned it.  I objected -- I objected to it.  I was

17   upset about it, having to do it.

18   Q.   Why did you object to that, giving that information?

19   A.   I was concerned because they were only asking me for two

20   pieces of information, someone's name and their date of birth.

21   And they asked me to do it from the oldest to the youngest.

22   And I questioned why they were only looking for that

23   particular information because I thought -- I couldn't

24   understand it, why they would only ask for those two pieces of

25   information.  I thought it -- I had to make an assumption.  I

 1   would assume that --

 2          MR. SIGEL:  Objection.

 3   A.    -- there was age discrimination involved.

 4          THE COURT:  You've answered the question.  There's no

 5   question before you.

 6   Q.    You can't assume.  And who did you bring this -- to whose

 7   attention did you bring this?

 8   A.    I brought it to my supervisor, Ilda Thibodeau.

 9   Q.    In response to your bringing that to her attention, what

10   did she do?

11   A.    I was asked to perform the analysis and to give it to

12   her.

13   Q.    In other words, you still had to do it, is that correct?

14   A.    Yeah, I had to do it.

15   Q.    Were you concerned about having to provide that

16   information?

17   A.    Yes, I was.

18   Q.    And why were you concerned about it?

19   A.    I thought that if I didn't do it and if I complained,

20   that I could potentially lose my job.

21   Q.    What, if anything, did you observe or notice about the

22   information that you provided?

23   A.    Based upon the analysis that I did, those individuals on

24   that particular data analysis, the data sort, they were let

25   go.  And when they were let go, they were replaced with other

1   younger employees.

2   Q.   Was there any doubt in your mind that this information

3   was being provided for -- in connection with a reduction in

4   force at the company?

5   A.   Yes, I do believe that that was the intent of it.

6   Q.   And it wasn't -- was it being provided for any other

7   reason that you're aware of?

8   A.   No, not that I'm aware of.

9         MS. ELLIOTT:  No further questions.

10        THE COURT:  Cross-examination.

11        MR. SIGEL:  Thank you, your Honor.

12        THE COURT:  Mr. Sigel.

13  CROSS-EXAMINATION BY MR. SIGEL:

14  Q.   Good morning, Miss Jearman.

15  A.   Good morning.

16  Q.   Miss Jearman, you were never involved in any analysis of

17  anything at Simonds, were you?  You were asked to compile

18  certain information, isn't that true?

19  A.   I was asked to compile information, which I believed to

20  be part of an analysis.

21  Q.   Okay.  But you never were involved in doing the analysis,

22  right?

23  A.   No.  That is absolutely correct.

24  Q.   And you were not subpoenaed to testify at this trial,

25  were you?  You're here on a purely voluntary basis, right?

# APPENDIX 13

COMMONWEALTH OF MASSACHUSETTS

COMMISSION AGAINST DISCRIMINATION

LOUIS P. ALBERGHINI,
      Charging Party,

V.

SIMONDS INDUSTRIES INC.
      Respondent.

DOCKET NO. 012310657

## AFFIDAVIT OF PATRICIA JEARMAN

I, Patricia Jearman, hereby depose under oath as follows:

1. I make this affidavit upon my personal knowledge.

2. I was formerly known as Patricia Dupuis.

3. I currently reside at 24 Joslin Road, Winchendon, MA  01475.

4. I am currently employed as a Human Resource Manager.

5. I was formerly employed at Simonds Industries Inc. from May 1, 1989 to January 27, 1996. I also worked there as a temporary employee in 1988 and until I was hired on May 1, 1989.

6. My position was that of Payroll/Benefits Clerk. My direct supervisor was Ilda Thibodeau.

7. I was aware of Simonds Industries Inc.'s policies and practices for reducing its workforce because of my position as Payroll/Benefits Clerk. During my employment, I was aware of the company's practice of reducing its workforce of older well-qualified employees and replacing them with newly hired younger, less qualified employees with no experience.

8. On two specific occasions, Ms. Thibodeau instructed me to sort the employees by age for the purpose of conducting reductions in force. This was done on computer spreadsheets prepared by me. On the first occasion, I prepared the spreadsheet on Lotus™ and on the second occasion, I prepared the spreadsheet on Excel™.

9.    The first time she asked me to sort the employees by age, I objected to it and told her that it constituted age discrimination. I asked her who the order came from that we were required to do it and she stated that "it came from the top." I felt that I had no choice, but to do as instructed by her. I was afraid of losing my job if I opposed it any further. I was very upset about having to prepare the spreadsheets.

Signed and sworn under the penalties of perjury this _11th_ day of April 2002.

_Patricia Jearman_
Patricia Jearman

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.

Subscribed and sworn to me this _11_ day of April 2002.

_Irene V Hales_
Notary Public
My Commission Expires:

IRENE V. HALES
Notary Public
Commonwealth of Massachusetts
My Commission Expires
September 12, 2008

# APPENDIX 14

**Simonds Industries, Inc**

**Headcount Report**

**Location: Fitchburg & Sales**

FITCH/BSALES

1:13 PM/8/21/01

| | | | Dec-00 | Jan-01 | Feb-01 | Mar-01 | Apr-01 | May-01 | Jun-01 | Jul-01 | Aug-00 | Sep-01 | Oct-01 | Nov-01 | Dec-01 | Jan-0 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Direct Hourly** | WK 2 | | | | | | | | | | | | | | | |
| **Indirect Hourly** | WK 4 & WK 1 | | | | | | | | | | | | | | | |
| **Direct Hourly PT or Temps** | | | | | | | | | | | | | | | | |
| **Indirect Hourly PT or Temps** | | | 55 | 53 | 51 | 49 | 49 | 41 | 41 | 42 | | | | | | |
| | | | 149 | 148 | 148 | 142 | 147 | 157 | 139 | 143 | | | | | | |
| **Purchasing & Planning** | | | | | | | | | | | | | | | | |
| | 1 Page, Jan | | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | | | | | | |
| | 2 Mundie, Norma 2V | | | | | | | | | | | | | | | |
| | 3 Mundie, Bob 31 | | | | | | | | | | | | | | | |
| | 4 Maybury/Dykis 57 | | | | | | | | | | | | | | | |
| | 5 Juske, Raymond | | | | | | | | | | | | | | | |
| **Mfg. Engineering** | | | | | | | | | | | | | | | | |
| | 1 Logan, William 19. | | 7 | 7 | 7 | 6 | 8 | 4 | 4 | 5 | | | | | | |
| | 2 Dexter, Jeremy 21 | | | | | | | | | | | | | | | |
| | 3 Breuif, Richard 44 | | | | | | | | | | | | | | | |
| mobring f | 4 Evanок, Ernest 65 | | | | | | | | | | | | | | | |
| | 5 Dupeny, Peter 24 | | | | | | | | | | | | | | | |
| | Salvatore Sandro N.H. Aug 55 | | | | | | | | | | | | | | | |
| sept | Albognhir, Collinger 61 | | | | | | | | | | | | | | | |
| | Flusher, Mulero/Celf auth | | | | | | | | | | | | | | | |
| **R & D** | | | | | | | | | | | | | | | | |
| **Plant Supervision** | | | | | | | | | | | | | | | | |
| | 1 Bourgois, David R | | 11 | 12 | 13 | 13 | 13 | 12 | 12 | 12 | | | | | | |
| | 2 Joyeux, John | | | | | | | | | | | | | | | |
| | 3 Schulz, Jeffrey | | | | | | | | | | | | | | | |
| | 4 Marien, Robert | | | | | | | | | | | | | | | |
| | 5 Bennett, Walter | | | | | | | | | | | | | | | |
| | 6 Edmonds, Karl | | | | | | | | | | | | | | | |
| | 7 Hagelberg, Donald | | | | | | | | | | | | | | | |
| | 8 Mansfield, Gary | | | | | | | | | | | | | | | |
| | 9 Szcok, Tom | | | | | | | | | | | | | | | |
| | 10 Thomas, Paul | | | | | | | | | | | | | | | |
| | 11 Meatley, Stephen | | | | | | | | | | | | | | | |
| | 12 Richards, Ronald | | | | | | | | | | | | | | | |
| | Delchrop, Todd seav Aurg | | | | | | | | | | | | | | | |
| | LTD | | | | | | | | | | | | | | | |
| R. Soullere | 1 Stewart, Dennis | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | | | | | | |
| **Fitchburg Plant Finance** | 1 Martin, Jeffrey | | 1 | 1 | 1 | 1 | 3 | 3 | 4 | | | | | | | |
| | 2 Howe, Rachel | | | | | | | | | | | | | | | |
| | 3 Breen, Marcia | | | | | | | | | | | | | | | |
| | 4 Bateman, William | | | | | | | | | | | | | | | |
| **Fitchburg Plant HR** | 1 Landies, Victoria | | 1 | 1 | 1 | 1 | 2 | 1 | 1 | 1 | | | | | | |

Keep    form

| 54 | Barnett | = Min 2 wks |
| 70 | Edmonds | 8 yrs = 3 wks |
| 54 | Hegelburg | |
| 58 | Marcin | |
| 61 | Mansfield | 42 yrs = 16 wks |
| 47 | Meatty | |
| 53 | Richards | |
| 55 | Schmitt | 22 yrs = 4 Months |
| 58 | Stewart | |
| 53 | Thomas | |
| 51 | Szorik | |

2 - PTA, Rela, Butr & Strokes  —  Thomas & Richards

3 - Metal Band       Marcin Meatty Hegelburg

1 - S/R             Stewart

1 - Maint           Szorik

7

# APPENDIX 15

Page 13

[1] 1,000, if I remember correctly, in
[2] producing their — I believe it was the Sensor
[3] line of razors, and they wanted us to
[4] dynamically model these linkages in order to
[5] determine when they would reach natural
[6] frequency and such.
[7] So we made a mathematical model of
[8] the linkages, put that into a program that had
[9] math CAD software and derived the equations of
[10] motion and force and whatnot. We also built a
[11] test fixture which, you know, simulated the
[12] motion of our mathematical model to compare it
[13] to, compare the two of them and see how close we
[14] were. We used LVDTs, accelerometers and other
[15] pressure transducers in order to check that.
[16] The end product, we actually were
[17] able to determine whether an air cylinder used
[18] as a closure spring for such systems was either
[19] idiomatic or isothermal, for which we got a
[20] paper written in the American Society of
[21] Mechanical Engineers.
[22] **Q:** Now, in what ways did that particular
[23] project use your mechanical engineering skills?
[24] **A:** It used several of my classes, such

Page 14

[1] as kinematics. We had to derive the equations
[2] of motion. Dynamics, we had to derive the
[3] equations of force inside the linkage. Dynamic
[4] modeling was one of the courses that I took,
[5] which was basically our whole project, as well
[6] as my mechanical engineering testing which tied
[7] into the accelerometers, LVDTs and pressure
[8] transducers.
[9] **Q:** Okay. Did the project involve the
[10] use of any other skills?
[11] **A:** Computer skills, in that we had to
[12] program the math CAD in order to calculate the
[13] equations of motion.
[14] **Q:** Okay. Were there any other skills
[15] besides computer and the mechanical engineering
[16] skills that you used in this project?
[17] **A:** Verbal skills. We did give a
[18] presentation. We also had to write a lengthy
[19] report, and in the end we wrote the paper for
[20] the American Society of Mechanical Engineers.
[21] **Q:** Okay. With regard to the project —
[22] projects that you talked of at the division of
[23] St. Gobain, in what ways did those projects, if
[24] any, utilize mechanical engineering skills?

Page 15

[1] **A:** Well, I had to use my — the class —
[2] what the hell is it? I'm trying to remember,
[3] it's been a while — design of machine elements,
[4] in order to select the bearings so that they
[5] could handle the load, as well as a few other
[6] classes to determine the amount of stock removal
[7] that the diamond wheel could remove at the rate
[8] that we wanted to remove it, a class to help me
[9] select the fasteners, select the motor, to make
[10] sure that it had the right horsepower in order
[11] to remove as much material as we needed.
[12] **Q:** Okay. Did the project involve any
[13] other skills, besides mechanical engineering
[14] skills?
[15] **A:** Some computer skills, because I
[16] modeled the entire machine in Solidworks, which
[17] is a three-dimensional solid modeling package.
[18] **Q:** Other than the computer and
[19] mechanical engineering skills that you
[20] described, did the project involve any other
[21] kinds of work skills?
[22] **A:** I did make a bill of materials for
[23] that, also, so —
[24] **Q:** I'm sorry, what kind of material?

Page 16

[1] **A:** A bill of materials, in order to
[2] present to my boss how much it would cost.
[3] **Q:** Other than those projects which
[4] you've mentioned, did you work on any other
[5] projects, or have any other employment during
[6] your five years at Worcester Polytech Institute,
[7] that used your mechanical engineering skills?
[8] **A:** I don't believe so.
[9] **Q:** Your resume lists that you have
[10] skills in CNC programming. Could you describe
[11] what that is?
[12] **A:** It means Computer Numeric Controls.
[13] You program the coordinate systems in certain
[14] amounts of lengths of motion over particular
[15] axes, in order to create a path with which the
[16] machine travels, be it the wire EDM or Normac,
[17] in order to create a certain shape.
[18] **Q:** Okay. And you also list as a skill
[19] on your resume MS Visual Basic 6.0. What is
[20] that?
[21] **A:** Microsoft Visual Basic is a language
[22] used to program — well, you can program just
[23] about any computer software. Most computer
[24] programs are — use Basic, or Microsoft Visual

Page 33

[1] the operators could use this in line, so that I
[2] didn't have to take samples of every single band
[3] that was made.
[4]   So I composed a set of work
[5] instructions, very simple instructions, step by
[6] step, with pictures, using Microsoft Word,
[7] absolutely step by step, so that anybody could
[8] use that Profilometer when I was done. It ended
[9] up being five pages, and it was ridiculous how
[10] dumbed-down I had to make it but — but they
[11] know how to use it now.
[12]   Q: Okay. So this was a written
[13] description of —
[14]   A: Yes.
[15]   Q: — what to do?
[16]   A: Yes.
[17]   Q: And who did you give this to?
[18]   A: I gave that to Rick Brault and Sal
[19] Santoro, and they presented it to the operators.
[20]   Q: Okay. So essentially it was for the
[21] operators, is that what you were preparing —
[22]   A: Yes.
[23]   Q: — this for? Yes?
[24]   A: Yes.

Page 34

[1]   Q: All right. And in composing these
[2] sorts of instructions, what sorts of work skills
[3] did that involve?
[4]   A: Mostly verbal. I had to be able to
[5] describe the operation, the instructions in a
[6] very clear, concise manner, as well as computer
[7] skills. I had to take digital photographs of
[8] every step and screen, screen captures, in order
[9] to show them the program used to use the
[10] Profilometer.
[11]   Q: To do that particular project, did
[12] you need to be a mechanical engineer?
[13]   A: No.
[14]   Q: Did anyone else assist you in that
[15] project?
[16]   A: No.
[17]   Q: And the last one says, "Composed work
[18] instructions." I assume these work instructions
[19] are different from the ones that you talked
[20] about just a minute ago?
[21]   A: For different machines.
[22]   Q: Okay. And how many compositions of
[23] work instructions did you do?
[24]   A: I believe there were seven of them.

Page 35

[1]   Q: And is that just for this particular
[2] project, seven of them?
[3]   A: Yes.
[4]   Q: And what line or machines were these
[5] work instructions relevant to?
[6]   A: That was — I believe that is the
[7] Line 39?
[8]   Q: Would you like to look at it?
[9]   A: Yes, please.
[10]   (Witness perusing document.)
[11]   A: Okay. That's for the Line 39.
[12] That's the Simonds welders that we have. We
[13] have six or seven different machines out there.
[14] This one is — actually it's not a Simonds, it's
[15] an Ideal machine, and all of them are different.
[16]   I had to take Digital photographs of
[17] each part of the machine, and you walk through
[18] the operation with the key man in the area in
[19] order to get a feel of, step by step, what
[20] needed to be done in order to set up the
[21] machine, operate it, and maintain it. It was
[22] similar to the work instructions for the T-500
[23] Profilometer.
[24]   Q: And did you need to be a mechanical

Page 36

[1] engineer in order to perform this particular
[2] project?
[3]   A: Probably not.
[4]   Q: Did anyone assist you on that
[5] project?
[6]   A: Just the operator, the key man in the
[7] area.
[8]   Q: And what product — I know you said
[9] it's Line 39. Was this different from the
[10] carbide line?
[11]   A: That encompasses all, all of the
[12] lines. That's where they weld the band saws
[13] together.
[14]   Q: When you say "it encompasses all of
[15] the lines," what —
[16]   A: Well, all of the band saw lines. Any
[17] band saw that passes through there that the
[18] customer orders in welded lengths, that has to
[19] go through Line 39.
[20]   Q: Okay. Now, did you do any other
[21] projects, other than what you listed here on
[22] your Accomplishments during that first year?
[23]   A: Yes, I did.
[24]   Q: Okay. What other ones did you do?

**Page 21**

[1] make sure that that's the one that you received?

[2]   (Witness perusing document.)

[3]   **A:** Yes.

[4]   **Q:** Okay. And page two of it, which says

[5] "Self-assessment," that was signed by you on

[6] 12/21/01. Is that the date that you received

[7] the performance review?

[8]   **A:** Yes.

[9]   **Q:** And the third page says "Employee

[10] Work Goals," and that's January 7th, '02. Is

[11] that the date that you received that part of it?

[12]   **A:** I don't recall.

[13]   **Q:** Okay. The Employee Work Goals, is

[14] that something that you produced or your manager

[15] produced?

[16]   **A:** Something that I produce.

[17]   **Q:** Okay. And the Self-assessment is

[18] something that you produce?

[19]   **A:** Yes.

[20]   **Q:** And the Manager Assessment is

[21] something that the manager produces?

[22]   **A:** Correct.

[23]   **Q:** The first page that says "Manager

[24] Assessment" is not signed. Do you recall, at

**Page 22**

[1] some point, whether Mr. Brault signed this?

[2]   **A:** I don't recall.

[3]   **Q:** But it is the one that he gave you?

[4]   **A:** Yes.

[5]   **Q:** And did he give you this in December

[6] of 2001, or some other time?

[7]   **A:** Some other time. I don't recall

[8] exactly when. The actual reviews weren't

[9] finished until three months after they were

[10] supposed to, so it would be March, because the

[11] bonuses and reviews were suspended by three

[12] months so —

[13]   **Q:** So that would be March of 2002?

[14]   **A:** I believe so.

[15]   **Q:** Okay. You indicate on your

[16] Self-assessment, it says here, "I feel that my

[17] biggest strength is the ability to glean

[18] knowledge from the operators and other engineers

[19] to use their experience to compensate for my

[20] inexperience." What "inexperience" were you

[21] referring to, when you made that statement?

[22]   **A:** Well, I had some formal training for

[23] CNC programming and whatnot, but I didn't know

[24] it as well as Jeremy. He showed me what he

**Page 23**

[1] knew, and I figured out the rest, and I'm faster

[2] at it than he is now.

[3]   Also, just in working, I didn't have

[4] the strength in working with the guys out on the

[5] shop floor that Rick and Jeremy had. We clashed

[6] at times, and they — they knew how to tiptoe

[7] around the Union workers, and I just didn't have

[8] that experience.

[9]   **Q:** Okay. You also note in the

[10] Development Needs Summary, you state, "Need

[11] additional training for PLC programming, Visual

[12] Basic, and other skills that will aid in my

[13] job." Let's take those one by one. What did

[14] you mean that you "need additional training in

[15] the PLC programming?"

[16]   **A:** We have — when they put the line in

[17] from Corona, the Steel Rule line, 80 percent of

[18] those machines use programmable logic circuits,

[19] the PLCs. They're all Allen Bradley's, and

[20] while I received some latter logic training in

[21] school, I hadn't used the Rockwell. It's

[22] Rockwell Technologies RS Link Software, the

[23] training used on the Allen Bradley's. I never

[24] received any formal training, still, but I've

**Page 24**

[1] played with the program and I figured it out

[2] myself. I picked up a manual and learned how to

[3] use it myself.

[4]   **Q:** Okay. Now, the PLC programming, I

[5] think you sort of defined it, but could you just

[6] describe what that is, specifically?

[7]   **A:** PLC programming — uses latter

[8] logic. It's a type of — well, a PLC is a

[9] device used in a piece of automated machinery,

[10] in order to signal linear actuators or other

[11] motion devices to make certain movements. It

[12] takes inputs from different sensors or switches

[13] that are used by the operators and, essentially,

[14] it's used to automate a piece of machinery.

[15]   **Q:** Okay. There's some electrical

[16] components to that —

[17]   **A:** Yes.

[18]   **Q:** — particular type of program; isn't

[19] that right?

[20]   **A:** Yes.

[21]   **Q:** Okay. And could you describe what

[22] the electrical components are of that kind of

[23] programming?

[24]   **A:** Well, the programming doesn't have so

Page 61

[1]  **A:** Yes, that's correct.

[2]  **Q:** What other skills do the projects

[3]  that you work on, and have worked on, require

[4]  you to use?

[5]  **MR. SIGEL:** I'm sorry, could I get

[6]  that question again?

[7]  **MS. ELLIOTT:** What projects that he

[8]  has currently been working on, and projects that

[9]  you did work on since you've been employed at

[10]  Simonds, require you to use? What skills?

[11]  **A:** I'm sorry, that's kind of —

[12]  **Q:** What skills did the projects that you

[13]  have been working on at Simonds currently, and

[14]  the ones that you worked on previously, the

[15]  entire time that you've been employed, what

[16]  skills do those projects require you to use?

[17]  **A:** A vast amount of computer skills,

[18]  verbal skills, oral skills, lots of mechanical

[19]  engineering skills.

[20]  Right now I'm designing a test

[21]  fixture to determine the force needed to remove

[22]  a piece of carbide from the carbide tip band saw

[23]  blade. This uses force transducers, and I had

[24]  to calculate the shear stress needed to remove

Page 62

[1]  the carbide, in order to derive the amount of

[2]  forces necessary for each band saw blade size.

[3]  It also requires a knowledge of machine design,

[4]  because I — the whole test fixture is using

[5]  machine components.

[6]  You know, there's computer skills,

[7]  some CNC programming I do on a regular basis.

[8]  It's a broad range, but a lot of it does have to

[9]  do with mechanical engineering.

[10]  **Q:** Okay. And other skills as well?

[11]  **A:** Yes.

[12]  **Q:** Actually, I do have a couple more

[13]  questions for you. Have you been made any

[14]  promises regarding your testimony here today, by

[15]  anybody from Simonds Industries?

[16]  **A:** No, I was not.

[17]  **Q:** And have you been threatened in any

[18]  way by anyone from Simonds Industries —

[19]  **A:** No, I haven't.

[20]  **Q:** — regarding your testimony today?

[21]  **A:** No, I have not.

[22]  **MS. ELLIOTT:** Okay. I don't have any

[23]  other questions.

[24]  (Whereupon, at 3:45 p.m.,

[24]  the deposition ended.)

Page 63

[1]  I have read the foregoing, and it is a

[2]  true transcript of the testimony given by me at

[3]  the taking of the subject deposition.

[4]

[5]

[6]

[7]

[8]

[9]

[10]                    **PETER DUPERRY**

[11]

[12]

[13]

[14]

[15]

[16]                         **DATE**

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

Page 64

[1]            ERRATA SHEET

[2]        I WISH TO MAKE THE FOLLOWING CHANGES

[3]  IN THE FOREGOING TRANSCRIPT OF MY DEPOSITION:

[4]

[5]  PAGE  LINE  CHANGE        REASON

[6]

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]  DATE: _____  _____

[23]            PETER DUPERRY

[24]

Page 49

[1] current ones. We use SPC charting in a few of
[2] the areas, such as ball welding, carbide ball
[3] welding. The operator takes — records data,
[4] and we use that data to make sure that we have
[5] consistent quality in the — coming from the
[6] machines —
[7]   **Q:** Okay.
[8]   **A:** — and I work with him to make sure
[9] that those measurement systems are working
[10] correctly.
[11]   **Q:** And with regard to that and the
[12] second item that we discussed under "Essential
[13] Duties and Responsibilities," do you need to be
[14] a mechanical engineer to perform those jobs,
[15] those duties?
[16]   **A:** You certainly need the mathematical
[17] skills and statistical knowledge in order to
[18] perform those duties.
[19]   **Q:** All right. And are mechanical
[20] engineers the only ones that would have those
[21] statistical —
[22]   **A:** No.
[23]   **Q:** — abilities?
[24]   **A:** No, they're not.

Page 50

[1]   **Q:** Or the math abilities?
[2]   **A:** No.
[3]   **Q:** Okay. "Work closely with
[4] manufacturing line unit managers to solve
[5] process issues relating to methods, machines or
[6] material within the assigned product line."
[7] Have you done that?
[8]   **A:** Could you repeat that?
[9]   **Q:** Sure. "Work closely with
[10] manufacturing line unit managers to solve
[11] process issues relating to methods, machines or
[12] material within the assigned product line."
[13] Have you done that?
[14]   **A:** Well, I've never heard of a "line
[15] unit manager." I don't think that position
[16] exists any more.
[17]   **Q:** Okay. Have you solved problems
[18] relating —
[19]   **A:** Yes, I have.
[20]   **Q:** — to machines?
[21]   **A:** I do that on a regular basis,
[22] troubleshooting, either modifying the current
[23] machinery or designing new machinery to improve
[24] the process.

Page 51

[1]   **Q:** The next one says, "Advise
[2] manufacturing line unit managers," and I know
[3] you say that position does not exist, "regarding
[4] operator-based process issues." Do you advise
[5] operators based on — about process issues?
[6]   **A:** Well, I advise the foremen on
[7] instances where I think that the operators are
[8] causing bad quality or — and whatnot. We have
[9] had many instances where lazy operators haven't
[10] checked the material at the proper rate and
[11] whatnot, and I've advised — I advise the
[12] foremen to make sure that they keep an eye on
[13] the operators.
[14]   **Q:** So you have foremen that you work
[15] with?
[16]   **A:** Yeah. I assume that that's what they
[17] mean by the "line unit managers."
[18]   **Q:** And who do those foremen manage?
[19]   **A:** They manage the operators themselves.
[20]   **Q:** The next one says, "Work closely with
[21] the product manager and marketing group
[22] regarding product issues related to the
[23] manufacturing process of assigned product line."
[24] Do you do that?

Page 52

[1]   **A:** Well, I'm not sure what they mean by
[2] "product manager," but I do work with marketing
[3] and the product planner to find out, you know,
[4] if the customer has any complaints regarding
[5] quality, or if they want changes made to the
[6] design of the actual product.
[7]   **Q:** Okay. You don't know of any person
[8] who has the title "product manager?"
[9]   **A:** I'm not familiar with that, no.
[10]   **Q:** The next one says, "Document and
[11] improve any material or method deviations, both
[12] permanent or temporary, for assigned product
[13] line." Do you do that?
[14]   **A:** Could you repeat that?
[15]   **Q:** "Document and approve any material or
[16] method deviations, both permanent or temporary,
[17] for assigned product line."
[18]   **A:** Yes. The grinding wheels that we
[19] use, I had to approve that those were better
[20] than what we were using before, and I had to set
[21] that up on a reorder system. We've also
[22] approved the different grades of carbide and
[23] different materials for the carbide line.
[24]   **Q:** Okay. Of these last four things that

**Page 41**

[1] to become an internal auditor.

[2] **Q:** Okay. And is that "a few months

[3] ago," since you've been employed —

[4]    **A:** Yes.

[5] **Q:** — at Simonds?

[6]    **A:** Yes.

[7] **Q:** And did the company pay for that

[8] training?

[9]    **A:** Yes, they did.

[10] **Q:** And that's additional training that

[11] you had, other than what you told me about

[12] previously? You had forgotten about it; is that

[13] right?

[14]    **A:** Yes. I did work, to some degree,

[15] with ISO 9,001 at my internship at St. Gobain.

[16] **Q:** Okay. Does any of the manufacturing

[17] processes at Simonds Industries require, or use,

[18] any sort of quality control systems that are

[19] automotive-industry based?

[20]    **A:** I'm not familiar with the automotive

[21] industry, so I can't answer that.

[22] **Q:** Did anybody ever give you, at

[23] Simonds, a manual or anything that came from the

[24] automotive industry to study, concerning quality

**Page 42**

[1] control?

[2]    **A:** I believe Chip Holm has shown me some

[3] SPC charting that is used by Ford Company, I

[4] believe.

[5] **Q:** And have you ever referred to that

[6] manual in your work?

[7]    **A:** No.

[8] **Q:** I may have asked you this, but your

[9] job title is still product engineer; is that

[10] right?

[11]    **A:** Yes, it is.

[12] **Q:** To your knowledge, did you take over

[13] any projects that had previously been performed

[14] by Lou Alberghini?

[15]    **A:** Yes.

[16] **Q:** Okay. And what projects were those?

[17]    **A:** The — just one, it was the carbide

[18] product data sheets.

[19] **Q:** And would that have been a project

[20] that you performed as well? Is that not listed

[21] on your Accomplishments?

[22]    **A:** No, it's not.

[23] **Q:** Okay. And what did that involve?

[24]    **A:** It involved drafting the dimensions

**Page 43**

[1] of grinding operations, giving details of the

[2] specifications of the geometry of the triple

[3] chip and other carbide band saws.

[4]    **Q:** Okay. And was some of that project

[5] completed when you took the project over?

[6]    **A:** Some of it, yes.

[7] **Q:** Approximately what percentage of it

[8] was completed?

[9]    **A:** I couldn't say.

[10] **Q:** Okay. Less than a third of it, or

[11] more than a third of it?

[12]    **A:** I don't know, because we've added a

[13] lot of new products to the line.

[14] **Q:** Okay. Is it kind of an ongoing

[15] thing?

[16]    **A:** Yes, it is.

[17] **Q:** Okay. And does that particular

[18] product involve or use mechanical engineering

[19] skills?

[20]    **A:** That uses more drafting skills.

[21]    **Q:** Drafting skills?

[22]    **A:** Yes.

[23]    **Q:** Is drafting something that mechanical

[24] engineers do?

**Page 44**

[1]    **A:** Yes.

[2] **Q:** Any other projects that you know of,

[3] that you're aware of, that used to be a project

[4] that Mr. Alberghini had worked on?

[5]    **A:** (Witness shakes head negatively.)

[6] No.

[7] **Q:** Have you had any conversations with

[8] anyone, other than Mr. Sigel, concerning this

[9] case or your testimony today?

[10]    **A:** No.

[11] **Q:** Did you have any discussions with

[12] Jeremy Dexter?

[13]    **A:** Nothing really in particular, no.

[14] **Q:** Okay. Did you discuss something with

[15] him?

[16]    **A:** He said, "Good luck." We didn't

[17] really talk about it.

[18] **Q:** Okay. And did you have any

[19] discussions with Mr. Brault, relative to your

[20] testimony today?

[21]    **A:** (Witness shakes head negatively.)

[22]    **MR. SIGEL:** You have to answer

[23] verbally.

[24] **Q:** I'm sorry?

# APPENDIX 16



SIMONDS INDUSTRIES INC.
135 Intervale Road
P.O. Box 500
Fitchburg, MA 01420
978-343-3731 x207
978-343-3489 (fax)

David P. Witman
General Counsel
dwitman@simonds.cc

February 28, 2002

Ms. Angela Robertson
Investigator
Massachusetts Commission Against Discrimination
436 Dwight Street, Room 220
Springfield, MA 01103-1317

Re:    Louis P. Alberghini (the "Complainant")
       Simonds Industries Inc. (the "Respondent")
       MCAD Charge No. 01SEM10657
       EEOC Charge No. 16CA200719

Dear Ms. Robertson:

I am General Counsel to Simonds Industries Inc. [the "Respondent"] in the captioned matter. Please consider this letter as the Respondent's Statement of Position as required by 804 CMR 1.03 (7). The Respondent is subject to Federal reporting requirements, and attached hereto as EXHIBIT A is a copy of the Respondent's current EEO-1 for its Fitchburg, Massachusetts facility - the venue where the Complainant formerly worked. Please be advised that the Respondent is not interested in discussing monetary settlement of this claim which it considers wholly without merit.

The Respondent denies emphatically any violation of M.G.L. 151B or the Age Discrimination in Employment Act of 1964, as amended, (the "ADEA"), and Respondent answers Complainant's PARTICULARS as follows:

1.    The Respondent agrees with the statements set forth in Paragraph 1 of the Charge. In addition, the Respondent states that in January of 2000, the Complainant was laid off as part of the first wave of a Reduction in Force; however, Complainant was asked to return to work within the following month because it quickly became apparent that the timing of Complainant's first RIF resulted in inadequate staffing for continuing projects at the time. Had Respondent intended to terminate Complainant's employment because of age, Respondent would not have re-employed Complainant in February of 2000. Due to continuously deteriorating business conditions, and reduced sales, additional terminations under the ongoing RIF were required after 2000, and

Complainant's employment was again terminated in May of 2001 after more than a year of continuous employment between the two RIF termination dates. The continuing recession is still requiring additional RIF terminations.

Enclosed with this Position Statement, please find a copy of the complete personnel file of Complainant, marked EXHIBIT 1.0.

2.    Respondent agrees with the statements set forth in Paragraph 2 of the Charge.

3.    Respondent agrees that Complainant performed his job duties satisfactorily as a general rule. Copies of Complainant's performance reviews are included in EXHIBIT 1.0 and speak for themselves. Respondent agrees that Complainant did not receive any disciplinary actions while employed with Respondent.

4.    Respondent last terminated Complainant's employment on May 31, 2001 as part of a Simonds-Group-wide reduction in force (hereinafter, the "RIF") begun the end of 1999 and continuing to this date. To date, this RIF has resulted in the loss of more than two hundred (200) jobs (about one in every four jobs) in the Simonds group. There will continue to be jobs lost in connection with the ongoing RIF.

5.    Respondent did not terminate Complainant's employment on the basis of age. Rather, Respondent was faced with the unenviable task of stripping down all operating departments, including engineering, to the lowest levels possible while still retaining the most essential functions. As part of the restructuring to accommodate the RIF, the engineering department, indeed the entire salaried manufacturing sector, was reorganized from the structure shown on EXHIBIT 5.0(A) to that of EXHIBIT 5.0(B) as of the present time. Interim organizational charts appear between the two EXHIBITS 5.0. It should be noted that a formerly fragmented product-line-oriented engineering function has given way to a new facility oriented organization for the engineering function. It should be noted additionally the significant reduction in salaried manufacturing personnel (including engineering) over the course of the past few years, as made possible by the reorganization of this sector from product line to facility based. This new orientation came about when a new Vice President of Manufacturing, Mr. Harold Holm (age 46), took over manufacturing operations.

Complainant's last job title was Project Engineer. A copy of the Project Engineer job description is attached as EXHIBIT 5.1. The major functions of a Project Engineer were to perform specifically assigned engineering projects relating to manufacturing processes and plant maintenance. A Project Engineer did not generally perform product-related engineering as an ongoing responsibility; however, Complainant did update product prints as part of his responsibility, based on information coming back to him from the factory. Quite soon after Complainant was laid off, the former head of the engineering department, Raymond Edson (age 59), Director of Manufacturing Engineering, announced that he was retiring and going into selling real estate. Additionally, at about the same time, an Engineering Manager, Steve Niemi, (age 32)

announced his resignation to take a position with another company. Thus, after the RIF reductions, as well as the Edson and Niemi resignations, the engineering department quickly found itself once again with inadequate staffing. There was discussion at the time to ask Complainant to return; however, an assessment was done as to the specific needs of a very lean and redirected engineering department, and it was decided that the need on the product engineering side (eg., metallurgy, product development and quality, and machine design) greatly outweighed the need on the manufacturing/maintenance ad hoc project side. Complainant's experience and skills lay with manufacturing/maintenance, ad hoc general projects and electrical engineering, not with product engineering, machine design or metallurgy. Thus, Respondent subsequently hired two Product Engineers to replace Messrs. Edson and Niemi, not to replace Complainant. In response to that need, the Respondent hired Mr. Salvatore Santoro (age 55, dob 8/29/46) and Mr. Peter Duperry (age 23, dob 2/23/78). A copy of the job description for Product Engineer is attached as EXHIBIT 5.2. Neither of these two new engineers performed any project by project engineering services relating to general manufacturing or maintenance, as did Complainant. The kinds of projects formerly undertaken by Complainant are no longer undertaken as specific and integrated engineering projects, but have become non-engineering tasks performed generally by the manufacturing sector.

6.  Respondent does not understand Complainant's statements in Paragraph 6 of the Charge. Richard Brault (age 49, dob 9/2/52) is and was an Engineering Manager. Complainant was never a manager of any engineering personnel or functions; even though Complainant did manage maintenance personnel and functions. A copy of Mr. Brault's job description is attached as EXHIBIT 6.0(A). Jeremy Dexter (age 24, dob 9/23/77) is and was a Manufacturing Engineer as well as holding a degree specifically in metallurgy. Complainant does not have metallurgical expertise. A copy of Mr. Dexter's job description is attached as EXHIBIT 6.0(B).

7.  The RIF did not affect a disproportionate number of older workers over ages fifty (50) or sixty (60). See, statistical analysis hereinafter comparing the average age Respondent's employee population to the average age of the employee population eliminated in connection with the RIF. As can be seen from the statistical analysis, as of the end of 2001, the active domestic employee population of Respondent (i) between 40 and 50 years of age was 171/525 – 33%; (ii) between 50 and 60 years of age was 187/525 – 36%; and (iii) over 60 years of age was 43/525 – 8%. This demonstrates that 77% of Respondent's active domestic population is within the protected age classification of more than forty (40) years of age. The average age of Respondent's active domestic employee population at the end of 2001 was 46.66 years of age. The average age of those employees whose employment ended in 2001 was 43.62.

8.  Respondent admits that its policy requires that severance payments cease when a former employee files a claim for unemployment compensation. Respondent is unaware that this kind of provision violates any applicable law, ordinance or regulation. Typically, terminated employees collect their severance and then file for unemployment benefits at the end of the severance period.

9.    The Release referenced by Complainant was not intended to act as a release of any claims relating to unlawful age discrimination and will not be interposed by the Respondent as a bar to any such claim. Complainant did not receive a list of other employees terminated in the RIF because he was not being asked to release any age discrimination related claims. The "so-called" reduction in force eliminated approximately one out of every four jobs world-wide in the Company. Respondent believes that these numbers suggest that this was not a "so-called" RIF; rather, this RIF is required because of dramatically deteriorating economic conditions in our industry, a serious threat to the continued existence and viability of the Company.

10.    Respondent did not hire anyone to replace Respondent and no longer employs anyone as a Project Engineer with general manufacturing and maintenance project responsibility. Respondent's now lean engineering department has been refocused on product development and quality, metallurgy and machine design. Complainant's experience and expertise do not lie in these areas. Many of the functions performed by Complainant are no longer classified as engineering and are performed, when needed, by non-engineers in the manufacturing/maintenance sector.

It should be pointed out that the job description of "Project Engineer" had not been used since the 1980's. It was resurrected in 2000 to accommodate two individuals in an engineering department which was not well defined at the time, but which appeared to need two additional personnel. First, Complainant was asked to return to work after a month of lay-off to handle some identified projects. Second, Jeremy Dexter had come off his internship and was available for a full time position. It was important to retain Mr. Dexter because of his metallurgical qualifications and degree. Complainant and Mr. Dexter were hired into this "new" job description which was intended as a kind of engineering reserve to handle engineering "projects" when they arose. Mr. Dexter is no longer a generalist, "project engineer" since he is now focusing on his duties as a metallurgist.

11.    Respondent denies that Complainant's age was a factor in the decision to eliminate the Project Engineer position and, thus, terminate Complainant's employment. Respondent denies that it violated the Older Workers Benefit Protection Act. The "waiver of claims" form referred to by Complainant was not designed, nor intended, to act as a waiver of any claims of unlawful discrimination, and Respondent does not intend to offer Complainant's signature on this document as a defense to the instant Charge of Discrimination. The "waiver of claims" is designed, and intended, solely to require a full disclosure by an exiting employee of all general employment claims as of the employment termination date, and to act as a bar against any future undisclosed general employment claims. The policy does require execution of all exit documentation as a condition precedent to an exiting employee's right to policy severance.

Respondent is presently negotiating an agreement with Ernest Evancic (Age 65, dob 1/12/37), our Chief Metallurgist in the engineering department. Mr. Evancic recently indicated his intention to retire to Maine. We have asked him to remain an employee because of his invaluable experience and expertise in engineering, particularly metallurgy. Mr. Evancic has agreed in principle to remain an employee for two more years in exchange for certain extended benefits which Respondent is willing to provide. The Evancic situation demonstrates clearly that the Respondent has no interest in culling out older workers simply because they are older workers, particularly in the engineering department. To the contrary, Respondent is willing to make significant benefits concessions to have older workers remain employees when their expertise and experience are of great value to the Respondent. The difference here is that functions supported by Mr. Evancic's skills are essential to the Respondent; unfortunately, Complainant's functions were expendable.

12.    Respondent denies the statements made by Complainant in Paragraph 12 of the Charge.

## REDUCTION IN FORCE STATISTICS

To date, since the calendar year 2000, just under three hundred (300) domestic employees lost their jobs as the result of position elimination (RIF), normal retirement, disability, resignation or termination for cause or business reasons. In connection with this reduction, approximately two hundred (200) domestic positions were eliminated, some by reduction in force and some by natural attrition, at seven (7) facilities in the United States. Enclosed as EXHIBIT 7.0 with this Position Statement is a complete listing of all employees terminated in the United States (including the Reduction in Force since calendar year 2000 to the date hereof, showing the names, positions, age and type of termination for each.

For the proper evaluation of the distribution of ages of those employees whose positions were terminated, it is necessary to consider the average age of the entire workforce at Respondent's seven (7) United States facilities. Enclosed as EXHIBIT S.1 with this Position Statement is a complete listing of all employees at the beginning of January, 2000, and a similar listing as of the end of 2001, both showing ages and employment status: active (A) or terminated (T). Note that the average age of domestic employees at the end of 2001 is 46.66 years of age. In addition, since many management positions were eliminated, it is remarkable that the average total population age remains older than the average RIF population age. Notwithstanding what could have been this natural slant toward older employee terminations, the average age of all terminated employees in 2001 was 43.62, more than three (3) years younger than the entire domestic employee population at the end of 2001. Thus, there can be no cogent argument that the RIF has had a disproportionate impact on older workers.

SEE, *infra*, description of the Reduction in Force for a more detailed understanding of the nature, scope and reasons for the Reduction in Force, of which Complainant's termination was a part.

## SUPPLEMENTAL STATEMENTS OF FACT

A.    Reduction in Force.

Beginning in the last quarter of 1999, it was determined that the Company employed many more people than was the published standard for manufacturing companies of comparable size. An analysis was done into all sectors of the Company, including manufacturing, in an effort to make operations more efficient, increase productivity and reduce costs. The conclusion of the analysis at that time was that many positions needed to be eliminated world-wide at an annualized cost savings of more than one million and a half dollars without decreasing productivity and with an increase in efficiency. Redundant positions within the Company were identified without regard to any qualifications other than the redundancy of the positions themselves. A list was compiled, matching the potentially redundant positions with the employees then holding those positions, showing the age, tenure of employment, job position and salary of each identified employee. The list, and the objectives of the reduction in force, were then given to Human Resources and Legal for evaluation in order to ensure that the reduction in force not disproportionately affect adversely any constitutionally suspect class. Executive management then cooperated with Human Resources and Legal to modify the list and produce a final list of the positions which would be eliminated. The Company is, in fact, on schedule to achieve the targeted cost reductions and improved efficiencies planned in connection with the Reduction in Force.

In point of fact, there have been additional eliminations since 2000, as described above, and there are still eliminations to be accomplished, both domestically and abroad because of the manufacturing recession which has hit Respondent's industry very hard. For example, entire manufacturing facilities in the United Kingdom and in California have been closed completely, eliminating nearly all jobs in those locations. There are still future plans to close, or greatly diminish, other complete plants.

The economic conditions which generated the RIF are indisputable and quite simple. Net sales for Respondent in 1999 were $127.5MM, in 2000 were $125.9MM, and in 2001 were $107.1MM. As a result of decreasing sales in a manufacturing recession, the Respondent has defaulted on its $5MM semi-annual interest payment for its $100MM public bond issue. Respondent had to cut costs significantly in order to compensate for lost sales and in order to survive. Management devised a plan for permanent annual cost reductions of $10MM. Over $1.5MM of this plan needed to come from elimination of jobs. Complainant's job was eliminated as part of the required RIF.

# CONCLUSION

The Reduction in Force has not been unthinkingly thrown together; nor is it a mass illusion to disguise unlawful discrimination against any individual or group, as Complainant suggests. Rather, it is being done only after careful analysis of industry standards for employment and planning for increased workforce training, competency, efficiency, productivity, job redundancy and cost savings in a severe manufacturing recession. Human Resources and Legal participated early in the process of identifying positions to be eliminated to ensure that there not be disproportionate adverse impact on any protected class. All eliminated positions were truly eliminated, and most of the functions associated with them are no longer performed within the Company. The Respondent's viability as an on-going business concern depended, and continues to depend, on cost reductions like the RIF. A project as massive and challenging as this RIF could hardly have been undertaken, as Complainant's attorney suggests, simply as a ruse to eliminate older workers from the workforce. All terminated employees were given standard exit interviews and given the same treatment, including standard, published policy severance and the offer of outplacement services. As many terminated employees as possible (including several in the protected age class) were interviewed for open positions as these became available after the reduction in force. (Even Complainant was re-hired for more than a year after his first RIF until further reductions were required by the need to further reduce costs.)

Complainant was a valued, long-time employee of Respondent and is well respected and thought of by all who worked with him. Had Respondent wanted to terminate Complainant because of his age, Respondent would not have rehired Complainant for an additional year after the first round of RIF in 2000. If Respondent were interested in getting rid of older workers, it would not have offered Mr. Evancic concessions to stay on. Complainant's position and experience as an electrical engineer and project engineer, performing ad hoc specific assignments, was a luxury for Respondent which could no longer be afforded in the current manufacturing recession. The focus of a reduced and streamlined engineering department had to be product development and quality, machine design and metallurgy. Complainant, quite frankly, does not fit into these areas.

The unfortunate reality of a manufacturing recession this extensive is that even those who perform their jobs satisfactorily, and are liked and respected by their co-workers, are not protected from economic downsizing. It was a difficult decision to terminate Complainant's employment, and to suggest that it was made because of his age simply ignores the unfortunate but real facts.

Complainant does not allege any specific facts suggesting that he specifically was terminated because of his age. His assertion that the RIF affected disproportionately

older employees in the age-protected class is factually disproven by the statistics and analyses attached to this Position Statement. Complainant's assertion that he was "replaced" by younger workers is disproven by the huge gap in qualifications between Complainant and two employees hired in the engineering department subsequent to Complainant's lay-off, and by the fact that the kinds of duties formerly performed by a "Project Engineer" like Complainant, are no longer the responsibility of the engineering department at all and are now handled by general manufacturing personnel on a non-project basis.

Sincerely,

David P. Witman
General Counsel

Attested:

Henry Botticello
CFO
Dated: February 28, 2002

cc:    Ms. Marcia L. Elliott, Esq.
       Mr. Jonathan Sigel, Esq.

*Notarization*
■■■■■■■■
*Commonwealth of Massachusetts*
*Worcester, ss*

        *Then personally appeared before me the above-signed David P. Witman, known to me, and stated under oath that the foregoing instrument/document signed by him is signed by him of his own free will and is his duly executed act in his capacity as General Counsel to Simonds Industries Inc.*

*Name: Rachel Howe*
*Notary Public*
*My Commission Expires: 6/15/07*