# APPENDIX 20

**SIMONDS**

SIMONDS INDUSTRIES INC.
Intervale Road
P.O. Box 500
Fitchburg, MA 01420
Tel. (978) 343-3731
Fax (978) 343-3489

September 6, 2000

Ms. Angela Robertson
Investigator
Massachusetts Commission Against Discrimination
436 Dwight Street
Springfield, MA  01103-1317

Re:    Ronald Larsen (the "Complainant")
       Simonds Industries Inc. (the "Respondent")
       MCAD Charge No. 00230397
       EEOC Charge No. (unknown)

Dear Ms. Robertson:

        This office represents Simonds Industries Inc. [the "Respondent"] in the captioned
matter.  Please consider this letter as the Respondent's Statement of Position as required by 804
CMR 1.03 (7).  The Respondent is subject to Federal reporting requirements, and attached hereto
as EXHIBIT A is a copy of the Respondent's current EEO-1 for its Fitchburg, Massachusetts
facility - the venue where Ronald Larsen [the "Complainant"] formerly worked.  Please be
advised that the Respondent is not interested in discussing monetary settlement of this claim
which it considers wholly without merit.

        The Respondent denies emphatically any violation of M.G.L. 151B or the Age
Discrimination in Employment Act of 1964, as amended, (the "ADEA"), and Respondent answers
Complainant's PARTICULARS as follows:

        1.    Simonds Industries Inc. was never known as "Wallace Murray" or "Household
International."  In April of 1988, Simonds Industries Inc. was incorporated in the State of Delaware
and purchased the assets of the Simonds Cutting Tools Division of Household Manufacturing, Inc.,
a wholly owned subsidiary of Household International, Inc.  Respondent denies that it is a legal
successor to either Wallace Murray Corporation, Household International Inc. or Household
Manufacturing Inc.  Accordingly, Complainant became an employee of Simonds Industries Inc. on
or about April 15, 1988.

        At the time of the termination of Complainant's employment, Complainant's job
title was not "General Foreman of the Metal Group;" rather, it was Plant Operations Manager,
serving in fact as "Manufacturing Manager, Metal Group."  Respondent agrees that Complainant
held other middle management and manufacturing positions over the years, with Respondent, and
prior to that with Wallace Murray Corporation and Household Manufacturing Inc., former owners



of the assets and business now owned by Simonds Industries Inc. Enclosed with this Position Statement, please find a copy of the complete personnel file of Complainant, marked EXHIBIT 1.0.

2.      Respondent agrees that Complainant is sixty-one (61) years of age and was born on November 8, 1938.

3.      Respondent denies all the allegations of Complainant's paragraph 3. On January 7, 2000, Complainant entered unannounced into Mr. Jordan's (age 53, dob 7/30/47) office to inquire about his having heard of another employee being let go by Simonds and to ask Mr. Jordan if he (Complainant) were going to be involved in the reduction in force. Mr. Jordan informed Complainant that he did not wish to speak with him alone on the matter and that Ilda Thibodeau (age 49, dob 3/16/51), Manager of Compensation and Benefits, would be joining them to discuss the matter in complete detail. Prior to their being joined by Ms. Thibodeau, Mr. Jordan made no comments to Complainant about the status of Complainant's employment, any changes which were forthcoming, nor the reasons for any such changes.

4.      On January 7, 2000, Ms. Thibodeau and Mr. Jordan did meet with Complainant in a conference room near Mr. Jordan's office. Enclosed as EXHIBIT 4.0 with this Position Statement, please find a copy of a Memorandum to File prepared by Ms. Thibodeau immediately subsequent to the meeting with Complainant and others on January 7, 2000. Enclosed as EXHIBIT 4.1 with this Position Statement, please find a memorandum written on the date indicated by Mr. Jordan describing his recollection of Complainant's exit interview. Mr. Jordan and Ms. Thibodeau have identical recollections of the interview. Complainant was not instructed by anyone to sign anything; rather, Ms. Thibodeau conducted a routine exit interview and provided Complainant with all the forms routinely provided to terminating employees at their exit interviews. Ms. Thibodeau specifically told Complainant that he could take the paperwork home with him to review and consult with an independent attorney prior to signing anything. Complainant was visibly angry at this meeting and rejected the recommendation to take home, or have reviewed legally, the exit documentation provided to him. Complainant repeated several times to Ms. Thibodeau and Mr. Jordan words to the effect that he did not wish to study the forms, nor have them reviewed by counsel, and that he just wanted to sign and have the process be done with. At no time did any authorized manager of Respondent meet alone with Complainant to discuss any matter connected with Complainant's termination in connection with the reduction in force.

The "waiver of claims" form referred to by Complainant was not designed, nor intended, to act as a waiver of any claims of unlawful discrimination, and Respondent does not intend to offer Complainant's signature on this document as a defense to the instant Charge of Discrimination. The "waiver of claims" is designed, and intended, to require a full disclosure by an exiting employee of all general employment claims as of the employment termination date, and to act as a bar against any future undisclosed general employment claims. The policy does require execution of all exit documentation as a condition precedent to an exiting employee's right to policy severance. Respondent has never, in fact, denied severance to any exiting employee for not having signed a "waiver of claims" form, despite the published policy.

Respondent did not provide Complainant with a list of employees company-wide who were being terminated as a result of the reduction in force.

5.      Subsequent to Complainant's termination date, Ms. Thibodeau did arrange for Complainant to be interviewed by Mr. Ronald Owens(age 55, dob 11/30/44), Vice President of Manufacturing, for a Plant Manager position at a plant location outside Massachusetts. At Complainant's request, Mr. Owens met with Complainant off site and conducted an employment interview. Complainant did not express any interest to Mr. Owens in relocating out of state, but Complainant did not state unequivocally that he would not relocate. Mr. Owens considered two former employees for this Plant Manager position – the Complainant and Mr. James Bourque (age 48, dob 9/23/51), both of whom held equal positions as Product Group Manufacturing Managers within Respondent's Fitchburg, Massachusetts manufacturing operations and both of whom had lost their jobs in the reduction in force. Enclosed as EXHIBIT 5.0 with this Position Statement, please find summaries of the positions of Mr. Bourque and Complainant as well as those positions reporting to Mr. Bourque, Complainant and Mr. Jordan just prior to the reduction in force. Note that Mr. Jordan rated Complainant as a "Strong" performer and Mr. Bourque as an "Outstanding" performer on EXHIBIT 5.0. After due consideration, Mr. Owens elected to offer the Plant Manager position in Ohio to Mr. Bourque, not to Complainant.

Mr. Owens did not inform Complainant at the time of the interview that the location of the Plant Manager's open position was Newcomerstown, Ohio for two reasons. First, the then-current Plant Manager at this location had not yet been notified that he was being replaced; and, second, about nine (9) months earlier, Complainant had been warned about a situation at a series of manufacturing meetings in Florida in which Complainant had apparently had too much to drink one evening and acted in a way at dinner which may have amounted to sexual harassment of the Human Resources Manager of the Newcomerstown, Ohio facility, Ms. Shirley Osler (age 53, dob 6/7/47). Both Mr. Owens and David P. Witman (age 55, dob 4/24/45), Corporate Counsel, along with others, witnessed the event. Enclosed as EXHIBIT 5.1 with this Position Statement, please find a copy of a formerly sealed letter written contemporaneously by Mr. Carnivale to Complainant's personnel file, and describing, the episode and follow-up actions taken. Ms. Osler was interviewed both at and subsequent to the incident, both by Mr. Owens and Mr. Witman, and she advised that she was made extremely uncomfortable by Complainant's actions toward her and that she appreciated the Company's intervention to ensure that it would not happen again. Despite this incident, Mr. Owens interviewed both Mr. Bourque and Complainant as technically qualified candidates for the job in Ohio, both of whom are in the protected age class and both of whom had lost their jobs as a result of a reduction in force.

6.      Neither Mr. Owens, nor any other executive or manager of Respondent, ever inquired of Complainant about Complainant's age. Mr. James Yore (age 58, dob 7/10/42), Plant Manager of Respondent's Big Rapids, Michigan facility never told Complainant that he was "too old and would not fit in with the new group." In fact, neither Mr. Yore nor Complainant knew at the time which Plant Manager position was available, making it *non sequitur* for Mr. Yore to have commented on Complainant's ability to fit into the new position. Mr. Yore had no authority to affect Complainant's employment nor to participate in any decision which might affect any change in the status of Complainant within Respondent's organization. Respondent finds it disingenuous for Complainant to fabricate allegations of age related comments from managers of Respondent for the sole purpose of attempting to fulfill the requirement to allege sufficient facts so as to present a *prima facie* case of unlawful discrimination on the basis of age.

Respondent is unaware of any conversations which may have taken place between Mr. Robert Deedrick (age 57, dob 12/4/42), former Vice President of Manufacturing, and Complainant in 1999. Mr. Deedrick was not an employee of Respondent at the time of the termination of employment of the Complainant and did not, therefore, participate in any decision to terminate the employment of Complainant or to hire Mr. Bourque as the new Plant Manager at Newcomerstown, Ohio.

7.    Mr. Raymond Martino (age 46, dob 8/27/54) became President of Respondent in October of 1999. Mr. Ross George (age 67, dob 11/29/32) retired as President at that time and retained his position as Chairman of the Board of Directors, a position which he still holds.

Mr. Harry Rogers (age 59, dob 4/12/41), former Vice President of International and Rule Products, agreed to an executive severance package on August 1, 1999. The reason for the severance was that international and rule product sales were stagnant and insufficient to support an upper-level executive, and costs needed to be reduced. Mr. Rogers's duties were divided between Mr. James Palmer, Vice President Metal Products (age 59, dob 2/13/41), and Mr. Roland Richard, Vice President Wood Products (age 58, dob 1/8/42), both of whom are older than Mr. Rogers and were already employed by Respondent in upper-level executive management. Neither Mr. Richards nor Mr. Palmer received additional compensation as a result of assuming these additional duties.

Ms. Nancy Ackles (age 67, dob 12/28/32), Mr. Lou Alberghini (age 60, dob 8/30/40) and Ms. Victoria Lanides (age 57, dob 7/21/43) were all terminated as employees in early January, 2000, as a part of the Reduction in Force. Ms. Ackles's primary function was that of lone member of a once larger typing pool which diminished over time as middle managers began doing their own word processing on personal computers. There is currently no typing pool at any facility operated by Respondent. Mr. Alberghini's former position as Manager of Manufacturing Services was eliminated, but Mr. Alberghini was subsequently rehired to an open Engineering position for which he qualified. Ms. Lanides was one of two Human Resources support personnel working for Mr. Carnivale who was charged with elimination of one of his two direct-report positions. Mr. Carnivale's other direct report was Ms. Betty Schofield (age 46, dob 7/11/54). Ms. Schofield, and her position, were retained over Ms. Lanides, in large part, because of Ms. Schofield's expertise and knowledge relating to the collective bargaining agreement with the union, which was scheduled for renegotiation in the coming months.

To date in calendar year 2000, approximately one hundred thirty-three (133) domestic employees lost their jobs as the result of position elimination, normal retirement, disability, resignation or termination for cause or business reasons. In connection with this reduction, approximately fifty-seven (57) domestic positions were eliminated, some by reduction in force and some by natural attrition, at seven (7) facilities in the United States. Enclosed as EXHIBIT 7.0 with this Position Statement is a complete listing of all employees terminated in the United States (including the Reduction in Force in calendar year 2000, showing the names, positions, age and type of termination for each.

For the proper evaluation of the distribution of ages of those employees whose positions were terminated, it is necessary to consider the average age of the entire workforce at Respondent's seven (7) United States facilities. Enclosed as EXHIBIT 7.1 with this Position Statement is a complete listing of all employees at the beginning of January, 2000, showing present ages and employment status: active (A) or terminated (T). Note that the average age of eight hundred and four (804) domestic employees is 45.14 years of age. In addition, since many management positions were eliminated, it is to be expected that older employees be affected since more experienced workers hold management positions. Notwithstanding this natural tendency, the average age of all terminated employees in calendar year 2000 is 41.85, more than three (3) years younger than the entire domestic employee population.

It should be noted that Respondent does not mention Mr. James Bourque in his Charge. Mr. Bourque, the peer of Complainant as to job responsibility in Fitchburg, Massachusetts, and also in the protected age class, was terminated in the reduction of force, as well. Mr. Bourque and Complainant were both interviewed and considered for the job opening in Ohio; Mr. Bourque was rehired to that position and is still Plant Manager in Ohio. Neither Mr. Bourque's nor Complainant's former job in Fitchburg, Massachusetts presently exists; in fact, not even the concept of their former jobs presently exists. More responsibility is now being expected and received from groups of workers and their direct supervisors, taking the focus away from management by edict toward management by joint cooperation.

SEE, *infra*, description of the Reduction in Force for a more detailed understanding of the nature, scope and reasons for the Reduction in Force, of which Complainant's termination was a part.

8.    Respondent agrees that Complainant had mostly very good (high-competent/strong) performance reviews, received merit increases regularly and was promoted several times over the course of his employment tenure with Respondent and the prior owners of the business prior to 1988. Respondent's employment was not terminated for non-performance or poor performance; rather, Respondent's position was eliminated as a result of the restructuring of manufacturing operations and philosophy and the resulting reduction in force.

9.    Respondent denies that Complainant's employment was terminated on the basis of his age and states further that the reason was manufacturing restructuring and reduction in force – not a singling out of Complainant. Respondent denies that Complainant was not rehired for the Plant Manager position in Ohio on the basis of his age and states further that the individual hired for this position, Mr. Bourque, also in the protected age class, was deemed by executive management to be better able to implement the goals of new executive management for the Ohio operations.

Respondent believed, and still believes, that both Mr. Bourque and Respondent were, and are, technically qualified to be Plant Manager in Ohio. Complainant was not selected for this position over Mr. Bourque for three fundamental reasons:

First and foremost, Complainant's management style is confrontational, not compatible with the new operations system which is still being implemented company-wide (not

just here in Massachusetts). Complainant was very effective in getting his job done; however, his methods of achieving his objectives do not, in the view of executive management, promote cooperation between labor and management nor the new Simonds Operating System. SEE, *infra*, discussion of Simonds Operating System and materials distributed at a recent company-wide management seminar;

Second, Respondent had serious concerns about putting Complainant in charge of a facility whose Human Resource Manager, Ms. Shirley Osler, had experienced a prior incident which may have arisen to the level of sexual harassment by Complainant. A Plant Manager needs to work closely with the plant Human Resources Manager, and this was an area of concern to Respondent; and

Third, Mr. Bourque was evaluated "outstanding" (as opposed to Complainant's "strong") and showed far more enthusiasm for the new position than did Complainant. Executive management felt strongly that Mr. Bourque would do a better job than Complainant. To date, Mr. Bourque has proven to be the correct choice.

10.     Respondent repeats that it did not discriminate unlawfully against Complainant on the basis of his age.

## SUPPLEMENTAL STATEMENTS OF FACT

A.     Reduction in Force.

Beginning in the last quarter of 1999, it was determined that the Company employed many more people than was the published standard for manufacturing companies of comparable size. An analysis was done into all sectors of the Company, including manufacturing, in an effort to make operations more efficient, increase productivity and reduce costs. The conclusion of the analysis was that approximately sixty (60) positions needed to be eliminated world-wide at an annualized cost savings of approximately $1,595,195 without decreasing productivity and with an increase in efficiency. Redundant positions within the Company were identified without regard to any qualifications other than the redundancy of the positions themselves. A list was compiled, matching the potentially redundant positions with the employees then holding those positions, showing the age, tenure of employment, job position and salary of each identified employee. The list, and the objectives of the reduction in force, were then given to Human Resources and Legal for evaluation in order to ensure that the reduction in force not disproportionately affect adversely any constitutionally suspect class. Executive management then cooperated with Human Resources and Legal to modify the list and produce a final list of the positions which would be eliminated. The Company is, in fact, on schedule to achieve the cost reductions and improved efficiencies planned in connection with the Reduction in Force.

In point of fact, there are still eliminations to be accomplished, both domestically and abroad. For example, a manufacturing facility in the United Kingdom will be closed entirely in the coming months, and that building will be sold.

There had been three (3) Manufacturing Managers for three (3) product groups in the Fitchburg, Massachusetts manufacturing facility, Mr. Bourque (Wood Products), Complainant (Metal Products) and Mr. Richard Souliere (age 59, dob 4/17/41)(Rule Products). Some months prior to the Reduction in Force, Mr. Souliere requested temporary leave because of a disability; Respondent granted the leave. Subsequently, but still prior to the Reduction in Force, Mr. Souliere requested permanent disability status; Respondent granted that status. Accordingly, all three Product Group Manufacturing Managers in Fitchburg, Massachusetts have been eliminated, those of Mr. Bourque and Complainant as part of the Reduction in Force, and that of Mr. Souliere by way of natural attrition at Mr. Souliere's request prior to the Reduction in Force. Not only were these positions eliminated, but also the functions associated with these positions have also been eliminated in connection with the implementation of the Simonds Operating System.

B.    Simonds Operating System.

    In conjunction with the Reduction in Force, executive management has introduced a new "Simonds Operating System" in order to ensure that the purpose for the Reduction in Force be properly implemented and successful. This Simonds Operating System was presented to managers from all over the country at a series of meetings held in May, 2000. The new operating system expresses a philosophy of communication and group cooperation and shifts focus away from unilateral decisions by single managers or single departments. It deemphasizes rigid individual responsibilities and establishes the cooperative setting of goals and methods for achieving those goals.

    As an integral part of the implementation of the new Simonds Operating System, the Company applied for, and received, a grant from the Massachusetts Department of Employment and Training ("MDET") in the amount of approximately $52,100, to be applied toward the retraining of its employees in Massachusetts in the concept of reallocating responsibilities and decision-making to groups of employees rather than rely upon traditional notions of management by edict. Copies of materials describing the nature of the grant and the retraining program are enclosed with this Position Statement as EXHIBIT SUP-B. Respondent has budgeted the sum of $109,800, in addition to the $52,100 MDET grant, for the retraining of its employees. Two hundred eighty-two (282) Massachusetts employees are involved in the retraining which is designed to promote "leadership development, team building/problem solving" in its entire workforce. See, EXHIBIT SUP-B, II, 1, written on March 22, 2000 as part of the Workforce Training Fund Application to MDET.

## CONCLUSION

    Both Complainant and Mr. Bourque were at the same level of manufacturing management. Mr. Bourque was in charge of all wood products manufacturing in Fitchburg, Massachusetts and had Unit Managers reporting to him. Complainant was in charge of all metal products manufacturing in Fitchburg, Massachusetts and had Unit Managers reporting to him. Both reported directly to Mr. Jordan, Plant Manager.

    The new Simonds Operating System stresses less unilateral management by edict and focuses on organizing workers and their immediate supervisers into groups to assume more

responsibility and make more decisions. Accordingly, both Mr. Bourque's and Complainant's middle management positions were identified to be part of the Reduction in Force and eliminated. The Reduction in Force, as described above, does not disproportionately affect the protected age class, of which both Mr. Bourque and Mr. Larsen are members. Mr. Bourque and Complainant were both terminated when their positions were eliminated. Thereafter, a position for Plant Manager in Newcomerstown, Ohio became available. Both Mr. Bourque and Complainant were interviewed for this position. Mr. Bourque was selected for this position over Complainant for the reasons described above.

The Reduction in Force was not unthinkingly thrown together; nor was it a mass illusion to disguise unlawful discrimination against any individual, as Complainant suggests. Rather, it was done only after months of careful analysis of industry standards for employment and planning for increased workforce training, competency, efficiency, productivity, job redundancy and cost savings. Human Resources and Legal participated early in the process of identifying positions to be eliminated to ensure that there not be disproportionate adverse impact on any protected class. All eliminated positions were truly eliminated, and most of the functions associated with them are no longer performed within the Company. All terminated employees were given standard exit interviews and given the same treatment, including standard, published policy severance and the offer of outplacement services. As many terminated employees as possible (including several in the protected age class) were interviewed for open positions as these became available after the reduction in force. The Company obtained a state grant to help reeducate its employees in the new Simonds Operating System which is still being implemented and which was kicked off at a three-day, company-wide meeting to managers months ago.

Looking at the total picture in which Complainant's position was eliminated, and in which Mr. Bourque was selected over Complainant for the Plant Manager position in Ohio, one must conclude that Complainant's charge of unlawful discrimination on the basis of age has no basis in fact and no merit at law. Additionally, there has been no "de facto" age discrimination here in that the protected age class was not disproportionately affected by the Reduction in Force since the average age of all terminated employees is more than three (3) years younger than the entire domestic employee population.

Sincerely,

David P. Witman
General Counsel

Affirmed:

Henry Botticello
CFO
Dated: 9/6/00

cc:    Ms. Marcia L. Elliott, Esq.

# APPENDIX 21

REPORT
ON STATISTICAL EVIDENCE
RELATED TO ALBERGHINI v. SIMONDS INDUSTRIES, INC.

George W. Cobb, Ph.D.

**1. Overview.** The analysis presented here compares the ages of two groups of managers and professionals, which, for convenience, I call "RIF" and "New Hires." The first group, "RIF," consists of mangers and professionals who were laid off due to the reduction in force at the Fitchburg branch of Simonds Industries, Inc. between January 2000, when Plaintiff Louis Alberghini was first laid off, and the end of 2001. The second group, "New Hires," consists of managers and professionals who were hired by the Fitchburg plant during that same period. The data show that within 20 months of the date of Plaintiff Alberghini's first termination, the Fitchburg plant had hired as many new managers and professionals as had been laid off as part of the reduction in force, and these new hires were on average a decade or more younger than those who had been laid off. Statistically, this age difference is "significant," that is, the evidence is extremely strong, strong enough to achieve the threshold used in science as the basis for valid conclusions. In what follows, I first tell how I defined the two groups, then summarize the age comparisons. (Details are given in an appendix to this report.)

**2. My qualifications.**

**a.** I am a graduate of Dartmouth College, where I was elected to Phi Beta Kappa as a junior in 1967, and received an A.B. summa cum laude, in 1968. I was awarded a Danforth Graduate Fellowship on my graduation from Dartmouth. I have an M.S. in Biometry (1971) from the Medical College of Virginia, and a Ph.D. in Statistics (1974) from Harvard University.

b. I joined the Department of Mathematics and Statistics at Mount Holyoke College as an Assistant Professor in 1974, was granted tenure and promoted to Associate Professor in 1980, and promoted to Professor in 1986. From 1980 to 1982, I served as Chair of the department, and from 1989 to 1992, I served as Mount Holyoke College's Dean of Studies.

c. In summer of 1977, I was a Visiting Research Associate in the Department of Statistics at Stanford University, and in 1978-79, I was an Honorary Research Fellow in the Department of Statistics at Harvard University. From 1982 to 1984, I served part time as a staff consultant at the Statistical Consulting Center of the University of Massachusetts in Amherst. In 1993, I was elected a Fellow of the American Statistical Association. From 1997-2000, I served on the National Academy of Science's Committee on Applied and Theoretical Statistics. In 2003, I was elected to a three year term (2004-2006) as vice-president of my professional society, the American Statistical Association.

d. I have been doing statistical consulting in the area of employment discrimination since 1978. I have worked on roughly two dozen cases totaling over 1000 hours, in some instances retained by the plaintiff, and others by a potential defendant. I have been qualified as an expert witness, and have so testified, in the United States District Court, District of Massachusetts, in Springfield, Massachusetts.

**3. Documents used.** The facts and data that I have relied upon are of the type commonly and reasonably used by experts in the field of statistical analysis of employment discrimination. Specifically, in the analysis reported here, I have used the following documents that were made available to me by Counsel for the Plaintiff:

a. Organizational charts of Simonds Industries for the relevant period before and after plaintiff Alberghini's termination.

b. Defendant's answers to interrogatories in the case of Ronald Larsen v. Simonds Industries, Inc..

c. A computer printout listing job codes, job titles, employee names, race, and gender.

d. A computer printout provided by Defendant in response to interrogatories in Alberghini v. Simonds, headed "Exhibit A," and listing employees by name, birthdate, age, date of hire, date of termination, age at termination, termination reason, location, current job title, and salary.

e. Portions of the affidavit of Ilda M. Thibodeau in Larsen v. Simonds.

f. Portions of Defendant's Memorandum of Law in Support of Summary Judgment in Larsen v. Simonds.

**4. General observations about statistical comparisons.** Statistical comparisons, because they are based on averages computed for groups of individuals, of necessity ignore some individual differences. In assessing possible employment discrimination, the ideal analysis would compare large groups of employees with exactly the same qualifications, responsibilities, and seniority, all reporting to the same person. In reality, no two individuals are exactly alike, and the ideal is impossible. Any choice of groups to compare involves unavoidable tradeoffs between using smaller groups in order to restrict comparisons to employees who are more nearly interchangeable, and using larger groups in order to have larger samples. Although it would be possible in principle to analyze all non-union employees together, neither the small group of top executive jobs nor the larger group of technical and sales jobs are directly relevant here because they are in no way comparable to the jobs held by the Plaintiff. Because two of Louis Alberghini's job titles at Simonds had been Manager of Manufacturing Services and Project Engineer, my analysis is based on managerial/professional positions at Simonds. In what follows, paragraphs 7 – 10 set out the details of the decisions I made about how to define this group. In practice, there may be decisions about particular employees that might reasonably go either way – either including or excluding an employee from the comparison. In such cases, a careful analysis will do the comparisons both ways, with

and without the employee in question, to see whether the conclusions are the same regardless of what is decided about the person in question. Paragraphs 8 – 12 set out the details of these multiple versions of the comparisons.

**5. How big a sample is required for a scientifically sound conclusion?** Each statistical comparison reported here is accompanied by a $p$-value, or observed significance level. The main purpose of a $p$-value is to provide a quantitative, scientific and objective basis for deciding whether a sample is large enough to support a sound conclusion. In science generally, and in discrimination cases, a result with a (two-sided) $p$-value of 0.05 or less (equivalently, a one-sided $p$-value of 0.025 or less) is defined to be "statistically significant," which includes in its meaning that that sample is large enough to justify a conclusion based on the statistical analysis. It is important to keep in mind that comparatively small-seeming samples can nevertheless qualify as statistically significant if the observed differences are large enough. With smaller samples, you need comparably larger discrepancies between groups in order to declare a difference to be statistically significant. Thus small samples with clear and large discrepancies can provide a basis for scientifically sound conclusions. For example (as any epidemiologist would agree) if 10 people go to a picnic, and 5 who eat shrimp salad get food poisoning while 5 who skip the salad stay healthy, the result would be highly significant, with a $p$-value of 1/252 of about 0.004, even though only 10 people are involved. In the comparisons reported here, the results are statistically significant, (apart from one near-miss exception). All comparisons in this report involve at least 15 people. The results qualify as statistically significant because the age differences are extremely large.

**6. How should employees be compared?** For assessing possible discrimination based on race or gender, the standard statistical approach compares the percentages in a protected class with percentages in some reference group. For example, to assess possible sex discrimination in terminations, one might compare the percentage terminated for women and men. In principle, one can use the same method to assess possible discrimination based on age: compare termination rates for those 40 or older and those younger than 40. It might seem that a method appropriate for one form of discrimination would be equally suitable for other forms, but in fact that is not true. Whereas race and gender are what statisticians call "categorical" variables; age is a quantitative variable. Although a 40-year-old and a 60-year-old both belong to the category "40 or older," to lump them together in the same category ignores potentially informative differences. (Imagine a hypothetical RIF at a company with all employees over 40, in which all and only employees 55 or older are terminated. Clearly older workers are being singled out for termination, but an analysis based on percentage terminated in the protected class would not detect that fact.) The analysis based on categories is not wrong, but it is less powerful (a technical term), that is, less able to detect real differences. For assessing possible age discrimination, the best analysis, from a scientific viewpoint, compares average ages rather than percentages for categories.

**7. Which employees should be included in the comparisons?** My analysis looks at employees (a) who worked at the Fitchburg plant, (b) in professional and managerial

jobs, (c) during the period from the beginning of the Reduction in Force (1/1/2000) and continuing up to the date of Exhibit A referenced in (3d) above.

a. *The Fitchburg plant*. The relevant question in Alberghini v. Simonds is whether age was a factor in the decision by Simonds to eliminate the job of Plaintiff Alberghini. Mr. Alberghini worked at the Fitchburg plant, and Fitchburg management participated in the decisions about which Fitchburg jobs to eliminate. It is therefore reasonable to regard the Fitchburg unit as the decision-maker, and the unit for which age comparisons are most directly relevant. The presence or absence of discrimination at other Simonds facilities is at best ancillary. Accordingly, I have restricted my statistical analysis to employees at the Fitchburg plant.

b. *Which jobs*? Plaintiff Alberghini was employed as Manager of Manufacturing Services and then briefly as Project Engineer. For reasons set out in Paragraph 4 above, my analysis is based on managerial/professional positions at Simonds. Paragraph 8 below gives the details.

c. *What time period?* A third decision concerns the relevant time interval for the comparisons. I have used the time interval beginning with the first of the layoffs in the RIF, on January 7, 2000, and extending through the most recent new hire listed in Exhibit A, on August 28, 2001, roughly 20 months later, and almost exactly 3 months after Plaintiff Alberghini's second and final layoff.

**8. Which jobs are managerial/profesional?** To identify managers and professionals, I worked from the computer printouts (3c and 3d above) of employees, job titles, and job codes provided by the defendant as part of the discovery in Alberghini v. Simonds. The job codes in the first (3c) list fall into three clusters: a top group ("EX") consisting mainly of vice-presidents, a middle group (codes 20-29) consisting of managers and professionals, and a third group (codes 100 and above), which includes Inside Salespersons (115), Unit Managers (121), and a variety of clerical and technical jobs. Salaries for jobs with codes above 100 are lower than salaries for jobs with codes 20-29, confirming that the two clusters of job codes represent distinct categories of jobs.

**9. Definition of the RIF groups**. I first used Exhibit A to identify employees listed as terminated with "RIF" given as the reason. I then used the list of job codes to exclude employees in the executive group (EX) and those with codes above 100. All the remaining employees had job codes in the range 20-29, except for Jeff Carnivale, who was not on the list with job codes. To this group of employees, I added Ralph Whitcomb, with job code 23, who was listed in the answer to Interrogatory 11 as having been terminated with the reason given as "RIF." In all, I carried out three comparisons, using three different versions of the RIF group. The first version (eight employees in the RIF group) included Jeff Carnivale. The second version included Carnivale, and also added Souliere, for whom the reason for termination was stated differently in different documents. The third version omitted both Carnivale and Souliere.

**10. Definition of the New Hires group.** I began with all employees listed in Exhibit A (3d above) as active and as having been hired after 1/7/00, the date of plaintiff Alberghini's first termination. None of these employees appear on the list (3c above) of employees, titles, and job codes (presumably, because that list was compiled before any of the new hires began work at Simonds). To identify managers and professionals in jobs roughly equivalent to those in the RIF group, I relied mainly on job titles, and to a lesser extent on salaries. I excluded three vice-presidents and the chief financial officer, assuming that they would be classified as executives. I also excluded an AP clerk and an Inside Sales Representative, assuming that their job codes would be above 100. (All other inside sales representatives have job codes of 115.) All the remaining eight employees had salaries between $49,920 (Duperry) and $98,800 (Boisoneau), a range that is consistent with the salary range for the RIF group. These eight constitute Version A of the New Hires group. I also considered a variant that included two additional employees, Kamerkar and Martin, who were hired after Plaintiff Alberghini's first termination on 1/7/00 but who had already left Simonds ( reason: "res") by the time Exhibit A was compiled. I did not include Bennett, who was hired after 1/7/00 but who was no longer active because he had been terminated due to further reduction in force.

**11. Results of the age comparisons.** The average age of the employees in the New Hires group was 38.42 years (41.88 for version B).[1] The average age of the employees in the RIF group was 52.76 (version 1), 53.65 (version 2), or 55.90 (version 3). Thus, on average, the eight (ten, for version B) managerial/professional employees hired during the roughly 20 months after plaintiff Alberghini was first laid off were between 10 and 17.5 years younger than those in the RIF group, depending on which versions of the two groups one uses.

**12. Are the results statistically significant? (Are the samples large enough?)** A standard statistical test (the two-sample *t*-test), often used for age comparisons in evaluating claims of employment discrimination, assigns a *p*-value of 0.0130 to the average age difference of 12.8 years for the comparison using RIF 1, New Hires A: nominally, the probability is only 13 out of 1000 that a difference this big could be the result of chance variation. Any value below 0.025 is "statistically significant", and by law can serve as evidence of discrimination. Similar tests using other versions of the two groups give *p*-values ranging from 0.0025 for the comparison most favorable to the plaintiff, to 0.0380 for the comparison most favorable to the defendant:

| RIF Version | 1 | 2 | 3 | 1 | 2 | 3 |
|---|---|---|---|---|---|---|
| New Hires Version | A | A | A | B | B | B |
| Sample size | 16 | 17 | 15 | 18 | 19 | 17 |
| Average age difference (yrs) | 14.34 | 15.23 | 17.48 | 10.88 | 11.77 | 14.02 |
| p-value | 0.0130 | 0.0071 | 0.0025 | 0.0380 | 0.0228 | 0.0100 |

---

[1] For consistency in comparing ages, it is necessary to pick a date and compute all ages as of that one fixed date. I have worked with ages as of 12/31/01. The age comparisons I report would be the same if I had chosen some other date instead.

13. **Which comparison is right?** Decisions about which employees to include in the groups involve tradeoffs and judgment. Statistically speaking, there may be no one "right" comparison. Rather, one tries a variety of comparisons and looks for consistent patterns. All six of the comparisons summarized in (11) show very large differences in average age, with very small $p$-values resulting from the formal statistical tests.

14. **Conclusion.** As noted before, statistical comparisons, because they are based on averages computed for groups of individuals, of necessity ignore individual differences. No statistical analysis, standing by itself, can prove that any particular personnel decision was discriminatory. Statistics *can*, however, show overall patterns, and can determine which patterns are so very extreme that they could not plausibly be explained as mere chance variation. Such is the case here. Within 20 months of the date of Louis Alberghini's first termination, the Fitchburg plant had hired as many new managers and professionals as had been laid off as part of the reduction in force, and these new hires were on average a decade or more younger than those who had been laid off. Statistically, this difference is "significant," that is, the evidence is extremely strong, strong enough to achieve the threshold used in science as the basis for valid conclusions.

15. **Meaning of the statistical evidence.** Although statistical analysis alone cannot *prove* that very large age differences like the ones seen here are due to discrimination, nevertheless statistics can be an essential part of the evidence. One also needs to know whether the jobs performed by the terminated employees were later performed by the newly hired employees. That second element of proof is something that cannot be determined statistically. Nevertheless, *if* in fact the new hires ended up doing the work of the employees whose jobs were eliminated, then it would be my judgment as a statistician that the results I have summarized in this report provide the only additional evidence needed to conclude that the defendant's actions were discriminatory. It is my judgment as a statistician that the statistical part of the proof is both clear and convincing.

# The "RIF" Groups

## Employee hired before 1/7/2000

| ID | DOB M | DOB D | DOB Y | Hire M | Hire D | Hire Y | Term M | Term D | Term Y | Why? | Act | RIF | Salary | Code | Surname | Current Job Title |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | 12 | 28 | 20 | 3 | 20 | 66 | | | | rif | 0 | 1 | $28,202 | 109 | Ackles | WORD PROC SEC |
| 17 | 5 | 28 | 39 | 4 | 19 | 99 | | | | rif | 0 | 1 | $96,393 | 24 | Alberghini | PROJECT ENGR |
| 19 | 5 | 30 | 62 | 4 | 18 | 89 | | | | rif | 0 | 1 | $66,144 | 27 | Baker | QUAL ASSRNG MGR |
| 38 | 9 | 1 | 52 | 3 | 27 | 72 | | | | rif | 0 | 1 | $38,243 | 117 | Basiwn | PAYROLL COORD |
| 9 | 4 | 14 | 51 | 9 | 9 | 89 | | | | rif | 0 | 1 | $30,030 | 110 | Brown | COST ANALYST |
| 32 | 10 | 21 | 47 | 5 | 15 | 88 | | | | rif | 0 | 1 | $79,376 | 27 | Brown | PRINCIPAL ENGR |
| 38 | 5 | 7 | 71 | 2 | 14 | 94 | | | | rif | 0 | 1 | $51,500 | ? | Carnivale, Jeff | PROD MGR |
| 18 | 8 | 15 | 68 | 6 | 19 | 97 | | | | rif | 0 | 1 | $45,211 | 121 | Darling | UNIT MGR |
| 30 | 3 | 30 | 62 | 8 | 8 | 86 | | | | rif | 0 | 1 | $83,096 | 23 | Gruych | SR ACCT MGR |
| 23 | 9 | 37 | 85 | 6 | 64 | 89 | | | | rif | 0 | 1 | $41,343 | 120 | Kozloski | MGR SYSTEMS & PROG INF SERV |
| 33 | 10 | 39 | 39 | 9 | 30 | 69 | | | | rif | 0 | 1 | $92,700 | 29 | Larson | PLANT OPERATIONS |
| 8 | 4 | 44 | 12 | 9 | 3 | 89 | 1 | 14 | | rif | 0 | 1 | $43,724 | 121 | Meahtey | MATERIAL COORD |
| 34 | 6 | 54 | 9 | 6 | 9 | 89 | 1 | 30 | 1 | rif | 0 | 1 | $33,325 | 115 | Meahtey | UNIT MGR |
| 36 | 2 | 54 | 5 | 31 | 99 | 89 | 1 | 31 | | rif | 0 | 1 | $71,599 | 121 | Rodriguez | INSIDE SALES |
| 29 | 9 | 41 | 11 | 6 | 79 | 89 | 1 | 30 | | rif | 0 | 1 | $73,902 | 121 | Schutt | MGR LEAN MFG |
| 28 | 4 | 54 | 12 | 27 | 85 | 89 | 1 | 31 | 1 | rif | 0 | 1 | $23,982 | 199 | Zirpolo | SWIT CBOARD/RECEPTION |
| 35 | 9 | 41 | 11 | 7 | 85 | | 1 | 1 | 1 | rif | 0 | 1 | $120,120 | EX | Dwelling | VP BUSINESS DEV |
| 24 | 12 | 50 | 6 | 17 | 41 | 8 | 8 | 27 | 0 | term | 0 | 0 | $75,348 | 23 | Whitcomb | MGR CORP ACCTG |
| 10 | 4 | 17 | 8 | 8 | 27 | 0 | | 1 | | ret | 0 | 0 | $63,162 | 23 | Souliere | UNIT MGR |

? Means Job Code not given in company list provided

| Employee | Included in RIF group? | Excluded? Reason | Age, if included Version 1 | Version 2 | Version 3 | Seniority | Age |
|---|---|---|---|---|---|---|---|
| Ackles | | Yes Code 109 | | | | 35.45 | 69.01 |
| Alberghini | Yes | | 61.34 | 61.34 | 61.34 | 19.70 | 61.34 |
| Baker | Yes | | 39.85 | 39.85 | 39.85 | 2.74 | 39.85 |
| Basiwn | | Yes Code 117 | | | | 29.76 | 49.33 |
| Brown | | Yes Code 110 | | | | 32.08 | 50.30 |
| Brown | Yes, Yes, No | | | | | 13.28 | 54.19 |
| Carnivale, Jeff | Yes | | 54.19 | 54.19 | 54.19 | 7.88 | 54.19 |
| Darling | Yes | | 30.83 | 30.83 | 30.83 | 4.62 | 30.83 |
| Gruych | Yes | | 64.32 | 64.32 | 64.32 | 35.39 | 64.32 |
| Kozloski | | Yes Code 120 | | | | 37.35 | 62.21 |
| Larson | | Yes Code 121 | | | | 32.25 | 63.15 |
| Meahtey | | Yes Code 121 | | | | 15.73 | 57.57 |
| Rodriguez | | Yes Code 115 | | | | 2.09 | 45.85 |
| Schutt | | Yes Code 121 | | | | 22.61 | 45.65 |
| Meahtey | | Yes Code 121 | | | | 13.01 | 47.72 |
| Zirpolo | | Yes Code 109 | | | | 6.12 | 60.07 |
| Dwelling | Yes | | Executive | | | 8.12 | 60.07 |
| Whitcomb | Yes | 51.07 | 51.07 | 51.07 | 51.07 | 22.06 | 51.07 |
| Souliere | No, Yes, No | | | 60.71 | 60.71 | 30.54 | 60.71 |
| Average Age | | | 52.76 | 53.65 | 55.90 | | |
| SD | | | 11.93 | 11.47 | 8.82 | | |
| n | | | 8 | 9 | 7 | | |

# The "New Hires" Groups

**Active Employee hired after 1/1/2000**

| ID | DOB M | DOB D | DOB Y | Hire M | Hire D | Hire Y | Salary | Surname | Job Title | Exclude? | Reason | Seniority | Age |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 115 | 11 | 14 | 50 | 5 | 8 | 0 | $135,000 | Benoit | VP SUPPLY CHAIN MGMT | Yes | Executive | 1.65 | 51.13 |
| 121 | 11 | 22 | 60 | 8 | 13 | 1 | $98,800 | Boissoneau | CORP CONTROLLER | | | 0.38 | 41.11 |
| 113 | 4 | 5 | 56 | 4 | 1 | 0 | $192,000 | Botticello | CHIEF FIN OFCR | Yes | Executive | 1.75 | 45.74 |
| 117 | 9 | 2 | 52 | 8 | 14 | 0 | $75,899 | Brault | ENG MGR FITCHBURG PLANT | | | 1.38 | 49.33 |
| 114 | 11 | 8 | 55 | 5 | 1 | 0 | $138,000 | Caselli | VP INF TECH & CIO | Yes | Executive | 1.67 | 46.15 |
| 116 | 9 | 6 | 77 | 5 | 17 | 0 | $54,912 | Dexter | PROCESS METALLURGST MFG ENG | | | 1.46 | 24.27 |
| 119 | 2 | 23 | 78 | 7 | 17 | 0 | $49,920 | Duperry | PRODUCT ENGR | | | 0.44 | 23.86 |
| 109 | 1 | 26 | 56 | 2 | 23 | 1 | $165,000 | Holm | VP MFG | Yes | Executive | 1.92 | 45.93 |
| 112 | 12 | 21 | 68 | 3 | 1 | 0 | $56,800 | Hyltinen | CREDIT MGR | | | 1.77 | 33.03 |
| 118 | 8 | 3 | 80 | 7 | 22 | 0 | $81,900 | Morrison | PROJECT MGR | | | 0.50 | 41.41 |
| 110 | 4 | 18 | 78 | 7 | 1 | 0 | $23,998 | Reeves, Jennifer | AP CLERK | Yes | Clerical | 1.86 | 23.70 |
| 122 | 12 | 25 | 62 | 8 | 28 | 0 | $66,999 | Reeves, Mark | PROD & INVENTORY CONTROL | | | 0.34 | 39.02 |
| 120 | 8 | 29 | 46 | 6 | 1 | 0 | $74,900 | Santoro | QUALITY MGR | Yes | Clerical | 0.40 | 55.34 |
| 111 | 8 | 9 | 63 | 3 | 6 | 0 | $34,608 | Turano | INSIDE SALES REP | Yes | Code =115 | 1.82 | 38.56 |
| 39 | 12 | 24 | 46 | 8 | 1 | 1 | $57,000 | Kamerkar | SR FINANCIAL ANALYST | Yes | RIF | resigned | 55.02 |
| 25 | 7 | 31 | 45 | 6 | 29 | 1 | $84,000 | Martin | PLANT CONTROLLER | | | resigned | 56.42 |
| 37 | 11 | 8 | 47 | 7 | 23 | 1 | $58,000 | Bennett | PRODUCTION SUPERV | Yes | RIF | RIF | 54.15 |

| Employee | Included In New Hires? | Age, If Included Version A | Version B |
|---|---|---|---|
| Benoit | | | |
| Boissoneau | Yes | 41.11 | 41.11 |
| Botticello | | | |
| Brault | Yes | 49.33 | 49.33 |
| Caselli | | | |
| Dexter | Yes | 24.27 | 24.27 |
| Duperry | Yes | 23.86 | 23.86 |
| Holm | | | |
| Hyltinen | Yes | 33.03 | 33.03 |
| Morrison | Yes | 41.41 | 41.41 |
| Reeves, Jennifer | | | |
| Reeves, Mark | Yes | 39.02 | 39.02 |
| Santoro | Yes | 55.34 | 55.34 |
| Turano | | | |
| Kamerkar | No, Yes | | 55.02 |
| Martin | No, Yes | | 56.42 |
| Average age | | 38.42 | 41.88 |
| SD | | 11.10 | 12.22 |
| n | | 8 | 10 |

# Age Comparisons

## Version 1A

|  | RIF1 | New Hires A |
|---|---|---|
| Difference | 14.34 | |
| Pooled SD | 11.52 | |
| SE | 5.76 | |
| t | 2.4895 | |
| df | 14 | |
| p-value | 0.0130 | |
| n | 8 | 8 |
| Ave | 52.76 | 38.42 |
| SD | 11.93 | 11.10 |
|  | 61.34 | 41.11 |
|  | 39.65 | 49.33 |
|  | 54.19 | 24.27 |
|  | 30.83 | 23.86 |
|  | 64.32 | 33.03 |
|  | 63.15 | 41.41 |
|  | 57.57 | 39.02 |
|  | 51.07 | 55.34 |

## Version 2A

|  | RIF2 | New Hires A |
|---|---|---|
| Difference | 15.23 | |
| Pooled SD | 11.30 | |
| SE | 5.49 | |
| t | 2.7732 | |
| df | 15 | |
| p-value | 0.0071 | |
| n | 9 | 8 |
| Ave | 53.65 | 38.42 |
| SD | 11.47 | 11.10 |
|  | 61.34 | 41.11 |
|  | 39.65 | 49.33 |
|  | 54.19 | 24.27 |
|  | 30.83 | 23.86 |
|  | 64.32 | 33.03 |
|  | 63.15 | 41.41 |
|  | 57.57 | 39.02 |
|  | 51.07 | 55.34 |
|  | 60.71 | |

## Version 3A

|  | RIF3 | New Hires A |
|---|---|---|
| Difference | 17.48 | |
| Pooled SD | 10.04 | |
| SE | 5.19 | |
| t | 3.3651 | |
| df | 13 | |
| p-value | 0.0025 | |
| n | 7 | 8 |
| Ave | 55.90 | 38.42 |
| SD | 8.62 | 11.10 |
|  | 61.34 | 41.11 |
|  | 39.65 | 49.33 |
|  | 54.19 | 24.27 |
|  | 64.32 | 23.86 |
|  | 63.15 | 33.03 |
|  | 57.57 | 41.41 |
|  | 51.07 | 39.02 |
|  | | 55.34 |

# Age Comparisons, continued

## Version 1B

| | | RIF1 | New Hires B |
|---|---|---|---|
| Difference | 10.88 | | |
| Pooled SD | 12.09 | | |
| SE | 5.74 | | |
| t | 1.8977 | | |
| df | 16 | | |
| p-value | 0.0380 | | |
| n | | 8 | 10 |
| Ave | | 52.76 | 41.88 |
| SD | | 11.93 | 12.22 |

| RIF1 | New Hires B |
|---|---|
| 61.34 | 41.11 |
| 39.65 | 49.33 |
| 54.19 | 24.27 |
| 30.83 | 23.86 |
| 64.32 | 33.03 |
| 63.15 | 41.41 |
| 57.57 | 39.02 |
| 51.07 | 55.34 |
| | 55.02 |
| | 56.42 |

## Version 2B

| | | RIF2 | New Hires B |
|---|---|---|---|
| Difference | 11.77 | | |
| Pooled SD | 11.87 | | |
| SE | 5.45 | | |
| t | 2.1576 | | |
| df | 17 | | |
| p-value | 0.0228 | | |
| n | | 9 | 10 |
| Ave | | 53.65 | 41.88 |
| SD | | 11.47 | 12.22 |

| RIF2 | New Hires B |
|---|---|
| 61.34 | 41.11 |
| 39.65 | 49.33 |
| 54.19 | 24.27 |
| 30.83 | 23.86 |
| 64.32 | 33.03 |
| 63.15 | 41.41 |
| 57.57 | 39.02 |
| 51.07 | 55.34 |
| 60.71 | 55.02 |
| | 56.42 |

## Version 3B

| | | RIF3 | New Hires B |
|---|---|---|---|
| Difference | 14.02 | | |
| Pooled SD | 10.92 | | |
| SE | 5.38 | | |
| t | 2.6046 | | |
| df | 15 | | |
| p-value | 0.0100 | | |
| n | | 7 | 10 |
| Ave | | 55.90 | 41.88 |
| SD | | 8.62 | 12.22 |

| RIF3 | New Hires B |
|---|---|
| 61.34 | 41.11 |
| 39.65 | 49.33 |
| 54.19 | 24.27 |
| 64.32 | 23.86 |
| 63.15 | 33.03 |
| 57.57 | 41.41 |
| 51.07 | 39.02 |
| | 55.34 |
| | 55.02 |
| | 56.42 |

# APPENDIX 22

# HOUSEHOLD MANUFACTURING

EXHIBIT
Jordan
# 4
10/3/02   9c

Simonds Cutting Tools        January, 1984

Position Title:     Project Engineer

Function:           Manufacturing Engineering

Reports to:         Engineering Manager

Mission:            Conceive, design, evaluate, propose and implement
                    engineering projects.

Principle Activities:

1. Stays current with State of the Art Technology applicable to Manufacturing.

2. Maintains intimate knowledge of Manufacturing processes.

3. Develops new methods, processes and/or equipment.

4. Performs economic studies to justify new methods, process and/or equipment.

5. Prepares Capital Expenditures for Management approval.

6. Prepares installation plans for new equipment.

7. Provides technical direction during the debug and start up phase of new methods,
   processes and/or equipment.

8. Provides technical direction for proper operation of new equipment.

9. Provides technical direction for proper maintenance of new equipment.

10. Performing numerous Engineering calculations.

11. Provides technical support to problem solving on production and support
    equipment.

## Simonds Industries Inc.

**Job Description**



**Job Title:** Product Engineer
**Grade:**
**Reports To:** Engineering Manager
**FLSA Status:** Exempt
**Prepared By:** David R. Bourgeois
**Preparation Date:** 05/03/2001
**Approved By:**
**Approval Date:**

### Summary:

The individual holding this position will insure that the assigned manufacturing process consistently delivers products that meet and exceed specifications. The position will be focused on identifying and solving technical process problems relating to manufacturing methods, machines and material for an assigned product line.

### Essential Duties and Responsibilities:

Improve, maintain or design as needed quality control systems to insure that product specifications are being met by the manufacturing process for the assigned product line.

Analyze return goods complaints (as prepared by the QC Technician) and develop corrective actions for process improvements within the assigned product line.

Work closely with Manufacturing Line Unit Managers to solve process issues relating to methods, machines or material within the assigned product line.

Advise Manufacturing Line Unit Managers regarding Operator based process issues. Assist in developing solutions to Operator based problems to be implemented by the Line Unit Manager.

Work closely with the Product Manager and marketing group regarding product issues related to the manufacturing process of assigned product line.

Document and approve any material or method deviations both permanent or temporary for assigned product line.

Approve cost reduction suggestions for assigned product line.

Advise management of relative project priorities to generate maximum return and effectively allocate scarce resources.

Anticipate process problems and initiate proactive corrective actions.

## Physical Demands

The Physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform essential functions.

In performing the duties of this job, the employee is regularly required to stand, walk, sit and talk or hear. The employee is occasionally required to read with hands and arms; climb or balance; and stoop, kneel, crouch or crawl. The employee must regularly lift, and/or move up to 25 pounds and occasionally lift and/or move up to 50 pounds. Specific vision abilities required by this job include close vision, distance vision, color vision, peripheral vision, depth perception, and the ability to adjust focus.

## Work Environment

The work environment characteristics described here are representative of those an employee encounters while performing the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform essential functions.

While performing the duties of this job, the employee is regularly exposed to moving mechanical parts. The employee is occasionally exposed to wet and/or humid conditions; high, precarious places; fumes or airborne particles; toxic or caustic chemicals; risk or electrical shock; risk of radiation; and vibration. The noise level in the work environment is usually moderate.

**Performance Measurement:**

Primary performance measurements include comparative reductions in customer complaints and production loss levels (scrap). Other key measurements include, cost and cycle time improvements.

**Supervisory Responsibilities:**

Supervises hourly personnel in maintaining and refining current manufacturing techniques within the assigned product line. Supervises other members of the manufacturing group as needed on a project basis as assigned by the Engineering Manager.

**Qualifications:**

To perform this job successfully, an individual must be able to perform each essential duty satisfactorily. The requirements listed below are representative of the knowledge, skill, and or ability required. Reasonable accommodations may be made to enable individuals with disabilities to perform essential functions.

**Education and/or Experience:**

Two year (Associates Degree) college or university certificate, or five years related experience and/or training or equivalent combination of education or experience.

**Language Skills:**

Ability to read, analyze and follow written instructions pertaining to manufacturing techniques. Ability to respond to common inquiries or complaints from operators and/or shop supervisory personnel. Ability to effectively present information to operators, shop management and executive management.

**Reasoning Ability**

Ability to define problems, collect data establish facts and draw valid conlcusions. Ability to devise and conduct experiments to validate theories and solidify conclusions.

**Certificates, Licenses, Registrations**

Maintain a working knowledge of ISO 9000 and automotive industry based quality control systems.