| | |
|---|---|
| Question: | What was your understanding of why the plant manager position was eliminated? |
| Answer: | Simonds had been, for some time, focusing various activities, sales, manufacturing into product – more of a product focus than a plant focus. So I think it was just an attempt to kind of carry that one step further and have, you know, co-plant managers, if you will, focusing on product lines as opposed to plant wide. |

\*\*\*

| | |
|---|---|
| Question: | And after you – after that change occurred in January of 2001, was your access to financial information regarding the Fitchburg plant any different than it had been before? |
| Answer: | Well, I'm going to say yes, but because concurrent with that change there were lots of changes in the overall management of the business where there was less of a – there was less of an information flow regarding profitability and more of an information flow regarding cost control. … the emphasis was more on controlling costs within one zone – sphere of influence … . |
| Question: | So to what do you attribute the change – the change in emphasis that you just described? |
| Answer: | Well, one of the cornerstones, if you will, of Ray Martino and his group's management style was a focus on cost control, year-to-year cost reductions, trying to really control conversion costs, you know as an attempt to improve the bottom line. So there was a tremendous amount of focus on conversion cost control even to the extent that our bonus plans were designed around it, for example, and it was just given a lot of – a lot more emphasis than, I guess, previously. |

(Jordan Dep. II at 17 – 18.)

At his deposition, Mr. Jordan also testified that he had no knowledge that Simonds discriminated against any employee on the basis of age or any other basis during the layoffs, including Plaintiff's layoff in May 2001. (Jordan Dep. II at 24 – 25.) Furthermore, Mr. Jordan testified as follows:

04-40092-FDS

> Question: Do you feel generally that the layoffs, including January 2000 and those after during your employment, were – and I'm using your words now – painful but necessary?
> Answer: Painful, yes. Necessary to achieve the stated cost reduction goals. So yes.

(Jordan Dep. II at 25.) Accordingly, even Plaintiff's own witness, Mr. Jordan, has testified that Plaintiff's layoff was the result of the Company's legitimate efforts to reduce costs.

Moreover, as Mr. Martino testified, the undisputed evidence demonstrates that, in and around May 2001, Simonds was undergoing severe financial difficulties, including declining sales, reduced profitability, rising costs and increased competition. (Larsen Trial Transcript 2-147 – 2-156; Thibodeau Aff. at ¶¶ 4 – 5.) It is also uncontroverted that, because of the weakening financial situation of the Company, Simonds was forced to default on its bond payment in 2001 and began to make preparations to file for bankruptcy. (Larsen Trial Transcript 2-156; Thibodeau Aff. at ¶ 5.)

Plaintiff also misconstrues the evidence regarding Simonds' acquisitions during the 2000-2001 time period. The undisputed evidence demonstrates that, although the Company continued to make acquisitions of profitable companies during this time period, the Company's acquisitions were combined with a similar number of divestitures of Simonds' unprofitable businesses. (Larsen Trial Transcript 2-157.) Therefore, contrary to Plaintiff's representations, the evidence regarding Simonds' acquisitions during this time period actually further demonstrates that the Company was undergoing financial difficulties and was taking necessary steps to improve its profitability. (Larsen Trial Transcript 2-157.)

Furthermore, Plaintiff also misrepresents the evidence regarding the Company's hiring of executives during this time period. Contrary to Plaintiff's allegations that Simonds "hired additional executive employees at significant salaries," the evidence actually demonstrates that

11

the Company was *reducing* the total number of executives Company-wide during this time period, in furtherance of its overall effort to reduce costs. (Larsen Trial Transcript 2-161 – 2-163.) Indeed, from 1999 through 2003, Simonds actually reduced the number of executive positions by seven. (Larsen Trial Transcript 2-161.) These facts are undisputed.

Accordingly, Plaintiff has failed to raise a genuine issue of material fact regarding the Company's financial situation in or around May 2001 when Plaintiff was laid off.

### D. Plaintiff Has Failed To Raise A Genuine Issue Of Material Fact Regarding The Reorganization Of The Engineering Department.

#### 1. *Plaintiff Mischaracterizes The Evidence Regarding The Timing Of The Reorganization.*

In his Opposition, Plaintiff mischaracterizes the evidence regarding the timing of the reorganization of the engineering department at Simonds' Fitchburg facility. Contrary to Plaintiff's allegations, the undisputed evidence demonstrates that, in May 2001, Simonds decided to eliminate the Project Engineer position. The Company determined that the functions of that position could be absorbed by the manufacturing sector as a whole as the Company's engineering department began to organize along specific product lines. (Thibodeau Aff. at ¶ 8; Jordan Dep. II at 17-18.) The evidence demonstrates that this reorganization did, in fact, occur in the engineering department and "that the engineering responsibilities were realigned and the engineers were basically given responsibility for specific product lines." (Deposition of Richard Brault taken on January 3, 2003 ("Brault Dep."), attached hereto as Exhibit 7, at 41 – 43.)

In his Opposition, Plaintiff asserts that the fact that the reorganization occurred approximately one month after Plaintiff's termination is evidence that Simonds' asserted reason for Plaintiff's termination (i.e., the reorganization of the engineering department) was fabricated in an effort to hide its discriminatory animus. However, the fact that the duties in the engineering department were reorganized after Plaintiff's layoff in accordance with the

12

reorganization plan which *precipitated* Plaintiff's layoff is evidence which supports the Company's position that his layoff occurred because of a planned reorganization. The fact that the reorganization occurred one month after Plaintiff's layoff, rather than before or immediately after, is not evidence of pretext.[4]

### 2. *Plaintiff Mischaracterizes The Evidence Regarding Jeremy Dexter.*

Plaintiff also seems to assert that he and Jeremy Dexter performed their jobs interchangeably. However, Plaintiff produced no evidence to substantiate this disingenuous and outrageous claim. Indeed, the undisputed evidence demonstrates that, at the time of Plaintiff's layoff, Jeremy Dexter held the position of Product/Manufacturing Engineer. The Product/Manufacturing Engineer position requires a substantial amount of computer skills and mechanical engineering expertise, which was not required for Plaintiff's position and which Plaintiff did not possess. (Deposition of Peter Duperry taken on January 3, 2003 ("Duperry Dep."), attached hereto as Exhibit 8, at 61 – 62.) Furthermore, the evidence demonstrates that, at the time of Plaintiff's layoff, Mr. Dexter was also responsible for metallurgical assignments, for which his Material Science expertise and related work experience made him particularly well-qualified. (Jordan Dep. II at 54, 65; Thibodeau Aff. at ¶ 23 and Exhibit 5 attached thereto.) In fact, at his deposition, Plaintiff admitted that he was not qualified to perform metallurgical assignments at the time of his layoff. (Alberghini Dep. I at 118-119.) Accordingly, Plaintiff's claim that he and Mr. Dexter performed their jobs interchangeably and that Simonds retained Mr. Dexter in place of him is utterly false. See Saposnik v. Babcock Borsig Power, Inc., 19 Mass. L. Rptr. No. 27 611, 614 (Mass. Super. September 12, 2005) (denying summary judgment

---

[4] It is noteworthy that, during the month after Plaintiff's termination and prior to the reorganization, the engineering department was in a state of flux because the Director of Manufacturing Engineering, Raymond Edson, retired and the Engineering Manager, Steve Niemi, resigned. (Thibodeau Aff. at ¶ 16.)

where plaintiff failed to adduce evidence to substantiate his allegation that he and younger employee performed their jobs interchangeably and that company retained younger employee in place of him). (A true and complete copy of the Saposnik decision is attached hereto as Exhibit 9.)

       3. *Plaintiff Mischaracterizes Sullivan v. Liberty Mutual Insurance Company.*

In his Opposition, Plaintiff cites Sullivan v. Liberty Mutual Insurance Company, 444 Mass. 34, 44 (2005) for the proposition that "[a] job is not eliminated unless the job duties are no longer performed by anyone." (Plaintiff's Memorandum at 10.) However, nothing in Sullivan at Page 44 (or anywhere else in the decision) supports Plaintiff's false proposition. Conversely, in considering an employer's selection of employees for layoff, the Supreme Judicial Court specifically recognized that the employer:

> … could also take into consideration other business needs that a substantial reduction in its professional staff would surely occasion. It could consider the particular expertise of an [employee], or whether two candidates for layoff had overlapping expertise. It could in short determine which of the [employees] would best meet its ongoing business needs, provided it did not make the selection for impermissible reasons.

Sullivan, 444 Mass. at 51. Similarly, in considering which employees to terminate in its RIF, Simonds took into account the particular expertise of its employees. The Company determined that employees other than Plaintiff would best meet its ongoing business needs, including taking over specific tasks that Plaintiff had performed.

As Simonds detailed in its Memorandum In Support of Defendant's Motion For Summary Judgment, the fact that Simonds may have consolidated duties or allocated the duties of Plaintiff and other laid off employees to different employees does not, by itself, raise a reasonable inference of discrimination. (Defendant's Memorandum at 10.) See Saposnik, 19 Mass. L. Rptr. No. 27 at 614 (Mass. Super. September 12, 2005) (denying plaintiff summary

14

judgment where he failed to show that retained employee performed plaintiff's former position where retained employee assumed some, but not all, of plaintiff's former duties).

### E. This Court Should Not Consider The Report Of Plaintiff's Expert Witness Because It Is Arbitrary, Incomplete And Without Any Probative Value.

This Court should disregard the expert witness report of Dr. George Cobb. First, Plaintiff's so called "statistical evidence" is incomplete because Dr. Cobb's analysis only addresses an arbitrarily chosen portion of the employees who were affected by the RIF. Specifically, the data used by Dr. Cobb is wholly insufficient because it includes only *some* of the individuals laid off from Simonds' *Fitchburg facility*. The reorganization and RIF which resulted in Plaintiff's layoff affected *all* five of the Company's facilities located both in the United States and outside of this country. The RIF was directed by Company-wide management, and resulted in the closure of plants in California and the United Kingdom. (Thibodeau Aff. at ¶ 6; Deposition of John Jordan taken on October 3, 2002 ("Jordan Dep. I"), attached hereto as Exhibit 10, at 39 – 44.) Accordingly, assuming *any* statistical analysis is appropriate in this case, the appropriate employee pool would be employees who were affected by the RIF throughout all the Company's locations. See Alves v. American Medical Response of Massachusetts, Inc., 76 F. Supp.2d 119, 122 (D. Mass. 1999) (Rejecting statistical data based only on pool of three employees in company's Massachusetts location when reduction-in-force affected Northeast region as a whole because "the relevant pools should be determined at the level at which decision making was done."); Shenker v. Lockheed Sanders, Inc., 919 F. Supp. 55, 59-60 (D. Mass. 1996) (Comparison for purpose of statistical analysis must include "the pool of employees from which

15

the terminated employees were drawn."). (See also Affidavit of Craig Lawson Moore, Ph.D. ("Moore Aff."), attached hereto as Exhibit 11, at ¶ 19.)[5]

Furthermore, Plaintiff's expert's sample is also unreliable because it is arbitrarily limited to only include those employees with "similar job codes," (codes 20-29) who were affected by the RIF at the Fitchburg facility. (Cobb Report at 2.) Importantly, Dr. Cobb's report utterly fails to demonstrate the basis for his conclusion that those individuals with job codes 20-29 were similarly situated to Plaintiff. (Moore Aff. ¶ 17.) See Sheehan v. Daily Racing Form, Inc., 104 F.3d 940, 942 (7th Cir. 1997) (Court refused to assign evidentiary significance to a statistical report for purpose of a motion for summary judgment where the statistical expert arbitrarily omitted individuals from the sample when "[t]he expert could easily have inquired about the feasibility of ascertaining through discovery [information necessary to correct for potential explanatory variables].").

Additionally, in his statistical analysis, Dr. Cobb uses an arbitrary and invalid comparison of employees. Dr. Cobb incorrectly compares the average age of employees in his so-called "RIF Group" to the average age of employees in his so called "New Hire Group." Dr. Cobb's comparison of the RIF Group to the New Hire Group is completely meaningless, however, because it does not address the overall age composition of employees who could have been chosen for the RIF, ( "the Selection Pool Composition").[6] (Moore Aff. at ¶ 20.) Indeed, as

---

[5] In the event that a rebuttal expert witness becomes necessary, Defendant has disclosed Craig Lawson Moore, Ph.D. as its expert and has attached his Affidavit hereto. Dr. Moore's Affidavit further demonstrates that Dr. Cobb's analysis and conclusions are inappropriate and invalid on multiple levels.

[6] For example, if, prior to the reduction-in-force, 75% of the Selection Pool was over 40, the fact that 75% of those laid off were also over 40 is statistically meaningless. See Pace v. Southern Railway System, 701 F.2d 1383, 1389 (11th Cir. 1983) (criticizing plaintiff's failure to provide evidence of the age composition of the selection pool and noting that "[i]f a substantial majority of the employee population of the department was composed of persons in the protected age group, the fact that 83% of those demoted were in the protected age group is not by itself significant").

16

Judge Skinner of the United States District Court for the District of Massachusetts recognized,

> In order to utilize statistics to demonstrate discrimination, there must be a comparison between the number of protected employees in (1) the set of terminated employees, and (2) the pool of employees from which the terminated employees were drawn.

Shenker, 919 F. Supp. at 59-60. See LeBlanc v. Great American Insurance Co., 6 F.3d 836, 848 (1st Cir.1993), cert. denied 511 U.S. 1018 (determining that the plaintiff's statistical evidence was not probative because it "failed to provide important information regarding the [selection pool]"); Alves, 76 F. Supp.2d at 122 ("In order to demonstrate statistically that [the employer] did not treat age neutrally, plaintiff must demonstrate that when the group of terminated employees is compared with the pool of employees from which the terminated employees were drawn, the comparison shows 'significant discrepancy in the incidence of protected status.'").

Even assuming, for argument's sake, that it were appropriate to compare employees affected by the Company's RIF and the employees hired by Simonds during the 20-month period after Plaintiff's RIF, Dr. Cobb's analysis would fail. Dr. Cobb's analysis is not based on comparable individuals. Dr. Cobb arbitrarily excludes a number of employees from his "New Hire Group" based upon their job titles and salaries, without any evidentiary basis for doing so. (Moore Aff. at ¶¶ 20 – 21.)[7] See also Sheehan, 104 F.3d at 943 ("The fact that younger workers … were retained in other jobs says no more about discrimination than if an automotive engineer fired by General Motors allegedly on grounds of age pointed out that GM had a 17-year old in its mail room."); Rea v. Martin Marietta Corp., 29 F.3d 1450, 1456 (10th Cir. 1994) ("[A] plaintiff's

---

[7] Perhaps Dr. Cobb's most blatant exclusions in that regard are his exclusions of Plaintiff and James Bourque, who were both managers in the Fitchburg facility and both rehired by Simonds almost immediately following their layoffs in January 2000. Plaintiff and Mr. Bourque were both older employees (ages 59 and 48, respectively) at the time Simonds rehired them. Dr. Cobb also arbitrarily excluded Victoria Lanides, who was also laid off in January 2000 and subsequently rehired by Simonds (at which time she was 57 years old).

statistical evidence must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between *comparable individuals*.") (Emphasis added.).

Furthermore, Dr. Cobb's comparison of the "RIF Group" to the "New Hire Group" is also fatally flawed, both because it fails to take into account any variables other than age that could potentially affect the results and because it includes a wide array of positions in the groups. Rathbun v. Autozone, Inc., 361 F.3d 62, 79 (1st Cir. 2004) ("The rudimentary analysis ... makes no attempt to ascertain the extent to which the apparent disparities may be attributable to factors other than gender. That is a significant shortcoming."); Sheehan, 104 F.3d at 942 (Court refused to consider expert's statistical analysis for summary judgment purposes noting, in part; "[m]ore important is the expert's failure to correct for any potential explanatory variables other than age. Completely ignored was the more than remote possibility that age was correlated with a legitimate job-related qualification.").

Additionally, Plaintiff's statistical analysis is not probative because it is based on a statistically insignificant number. (Moore Aff. at ¶ 18.) Dr. Cobb's analysis involved comparisons of only (a) 8-9 individuals in the "RIF Group" with (b) 8-9 individuals in the "New Hire Group." (Cobb Report at 4-5.) Such numbers are far too small to be statistically significant. See LeBlanc, 6 F.3d at 849 (dismissal of five employees too small to be statistically significant); Fallis v. Kerr-McGee Corp., 944 F.2d 743, 746 (10th Cir. 1991) (group of nine employees too small a sample to be probative); Simpson, 823 F.2d at 943 (17-person sample lacked sufficient probative value to support a verdict in an age discrimination suit), Soria v. Ozinga Bros., Inc., 704 F.2d 990, 995 (7th Cir. 1983) (15 employees out of 61 employees too small a group to be statistically significant). Dr. Cobb's reliance on such a small sample is particularly faulty in this case, where the ongoing RIF resulted in the elimination of

18

approximately 300 jobs (union and non-union) throughout the Company. (Thibodeau Aff. at ¶ 6.)

Finally, even if Plaintiff were to present all relevant data, it is generally recognized that statistical evidence is of limited probative value in a disparate treatment case, such as the case at bar. See LeBlanc, 6 F.3d at 848 ("[S]tatistical evidence in a disparate treatment case, in and of itself, rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its decision to dismiss an individual employee."). The Court should therefore not consider Dr. Cobb's flawed statistical testimony.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in its Memorandum in Support of Defendant's Motion for Summary Judgment, Defendant Simonds Industries Inc. respectfully requests that this Court grant that its Motion for Summary Judgment.

SIMONDS INDUSTRIES INC.

By its attorneys,

_____
Jonathan R. Sigel, BBO# 559850
Kathryn E. Abare, BBO# 647594
Bowditch & Dewey, LLP
311 Main Street, P.O. Box 15156
Worcester, MA 01615-0156
(508) 791-3511

Dated: October 27, 2005