1   have difficulty funding our interest payments.
2            THE COURT: All right. We're going to break
3   for lunch at this point.
4            Mr. Martino, you may step down for the time being.
5            Jurors, we're going to be in recess until two
6   o'clock today. I will ask you to come back at two o'clock
7   promptly. We will are going to go until about 3:30 this
8   afternoon. So it's a regular full day. I'll ask you to be
9   back here at two o'clock.
10           All rise for the jury.
11           (Whereupon, the jury left the courtroom.)
12           THE COURT: Be seated, counsel.
13           How much longer with Mr. Martino on direct?
14           MR. FELPER: I believe I'm more than halfway
15   through, your Honor. So less than a half hour.
16           THE COURT: Okay.
17           And the plaintiff will cross-examine for the
18   remaining hour of the day, presumably?
19           MS. ELLIOTT: I may finish much earlier than
20   that.
21           THE COURT: All right. In that case, we'll go
22   back to Mr. Jordan's cross-examination.
23           MS. ELLIOTT: Okay.
24           THE CLERK: All rise.
25           (Recess.)

```
 1   (The jury entered the room at 2:03 p.m.)
 2           THE COURT:  Good afternoon, jurors.  We're ready to
 3   resume.  Mr. Martino, please retake the witness stand.  Mr.
 4   Martino, you're reminded that you remain under oath.  Please
 5   be seated.  Mr. Felper may continue with direct examination.
 6           MR. FELPER:  Thank you, your Honor.
 7   Q.   I believe when we broke, Mr. Martino, we were talking
 8   about the company's financial performance in 2000.  In 2000,
 9   based upon the information that you had reviewed, did you
10   notice any trend in product costs?
11   A.   Not so much in product costs.  Product costs were
12   escalating in a gradual rate, which is the wage inflation and
13   healthcare and other fringe-benefit inflation.  More
14   pronounced was the compression of prices that was ongoing in
15   late 1999 with competitive situations.
16   Q.   Did that cause you any concern, Mr. Martino?
17   A.   Certainly.  With costs escalating, albeit gradually, and
18   prices declining, we'd have a continued margin squeeze.  In
19   the second half of 2000, as I'd mentioned, is when the sawmill
20   segment of our business began to go into recession with
21   dramatic declines in business.
22   Q.   Did that recession continue into 2001, Mr. Martino?
23   A.   Yes.  The sawmill -- let me explain.  Fifty percent of
24   our business at the time was sawmill related.  The other 50
25   percent was related to general industry, metal cutting and
```

1  activity in general, factories throughout America and Europe
2  where most of our business was.  The sawmill piece of the
3  business went into recession in mid-2000 as a result of
4  collapsing lumber prices.
5          In 2001 was when we began to see the metal cutting
6  side of our business go into recession.  So we actually had
7  both halves of our business in recession by the second quarter
8  of 2001.
9  Q.  And these financial situations that started in 2000 and
10 continued into 2001, did they have any impact on the company's
11 ability to meet its debt obligations?
12 A.  Yes.  It became clear by the beginning of 2001 that we
13 would be unable to meet our debt obligation and make that
14 interest payment, or the mortgage payment, as you've referred
15 to it.  And so we suspended our bond payment or our mortgage
16 payment in the beginning of 2001 and defaulted on our bonds.
17 Q.  At any point did the company contemplate filing for
18 bankruptcy protection?
19 A.  Yes.  One of our options, if we couldn't recover and the
20 recession continued, would be that we'd need to file for
21 bankruptcy.  So we prepared all the papers necessary to file
22 for bankruptcy right up to the point where we simply had to
23 walk into court and file.
24 Q.  There's been some talk in prior witnesses' testimony that
25 the company was making acquisitions in 1999 and into 2000.  Is

1   that correct?
2   A.   That is correct.
3   Q.   Do you recall the specifics of those acquisitions in 1999
4   and 2000?
5   A.   Yes.  There were -- it was actually not just acquisitions
6   but a combination of acquisitions and divestitures, or what we
7   call a reallocation of our resources.  We had a number of
8   parts of our business that were underperforming as a part of
9   the financial review that I conducted.  In late 1999 and 2000,
10  we had some business that were earning little or no profit,
11  and we decided to sell those businesses and sell some other
12  idle assets, like real estate, and take that money and try and
13  put it into businesses that were growing that were more a part
14  of our core product lines.
15        So beginning in 1999, we made a series of very small
16  asset purchases, or acquisitions, through 2000 and into 2001.
17  At the same time, we made a similar number of divestitures.
18  Q.   And looking back now, did those acquisitions prove
19  successful for Simonds?
20  A.   Yes.  In fact, we were able to raise money, with the
21  divestitures, to purchase the acquisitions and the assets that
22  helped grow our sales beyond our core business, that is, what
23  we would have sold otherwise had we not made the acquisitions
24  in 2000 and 2001, and also improved our profitability, because
25  the assets or the businesses that we acquired were generating

```
 1   activities.  That is, we were bringing purchasing activities,
 2   accounts payable, the collections of accounts, information
 3   technology and other functions were coming back into
 4   Fitchburg.  And, previously, many of these functions had been
 5   done at outlying locations.
 6           So in 1999, there was a reduction of one vice
 7   president across the company.  In 2000, we hired two, promoted
 8   a third and reduced three.  So, in fact, in 2000, there was no
 9   net increase in vice presidents.  In 2001, there was a
10   reduction of another; in 2002, a reduction of two more, vice
11   presidents or higher level; and in 2003, one more.  So over
12   the period in question, 1999 through 2003, we actually had
13   seven reductions, corporate-wide, of positions of vice
14   presidents or higher.
15   Q.   Just to deal with some of the vice president positions
16   that have been mentioned in the course of this litigation, was
17   there a vice president of finance hired by the company in
18   2000?
19   A.   Yes, there was.
20   Q.   Why was that person hired?
21   A.   That was a direct replacement from the vice president of
22   finance who resigned, so it was not an addition.  It was a
23   normal replacement in the course of business.
24   Q.   Did the company hire a vice president of information
25   technologies?
```

1   A.   Yes, we did.

2   Q.   Was that a current position that the company had?

3   A.   No.  That was one of the new positions.  And due to the
4   centralization of information technology activities, we
5   eliminated one vice president of information technology at our
6   Portland facility, hired one in Fitchburg, no net increase in
7   total but centralized the information technology at Fitchburg
8   inasmuch as our computer system was about 21 years old at the
9   time, which, in computer years, is sort of prehistoric.  So we
10  had a big project to upgrade our computer technology, and we
11  hired an outside person who had the skills and had done it
12  before.

13  Q.   Were those changes made?

14  A.   Yes.

15  Q.   In your opinion, did they have any impact on the
16  financial status of the company?

17  A.   Yes.  And had we not made those changes, I'm not sure we
18  would be able to serve our customers in the manner that they
19  expect to be served today.

20  Q.   Did the company also hire a vice president of logistics?

21  A.   Yes.

22  Q.   Was that an existing position at the company?

23  A.   That was a new corporate position.

24  Q.   Why was that position created?

25  A.   Again, we centralized purchasing activities, logistics,

1  activities, which is freight, transportation, intercompany
2  inventory movements. At the same time, we eliminated a vice
3  president of materials position at our Portland facility,
4  consolidated those activities in Fitchburg.
5  Q. And you think that change and those -- hiring that person
6  and those changes that resulted from hiring that individual
7  had any impact on the financial performance of the company?
8  A. Yes, absolutely. And it was positive. The
9  centralization of the purchasing activities in particular
10 allows us to combine all of our purchases for steel,
11 corrugated cartons, purchase products. In doing that in one
12 location as opposed to separate decentralized locations, gave
13 us a lot of purchasing power. So we're able to negotiate
14 better deals from our suppliers, better prices, better terms
15 and so on. So it had a very big impact on our company.
16 Q. Mr. Martino, are you familiar with one of the people that
17 was laid off in January of 2000 was an individual named Louis
18 Alberghini?
19 A. Yes.
20 Q. Do you know whether or not Mr. Alberghini was rehired by
21 the company?
22 A. In fact, he was.
23         MR. FELPER: May I approach the witness, your Honor?
24         THE COURT: Yes.
25 Q. Let me show you a document.

1   THE COURT:  If you're going to use it to refresh
2   memory, you ask him to look at it and read it to himself and
3   then ask him if it refreshes his memory as to what you are
4   trying to elicit.
5   Q.  Does it refresh your memory, Mr. Martino, in terms of who
6   was hired?
7   A.  Yes.
8   Q.  Who was hired?
9   A.  Mr. Lou Alberghini.
10  Q.  Did you have any participation in whether or not Mr.
11  Alberghini was rehired by the company in January of 2000?
12  A.  No, just the approval, the final approval.
13  Q.  Looking at that document, does that refresh your
14  recollection as to whether or not you approved that rehiring?
15  A.  Yes, I did.
16  Q.  Are you familiar with Mr. Owens' signature and initials?
17  A.  Yes.  They're also present.
18  Q.  Indicating that he also approved the rehiring?
19  A.  Yes.
20  Q.  Do you recall how old Mr. Alberghini was at this time?
21  A.  I don't.
22      MR. FELPER:  I have no further questions, your Honor.
23      THE COURT:  Cross-examination, Miss Elliott.
24  CROSS-EXAMINATION BY MS. ELLIOTT:
25  Q.  Mr. Martino, do you remember making some early

1   observations of the Simonds Industries company in October 29,
2   1999, shortly after you became the chief operating officer?
3   A.   Yes.
4   Q.   In that -- in your early observations, you observed that
5   one of the negatives of the company was that it promoted
6   people from within and it had resulted in some conventional
7   wisdom mentality and lack of diversity in the management
8   ranks?
9   A.   That's correct.
10  Q.   You are aware that the Fitchburg facility was
11  predominately an age-protected work force at that time?
12  A.   I was not.
13  Q.   You were aware, after January 7, 2000, that the Fitchburg
14  facility was predominately an age-protected work force?
15  A.   No, I was not.
16  Q.   Well, you conducted -- you indicated that you conducted
17  disparate impact analysis in and about January 7, 2000, with
18  regard to the layoff of those individuals, correct?
19  A.   That's correct, that the company conducted that analysis,
20  and I typically only see the analysis by exception.  If it
21  passes the appropriate tests, then it, by default, is accepted
22  as a part of the process.
23  Q.   So you had no involvement yourself in the disparate
24  impact analysis?
25  A.   Correct.  That's a human resource function.

1   Q.   In fact, you never saw any documents with regard to that
2   analysis if one was conducted for the January 7, 2000, layoff?
3   A.   To the best of my recollection, that's correct.
4   Q.   Now, Fitchburg met its plan goals for the year 2000, is
5   that right?
6   A.   Not that I recall.  The company did not meet its
7   objectives for the year 2000.  I don't remember specifically
8   whether Fitchburg did.  Typically, we measure our company
9   based on a number of areas, sales performance, plant
10  performance.  We don't typically view it just as a location
11  performance but more of a business performance.
12  Q.   But the Fitchburg facility paid a bonus in 2000, did it
13  not?
14  A.   That's correct.
15  Q.   Which means that they made their plan numbers for that
16  particular year?
17  A.   They either made the plan or a portion of the plan to
18  receive a bonus.  It's a graduated scale.
19  Q.   Now, in fact, the plan that you made for 2000 was more
20  aggressive than it was for 1999, isn't that right?
21  A.   That's correct.
22  Q.   And the net sales in 1999 were $127 million, roughly,
23  correct?
24  A.   Correct.
25  Q.   And the net sales in 1998 were 126 million, correct?

```
                UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS



RONALD LARSEN,                    )
          Plaintiff,              )
                                  )
                                  )
vs.                               )   CA No. 01-40059
                                  )
                                  )
SIMONDS INDUSTRIES, INC.,         )
          Defendant.              )


BEFORE:  The Honorable Nathaniel M. Gorton



              DAY THREE OF JURY TRIAL




         John Joseph Moakley United States Courthouse
                       Courtroom No. 4
                      One Courthouse Way
                       Boston, MA 02210
                   Wednesday, May 11, 2005
                          9:52 A.M.




                 Cheryl Dahlstrom, RPR, RMR
                    Official Court Reporter
         John Joseph Moakley United States Courthouse
               One Courthouse Way, Room 3209
                       Boston, MA 02210
            Mechanical Steno - Transcript by Computer
```

1   A.   If I could spend a couple minutes and explain to you what
2   the process is that we undertake at Simonds.
3   Q.   Please.
4   A.   Basically, when there is a reduction in force or a layoff
5   going to happen, vice presidents will give me a list of
6   positions that they wish to eliminate. Within those
7   positions, there may be many individuals or several
8   individuals that hold those positions. And then I do an
9   analysis to make sure that there isn't an adverse impact on
10  any protected group.
11       There may be -- may I give an example?  If we were
12  eliminating inside salespeople, there may be ten people listed
13  in that category which I would have in that analysis. Not all
14  ten people will be selected for the layoff. And it's
15  something that we find would be very disruptive, unproductive,
16  if those lists were hanging around and people were to find out
17  that their name was on a list to be eliminated and
18  subsequently they were not eliminated.
19       So that we feel that if there is no disproportionate
20  impact on the protected group and we've determined that and
21  we've determined the individuals that will be laid off from
22  those positions, there's no need to retain that any longer.
23  Q.   Thank you, Miss Thibodeau.
24       Also, just so we're perfectly clear, on your direct
25  examination by Ms. Elliott, she asked you about Exhibit 29.