# EXHIBIT 4

## Page 1

```
            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
                   CENTRAL DIVISION
                Civil Action No. 04-40092-FDS

LOUIS P. ALBERGHINI,            )
                Plaintiff,      )
    vs.                         )
                                )
SIMONDS INDUSTRIES, INC.,       )
                Defendant.      )

        DEPOSITION OF PATRICIA A. JEARMAN, taken
   at the request of the Defendant pursuant to the
   applicable provisions of the Federal Rules of
   Civil Procedure before Julie A. Bates, a Notary
   Public in and for the Commonwealth of
   Massachusetts, on Thursday, March 10, 2005, at
   the offices of Bowditch & Dewey, 311 Main Street,
   Worcester, Massachusetts.  Also present:  Ilda
   Thibodeau and Attorney David Witman.

   A P P E A R A N C E S :

   FOR THE PLAINTIFF:
   ELLIOTT LAW OFFICE P.C.
   307 Central Street
   Gardner, MA  01440
   (978) 632-7948
      BY:  MARCIA L. ELLIOTT, ESQ.

   FOR THE DEFENDANT:
   BOWDITCH & DEWEY, LLP
   311 Main Street
   Worcester, MA  01615
   (508) 791-3511
      BY:  JONATHAN R. SIGEL, ESQ.


               BAY STATE REPORTING AGENCY
   76 MILL STREET, WORCESTER, MASSACHUSETTS  01603
                     (508) 753-4121
```

## Page 2

### INDEX

Witness: Page

PATRICIA A. JEARMAN
  BY MR. SIGEL    3
  BY MS. ELLIOTT    118
  BY MR. SIGEL    127

### EXHIBITS

No.  Description  Page

1  Affidavit of Ms. Patricia Jearman  93

Certificate of Court Reporter  135

## Page 3

### PROCEEDINGS

PATRICIA A. JEARMAN, a witness called to testify by counsel for the Defendant, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY MR. SIGEL:

Q. Ms. Jearman, my name is Jonathan Sigel, and I represent Simonds Industries, Incorporated, regarding this litigation. And if you could, just for the record, please, state your full name.

A. Uh-huh (affirmative response). Patricia A. Jearman.

Q. And if you could spell your name for the record?

A. Uh-huh (affirmative response). All of it? In entirety?

Q. How about Jearman?

A. J-E-A-R-M-A-N.

Q. And what is your address currently?

A. It's 112 Saunders Street, and that's S-A-U-N-D-E-R-S, Street, in Gardner, Massachusetts.

## Page 4

Q. And your social security number?

A. Is 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.

Q. Date of birth?

A. Is 3/16 of 1966.

Q. And are you married?

A. Yes, I am.

Q. How long have you been married?

A. I've been married since May 14th of 2002. So almost three years.

Q. Okay. And is that your first marriage?

A. No. It's my second marriage.

Q. When were you married before that?

A. October 14th of 1988.

Q. And how long did that marriage last?

A. It dissolved, I believe it was, December 15th of 1999.

Q. And what was your name -- what was the name of your husband?

A. Andrew J. Dupuis, D-U-P-U-I-S.

Q. So is Jearman your original name, or your new married name?

A. No, it's my original maiden name.

Q. And what is your current husband's

45

```
11:24:02  1   the highlights of my job there.
11:24:04  2       Q.   Okay. And as far as doing those
11:24:15  3   functions, as far as your Simonds work goes,
          4   what would you say directly contributed to your
          5   ability to perform your job at Spectro?
11:24:25  6       A.   I worked with the company's salary
11:24:30  7   budgets at Simonds. I helped administer the
11:24:35  8   401K defined contribution plan. That was a
11:24:39  9   big, key thing. I did analysis on some of the
11:24:42 10   worker's comp there and was familiar with the
11:24:46 11   required reporting. Helping develop
11:24:54 12   handbooks -- oh, also another function, of
11:24:55 13   course, is policies and procedures within
11:24:58 14   Spectro.
11:24:58 15       Q.   Okay.
11:24:59 16       A.   I also helped the company at Simonds
1:25:03  17   help produce their employee handbooks. I
1:25:06  18   helped to do that. You know, mostly just the
1:25:09  19   clerical typing side of that. That was all
1:25:11  20   done by Ilda Thibodeau and, I think, counsel
1:25:16  21   and maybe consultants. I can't recall. It's
1:25:17  22   been a long time. Helping to do that was big.
1:25:20  23            Coordinating with locations and
1:25:23  24   communicating, doing -- helping with locational
```

46

```
:25:27  1   communications I assisted in. That's some
:25:38  2   summary. But a big part of the day was with
:25:41  3   the 401K administration. That was relatively
:25:45  4   time-consuming, is the paperwork of all the
:25:49  5   locations because we were the corporate
:25:51  6   location in Fitchburg.
:25:52  7       Q.   All right. And you worked with Ilda
:25:54  8   on the 401K?
:25:55  9       A.   Uh-huh (affirmative response), yeah.
:25:57 10       Q.   At Spectro, since you began your
:26:00 11   employment, have there been any layoffs?
:26:02 12       A.   Yes, there had been.
:26:05 13       Q.   Since you started there up until
:26:08 14   now?
:26:09 15       A.   Yes.
:26:09 16       Q.   And as HR manager, were you involved
:26:12 17   in any of those?
:26:13 18       A.   Yes.
:26:14 19       Q.   And as far as -- and were they large
         20   layoffs?
          I       A.   I don't know what you would define
:26:23 22   as "large".
:26:24 23       Q.   More than ten at a time?
:26:26 24       A.   Yes.
```

47

```
11:26:27  1       Q.   Okay. More than 20, do you
11:26:31  2   remember?
11:26:36  3       A.   I do not recall, but I do not think
11:26:39  4   at any one given time that there were ever more
11:26:41  5   than 20. I can't recall. I'd have to go back
11:26:45  6   and look.
11:26:46  7       Q.   And were you involved in assisting
11:26:50  8   in any way with those layoffs?
11:26:52  9       A.   Yes. Making some recommendations or
11:26:55 10   putting together information that needed to be
11:26:56 11   done; making sure that there wasn't any type of
11:26:58 12   adverse impact done; to make sure that, you
11:27:02 13   know, when we're looking at the force that
11:27:04 14   we're going to lay off, if it's, you know,
11:27:06 15   based upon seniority. A lot of times it was
11:27:09 16   mostly based upon seniority.
11:27:11 17       Q.   Is Spectro union or non-union?
11:27:14 18       A.   We're a non-union facility.
11:27:16 19       Q.   Okay. And when you said making sure
11:27:21 20   it didn't have an adverse impact, what do you
11:27:23 21   mean by that?
11:27:23 22       A.   That any particular groups -- we
11:27:26 23   have a very diverse work force at Spectro.
11:27:29 24       Q.   Okay.
```

48

```
11:27:29  1       A.   And, you know, you just want to make
11:27:33  2   certain that a group -- if you're just doing it
11:27:36  3   based upon seniority, there's not much you
11:27:39  4   can -- there's not much you can do. Depending
11:27:41  5   upon the number of people who we've had at a
11:27:43  6   particular time come in -- and I mean if the
11:27:46  7   work slows, a lot of times it was just based
11:27:49  8   upon seniority. But you just -- you want to
11:27:51  9   take a look to make sure that you're not going
11:27:53 10   to discriminate against any particular group.
11:27:56 11       Q.   When you say any particular group,
11:27:57 12   you mean any protected group.
11:27:59 13       A.   Any protected group, yes.
11:28:00 14       Q.   And by that you mean --
11:28:02 15       A.   Cultural diversity, you know, race,
11:28:07 16   national origin.
11:28:08 17       Q.   How about age?
11:28:10 18       A.   Yeah, absolutely.
11:28:12 19       Q.   And so what would you do to make
11:28:14 20   sure that you didn't discriminate or in your --
11:28:17 21   as you were just saying have an adverse impact
11:28:19 22   on older employees?
11:28:20 23       A.   You would perform an analysis. And
11:28:24 24   you would chart all that information -- their
```

Page 49

```
11:28:27  1   age, their race, their sex -- if it became an
11:28:33  2   issue. If it's just based upon seniority,
11:28:35  3   first in and first out, it depends upon the
          4   positions within the company. A lot of times
          5   the reductions in force would only come from
11:28:42  6   the manufacturing side, which they were
11:28:45  7   non-exempt employees. And a lot of times
11:28:48  8   they -- like I said, it was someone -- based
11:28:51  9   upon their date of hire. If we needed to let
11:28:53 10   people go, we would always do the least senior
11:28:57 11   person and work our way.
11:28:58 12        Q.   Okay. How about the exempt work
11:29:03 13   force, the salaried work force? Ever do any
11:29:06 14   layoffs with those folks?
11:29:07 15        A.   Yes.
11:29:09 16        Q.   And as far as reasons for layoff,
11:29:12 17   anything -- were there ever reasons other than
11:29:15 18   seniority?
11:29:20 19        A.   Yes. Actually perform functions,
11:29:23 20   whether they were -- those particular functions
11:29:27 21   were no longer needed within the company,
11:29:37 22   whether we were going to combine jobs based
11:29:37 23   upon other skill sets with people maybe with
11:29:37 24   more seniority.
```

Page 50

```
1:29:37  1        Q.   I understand. So when you were
1:29:39  2   eliminating positions or laying people off in
1:29:42  3   those circumstances, you did that analysis as
1:29:46  4   well to make sure the company wasn't
1:29:49  5   potentially at risk of discriminating?
1:29:53  6        A.   I believe so. I believe so. I
1:29:55  7   really -- it's been a long time since we've had
1:29:58  8   a layoff at Spectro.
1:30:00  9        Q.   When was the last time?
1:30:04 10        A.   I would want to say in 2002.
1:30:09 11        Q.   Okay.
1:30:09 12        A.   I -- to the best of my knowledge.
1:30:12 13        Q.   And --
1:30:14 14        A.   And that was the only time I believe
1:30:16 15   that we ever laid off salaried employees. We
1:30:20 16   also did hourly employees and then salaried.
1:30:22 17   The cuts were very deep. I believe at that
1:30:24 18   time we were only down to 50 employees at the
1:30:28 19   time. And even at the time I was almost
         20   recommending that they should let me go.
         21        Q.   Why?
1:30:35 22        A.   Just based upon certain functions,
1:30:36 23   we were wondering if other people could perform
1:30:39 24   different job duties at the time and whether it
```

Page 51

```
11:30:41  1   was really relevant.
11:30:43  2        Q.   Okay. And getting back to the --
11:30:49  3   you said employee data that you compiled with
11:30:53  4   respect to those folks, those salaried folks,
11:30:57  5   that included information you said about
11:31:01  6   whether they happen to be minority or not?
11:31:05  7        A.   I believe so. I mean, in those
11:31:07  8   types of jobs, our work force was so lean that
11:31:12  9   it really -- there's only one person that could
11:31:15 10   perform a particular job function just like
11:31:17 11   with me. I was the only person in human
11:31:19 12   resources. We'd only have one engineering
11:31:23 13   manager; we'd only have one particular person.
11:31:25 14   So a lot of times, either they were reduced,
11:31:29 15   they were totally eliminated -- sometimes
11:31:31 16   people couldn't even slide in -- or senior
11:31:33 17   management would take over those functions.
11:31:35 18             For example, if a materials manager
11:31:36 19   was let go, the senior vice president might
11:31:38 20   take over all those total responsibilities. So
11:31:41 21   it really wasn't a matter of someone else
11:31:45 22   taking -- they would just take over the
11:31:48 23   responsibilities of the position and no one
11:31:50 24   would be replaced right now. They would always
```

Page 52

```
11:31:52  1   get -- they just got absorbed.
11:31:54  2        Q.   They would consolidate.
11:31:56  3        A.   Yeah.
11:31:56  4        Q.   And that was for economic reasons?
11:31:58  5        A.   Yes.
11:32:07  6        Q.   And so the information you said that
11:32:09  7   you -- part of what you compiled were people's
11:32:13  8   ages as well, right?
11:32:14  9        A.   Yes.
11:32:15 10        Q.   And did you see any problem in doing
11:32:19 11   that?
11:32:19 12        A.   No, absolutely not. We want to make
11:32:22 13   sure that a particular group, protected group,
11:32:26 14   wasn't being targeted. We felt like we had a
11:32:29 15   responsibility to do that, to look, to make
11:32:36 16   sure.
11:32:37 17        Q.   At Simonds who hired you?
11:32:41 18        A.   At Simonds, I believe that Ilda did.
11:32:45 19   I believe that Ilda Thibodeau did, I believe.
11:32:48 20        Q.   And you said you were there as a
11:32:51 21   temporary employee before you were a regular
11:32:53 22   employee?
11:32:53 23        A.   That's correct.
11:32:54 24        Q.   And when were you a temporary
```

65

```
11:51:49  1   sense and is prudent to do that kind of
11:51:52  2   analysis, right?
11:51:53  3       A.   Right. That's correct.
          4       Q.   Did Ms. Thibodeau ever say to you
          5   that she felt she was being forced to do
11:52:02  6   certain things?
11:52:04  7       A.   No. No.
11:52:05  8       Q.   Were you familiar with the company's
11:52:07  9   written policies on equal employment
11:52:11 10   opportunity in your position?
11:52:12 11       A.   Yes. I'm certain I read them at
11:52:15 12   times when I had signed a -- you know, gotten
11:52:18 13   my handbooks.
11:52:20 14       Q.   Were you aware of any policy
11:52:23 15   regarding non-retaliation for reporting
11:52:26 16   discrimination or harassment?
11:52:27 17       A.   At that time, I cannot say that was
11:52:29 18   something that I was completely knowledgeable
11:52:39 19   of. You know, at that time, you know, I didn't
11:52:41 20   have -- it wasn't really a part of my job nor
11:52:45 21   was it something that I really focussed and
11:52:48 22   knew a lot about that. We never really had any
11:52:51 23   type of formal training at Simonds.
11:52:56 24       Q.   During the time that you worked
```

66

```
11:52:57  1   there, were you aware that there were laws that
11:53:02  2   prohibited discrimination on certain bases?
11:53:05  3       A.   Yes.
11:53:05  4       Q.   And were you also aware that there
11:53:07  5   were laws prohibiting a company retaliating
11:53:11  6   against someone for reporting discrimination?
11:53:14  7       A.   At that time, no, I was not aware of
11:53:17  8   protection against retaliation.
11:53:21  9       Q.   Were you aware of the company's
11:53:24 10   policy on reporting -- a policy and procedure
11:53:30 11   for an employee reporting complaints?
11:53:33 12            MS. ELLIOTT: Objection.
11:53:40 13       A.   Yes, I was. I knew who I should be
11:53:46 14   going to. Or at least there was -- who we were
11:53:49 15   supposed to go to was our supervisor or to the
11:53:52 16   locational HR manager at the time.
11:53:55 17       Q.   Okay. So who would that have been?
11:54:01 18       A.   Either my supervisor, Ilda
11:54:04 19   Thibodeau, or Jim Carnivale.
       20       Q.   Okay. And would you say that you
              were familiar with that throughout your
11:54:14 22   employment at Simonds?
11:54:15 23       A.   Yes. Yes, I would say so.
11:54:22 24       Q.   Do you have any personal knowledge
```

67

```
11:54:25  1   of any Simonds policy or practice after
11:54:32  2   January 27th, 1996?
11:54:35  3       A.   No, I do not.
11:54:37  4       Q.   Do you have any personal knowledge
11:54:39  5   of any Simonds reorganization after
11:54:43  6   January 27th, 1996?
11:54:47  7       A.   Yes, I do.
11:54:48  8       Q.   What is that?
11:54:50  9       A.   I do know that Joe Sylvia, I
11:54:57 10   believe, is no longer with the company. I do
11:55:00 11   know that -- just in general terms that Simonds
11:55:07 12   has been some sort of restructuring and that a
11:55:12 13   lot of the executives that were in place are no
11:55:16 14   longer there. And I do not know who they are.
11:55:18 15       Q.   Okay.
11:55:20 16       A.   I do know that Ilda's job title's
11:55:25 17   changed. She's the director of human
11:55:27 18   resources. I know that based upon some general
11:55:30 19   conversations that I've had with some former
11:55:33 20   colleagues of mine. We would get together -- I
11:55:35 21   haven't done -- I haven't gone -- we have like
11:55:37 22   a little dinner or get-together every once in
11:55:40 23   awhile, former employees. We talk about our
11:55:43 24   personal lives, but we'll talk in general terms
```

68

```
11:55:44  1   about, you know, what's happening, et cetera,
11:55:47  2   with -- at Simonds. Just very, very general
11:55:51  3   terms.
11:55:51  4       Q.   Okay. So you've heard about these
11:55:54  5   things happening, right?
11:55:57  6       A.   That's correct.
11:55:57  7       Q.   And when I say personal knowledge, I
11:55:59  8   mean have you been involved or observed these
11:56:02  9   things happening?
11:56:02 10       A.   No, I have not.
11:56:07 11       Q.   Same question with respect to any
11:56:10 12   reductions in force since you left the company.
11:56:12 13       A.   I know nothing about them besides,
11:56:14 14   you know, like I said, Lou telling me that he
11:56:18 15   was laid off -- I have to take that back. I
11:56:27 16   have heard that there had been some other staff
11:56:29 17   leaving the company, too, and I don't know the
11:56:32 18   extent of their leaving the company.
11:56:33 19            I know like a Ralph Whitcomb who I
11:56:37 20   knew of, an accounting manager there, I don't
11:56:40 21   believe he's with the company any longer. And
11:56:42 22   I know that Steve Harvey is no longer with the
11:56:45 23   company, he's in a -- he's doing his own CPA
11:56:50 24   company. And a couple other people are no
```

81

```
 1   A.   In the workplace -- and there are
 2  other people who have knowledge of it but
 3  probably won't come forward because they are
 4  probably afraid.  He would stick his fingers in
 5  my ear; he would tousle my hair; and one time
 6  he asked me to stand up because I was wearing a
 7  pair of shorts and they told me that the front
 8  row said I looked good in shorts and he wanted
 9  to see me standing up.
10   Q.   And it's your sworn testimony that
11  that was Attorney Witman who did that?
12   A.   That is absolutely correct.
13   Q.   And when was that?
14   A.   I can't recall the specific time,
15  but I complained about it on several occasions.
16  And it was kind of a joke in our department
17  whenever counsel would walk by, that people
18  would cover their ears.
19   Q.   And who did you complain to?
20   A.   I complained to Ilda Thibodeau and I
21  complained to Jim Carnivale about it.
22   Q.   And were you ever retaliated against
23  for complaining?
24   A.   No, I wasn't.
```

82

```
 1   Q.   And what, if anything -- strike
 2  that.  And how did they respond when you
 3  complained?
 4   A.   Nothing was done after the first and
 5  second and third time I complained.
 6   Q.   And when was that?
 7   A.   I cannot recall.  It was before I
 8  left.  It was not directly -- it was one of the
 9  main reasons -- it was one of several reasons
10  why I decided to leave the company.
11   Q.   How long did you remain at the
12  company after that happened?
13   A.   It probably took me about a year and
14  a half to find a job.
15   Q.   So you remained at the company for
16  one and a half years after you claim --
17   A.   Approximately.  If I had to put a
18  time line on it.  To the best of my
19  recollection, I believe so.  It's very
20  difficult to find a job.  It was a tough time,
21  it's hard.  And I was looking for the right
22  job, the right pay, the right -- there was
23  nowhere for me even to go at Simonds.  I knew
24  that, you know, and it was company that I
```

83

```
 1  particularly -- they had been good to me
 2  financially, I would say.  But I always thought
 3  that my merit increases were based upon my
 4  performance and my work there.
 5           But it wasn't until I made indirect
 6  comments about threatening -- when my husband
 7  learned of all these -- I didn't want to tell
 8  my husband about what was going on at work.
 9  When I finally told him about the last thing
10  that happened, to ask to be stood up, to stand
11  up, my husband -- my ex-husband at that time
12  was a police officer, and he was very upset to
13  learn about it.  And he told me if he doesn't
14  stop doing it, that he'll go and make sure that
15  he doesn't do it anymore.  And he asked me to
16  spread that word.  But I was also afraid
17  because he's counsel for the company.  He held
18  a very prestigious position within that
19  company.
20   Q.   And you're still angry about that
21  today; is that correct?
22   A.   I'm upset about the company not
23  taking any -- or not responding to my
24  complaints like they should have.
```

84

```
 1   Q.   Getting back to my question about
 2  your belief that they had a practice of laying
 3  off older employees and replacing them with
 4  younger employees, you talked about the age
 5  information you were asked to compile, right?
 6   A.   Uh-huh (affirmative response),
 7  that's correct.
 8   Q.   And you've also compiled that age
 9  information at Spectro, haven't you?  You
10  testified to that earlier?
11       MS. ELLIOTT:  Objection.  You can
12  answer.
13   A.   I believe -- I believe I have.  I
14  don't want to misspeak.  I believe I have.
15   Q.   We can go back and look at your
16  testimony.
17   A.   Yeah, no, I -- I know I at least did
18  one during my time at Spectro.  I did one
19  adverse impact analysis.
20   Q.   Okay.
21   A.   I believe.
22   Q.   And you compiled age information
23  about employees, right?
24       MS. ELLIOTT:  Objection.
```

85

```
12:14:35  1           MR. SIGEL:  What's your objection?
12:14:37  2       A.  It wasn't specific --
12:14:38  3           MR. SIGEL:  Excuse me, wait a
          4   second.
          5           MS. ELLIOTT:  My objection is that
12:14:41  6   you're putting words in her mouth.  That isn't
12:14:43  7   what she said.  She said she compiled a list
12:14:46  8   based upon many things, not just age.  She gave
12:14:48  9   a list of things.
12:14:49 10           MR. SIGEL:  My question was not only
12:14:51 11   based on age.  That wasn't my question.  Let's
12:14:53 12   go back and look at it.
12:14:54 13           MS. ELLIOTT:  I think it was.
12:14:55 14           MR. SIGEL:  No, it wasn't.  And I'll
12:14:56 15   ask it again.
12:14:57 16           MS. ELLIOTT:  Okay.
12:14:57 17       Q.  Your testimony was that you compiled
12:15:02 18   information including age information about
12:15:04 19   employees at Spectro; is that correct?
12:15:06 20       A.  Not specific to age.
12:15:10 21       Q.  All right.  I didn't ask that.  My
12:15:13 22   question was, you compiled employee information
12:15:16 23   as part of a layoff -- at least one you've done
12:15:18 24   at Spectro -- that included employee age
```

86

```
2:15:21  1   information; is that correct?
2:15:23  2       A.  That included, yes, that is correct.
2:15:24  3       Q.  Okay.  Was that improper?
2:15:27  4       A.  No, it was not improper.  It's
2:15:30  5   necessary.
2:15:30  6       Q.  Okay.  You did the same thing at
2:15:33  7   Simonds at least with respect to your
2:15:37  8   involvement with respect to employee ages and
2:15:39  9   relation to layoffs --
2:15:40 10           MS. ELLIOTT:  Objection.
2:15:41 11       Q.  -- correct?  You can answer the
2:15:43 12   question.
2:15:51 13       A.  I only recall being asked to provide
2:15:55 14   name and age, just those specific statistics.
2:16:00 15       Q.  I understand.  But you've testified
2:16:07 16   that it's a prudent thing to do to compile --
2:16:11 17       A.  It's --
2:16:12 18       Q.  -- let me finish my question
2:16:14 19   please -- to compile various employee data,
         20   including age, you said minority status, I
          I  believe --
2:16:24 22       A.  Yes.
2:16:24 23       Q.  -- to make sure that -- or help make
2:16:28 24   sure that the company is not having -- or that
```

87

```
12:16:34  1   the layoff is not having any kind of
12:16:38  2   discriminatory impact?  Is that my
12:16:40  3   understanding?
12:16:40  4       A.  Yes.
12:16:41  5       Q.  So then what was it about your doing
12:16:45  6   that for Simonds that you would distinguish
12:16:48  7   from what you've done at Spectro, if anything?
12:16:51  8       A.  I was only asked to provide specific
12:16:57  9   information regarding their name and their age
12:16:58 10   when I have other information that would have
12:17:01 11   been relative.  And when you're doing a riff
12:17:05 12   (phonetic spelling), to be prudent you need
12:17:08 13   other additional information which our
12:17:09 14   department would have only been able to
12:17:11 15   provide.
12:17:12 16       Q.  Do you know that that information
12:17:14 17   wasn't considered?
12:17:16 18       A.  No, I do not.  But I do believe -- I
12:17:19 19   do believe that I was only one of several
12:17:21 20   people who had the computer skills and the
12:17:25 21   databases at the time to really compile and
12:17:27 22   access that information and had the ability to
12:17:30 23   do that.
12:17:30 24       Q.  You were one of several people who
```

88

```
12:17:31  1   could do that.
12:17:34  2       A.  That is correct.
12:17:37  3       Q.  So is it your testimony that your
12:17:41  4   belief regarding -- that there was something
12:17:47  5   inappropriate about compiling that age
12:17:48  6   information at Simonds was inappropriate
12:17:53  7   because you think that's the only information
12:17:57  8   that was looked at?
12:17:59  9       A.  Yes.
12:18:00 10       Q.  Wouldn't it be prudent for Simonds
12:18:03 11   to look at that information the same way you
12:18:05 12   have at Spectro to make sure -- or at least
12:18:09 13   have an understanding of how many older
12:18:14 14   employees would be affected by a layoff?
12:18:17 15           MS. ELLIOTT:  Objection.
12:18:18 16       A.  Yes.
12:18:37 17       Q.  When you were preparing that
12:18:44 18   information at Simonds which included
12:18:44 19   employees' ages, did Ms. Thibodeau or anyone
12:18:47 20   else explain to you why that was being done?
12:18:50 21       A.  No.  I believe -- if I can make an
12:18:55 22   assumption, I believe that I was told that
12:18:56 23   there was going to be a layoff.
12:18:59 24       Q.  Okay.
```