# EXHIBIT 6

## Page 1

```
              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
                    CENTRAL DIVISION
                Civil Action No. 04-40092-FDS

LOUIS P. ALBERGHINI,           )
              Plaintiff,       )
                               )
    vs.                        )
                               )
SIMONDS INDUSTRIES, INC.,      )
              Defendant.       )

        DEPOSITION OF JOHN W. JORDAN, taken at
the request of the Defendant pursuant to the
applicable provisions of the Federal Rules of
Civil Procedure before Julie A. Bates, a Notary
Public in and for the Commonwealth of
Massachusetts, on Thursday, March 10, 2005, at
the offices of Bowditch & Dewey, 311 Main Street,
Worcester, Massachusetts.  Also present:  Ilda
Thibodeau and Attorney David Witman and
Attorney David Felper.

A P P E A R A N C E S:

FOR THE PLAINTIFF:
ELLIOTT LAW OFFICE P.C.
307 Central Street
Gardner, MA  01440
(978) 632-7948
    BY: MARCIA L. ELLIOTT, ESQ.

FOR THE DEFENDANT:
BOWDITCH & DEWEY, LLP
311 Main Street
Worcester, MA  01615
(508) 791-3511
    BY: JONATHAN R. SIGEL, ESQ.


          BAY STATE REPORTING AGENCY
    76 MILL STREET, WORCESTER, MASSACHUSETTS  01603
                 (508) 753-4121
```

## Page 2

### INDEX

| Witness: | Page |
|---|---|
| JOHN W. JORDAN | |
| BY MR. SIGEL | 3 |
| BY MS. ELLIOTT | 87 |
| BY MR. SIGEL | 108 |

### EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | Recap of Termination Meetings | 25 |

Certificate of Court Reporter    118

## Page 3

                    P R O C E E D I N G S

    **JOHN W. JORDAN,** a witness called to testify by counsel for the Defendant, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY MR. SIGEL:

Q.   Good afternoon, Mr. Jordan.  My name is Jonathan Sigel, and as you know I represent Simonds Industries --

A.   Uh-huh (affirmative response).

Q.   -- in this case.  We're -- as you also know, Mr. Alberghini has brought a claim for age discrimination.

MR. SIGEL:  First of all, can we just agree to usual stipulations?

MS. ELLIOTT:  Correct.

Q.   And you will have an opportunity if you want to review your deposition and sign your deposition and make any changes on the errata sheet which you deem necessary.

    Do you have any health condition or are you taking any medication --

A.   No.

## Page 4

Q.   -- okay.  Maybe I should have started with the ground rules.  But if you could let me finish the question --

A.   Oh, sure.  I thought you had.

Q.   -- before you answer.  And don't hesitate to ask me to repeat a question if you want to.

A.   Okay.

Q.   Or for clarification.  I'm not trying to confuse you in any way.  Your only job is to give your testimony to the best of your memory and truthfully.  If you want a break at any time, don't hesitate to mention that as well.  So my question is, do you have any health condition, or are you taking any medication that would impair your memory or ability to testify truthfully at this deposition?

A.   No.

Q.   Thank you.  Mr. Jordan, how did you come to be involved with this case?

A.   Probably dates back to, I'm going to say, late 2001.  I was contacted at some point

Page 17

1  was less of an information flow regarding
2  profitability and more of an information flow
3  regarding cost control. Kind of a -- I mean
4  somewhat of a subtle change, I guess.
5       But many of the existing financial
6  documents that, you know, had been relied upon
7  for years on a monthly basis were now being
8  substituted by, you know, different type
9  documents. And again, the emphasis was more on
10 controlling costs within one zone -- sphere of
11 influence as opposed to looking at Fitchburg
12 plant profitability, which used to be a very
13 key -- previously was a very key measurement.
14     Q.   So to what do you attribute the
15 change -- that change in emphasis that you just
16 described?
17     A.   Well, one of the cornerstones, if
18 you will, of Ray Martino and his group's
19 management style was a focus on cost control,
20 year-to-year cost reductions, trying to really
21 control conversion costs, you know, as an
22 attempt to improve the bottom line. So there
23 was a tremendous amount of focus on conversion
24 cost control even to the extent that our bonus

Page 18

1  plans were designed around it, for example, and
2  it was just given a lot of -- a lot more
3  emphasis than, I guess, previously.
4       Q.   Did your bonus criteria to yourself
5  change beginning in January of 2001 when you
6  changed positions?
7       A.   Yes, because the old bonus plan was
8  based on gross profit at the Fitchburg facility
9  plus some inventory goals. And again, the
10 hourly bonus plan -- and to the best of my
11 recollection all bonus plans -- were now -- but
12 the drivers were now cost reduction.
13     Q.   Cost reduction company wide as
14 opposed to just Fitchburg?
15     A.   I think -- I'm sure there were --
16 yes, just Fitchburg, that I'm aware of. I'm
17 sure there were, you know, corporate plans for
18 corporate people, but it was Fitchburg based.
19     Q.   When you were plant manager, did you
20 have access to company-wide financial
21 information?
22     A.   Yes. I'd get the so-called monthly
23 book that had financial statements from the
24 other facilities as well as Fitchburg.

Page 19

1       Q.   And --
2       A.   I can't say that I spent a lot of
3  time studying the other facilities, but yeah,
4  they were available.
5       Q.   And how about after your position
6  changed from plant manager? Did you have the
7  same access to company-wide information?
8       A.   No.
9       Q.   After the layoffs in January of
10 2000, are you aware of any subsequent layoffs
11 at the company during the remainder of your
12 employment?
13     A.   Yes.
14     Q.   And if you could just describe all
15 of those for me.
16     A.   During -- after 2000 but before I
17 left?
18     Q.   Correct. After January of 2000 but
19 prior to your leaving the company.
20     A.   Well, I'm certainly aware of the Lou
21 Alberghini, Bill Baker, Barry Brown layoffs
22 in -- was it May of 2001 --
23     Q.   Right.
24     A.   -- why we're here. Others? There

Page 20

1  was a Steve Grueitz (phonetic spelling) in
2  customer service. There may have been some --
3  you know, I'm not -- I suspect there were some
4  possibly in data processing or inside sales of
5  the financial area that I'm -- can't really
6  recall. But -- yeah, I suspect there were some
7  in pretty much every aspect of the business.
8       Q.   And are you -- when you say that,
9  are you talking about Fitchburg only or
10 company-wide?
11     A.   Well, there were definitely some
12 moves at the plant in Ohio, the plant in
13 Michigan, so I would say it was company wide
14 without being able to necessarily recall names.
15     Q.   Okay. So in the Fitchburg facility,
16 do you recall, as you sit here today, any
17 layoffs between Mr. Larson's layoff, for
18 example, in January of 2000 and
19 Mr. Alberghini's initial layoff at that time,
20 and Mr. Alberghini's subsequent layoff in May
21 of 2001?
22     A.   Between?
23     Q.   Between --
24          MS. ELLIOTT: Which between are you

30 sheets

21

14:48:34  1  referring to?
14:48:35  2          THE WITNESS: Yeah. I understand
14:48:36  3  the time frame.
          4          MS. ELLIOTT: I don't.
          5          MR. SIGEL: Okay. Between January
14:48:39  6  of 2000 and May of 2001.
14:48:41  7          MS. ELLIOTT: Okay.
14:48:49  8      A.  Let's see. There was a reduction
14:48:52  9  of -- I want to make sure I'm -- there was a
14:48:56 10  reduction of the unit manager, Todd, and --
14:49:00 11  prior to that, I believe. Again, I'm not sure
14:49:07 12  about all the -- you know --
14:49:11 13      Q.  Todd Darling?
14:49:12 14      A.  Todd Darling, yeah. I'm not sure
14:49:15 15  about all the other -- again, there might have
14:49:17 16  been some finance or data processing or inside
14:49:22 17  sales that I'm not aware. I mean, I suspect
14:49:24 18  there were, but I don't really know.
14:49:29 19      Q.  Did you have any involvement in any
14:49:31 20  of the decision regarding layoffs that occurred
14:49:34 21  after January of 2000?
14:49:36 22      A.  No.
14:49:44 23      Q.  Were you asked for your input
14:49:46 24  regarding any of those layoffs?

22

14:49:50  1      A.  After?
14:49:52  2      Q.  Yes. After January of 2000.
14:49:53  3      A.  No.
14:49:57  4      Q.  So you had no input into the
14:50:03  5  decision to lay Mr. -- lay off Mr. Alberghini
14:50:06  6  in May of 2001?
14:50:08  7      A.  No.
14:50:08  8      Q.  Did you have any knowledge of the
14:50:10  9  reasons for his layoff in May of 2001?
14:50:15 10      A.  No.
14:50:26 11      Q.  In your opinion, were the layoffs
14:50:30 12  which occurred after January of 2000 and prior
14:50:32 13  to your leaving the company based on legitimate
14:50:38 14  reasons?
14:50:40 15      A.  I don't have a comment on that.
14:50:43 16      Q.  So you can't say either way?
14:50:46 17      A.  Legitimate is kind of a value
14:50:48 18  judgment. Company had embarked on some
14:50:54 19  downsizing, so be it. It's not important
         20  whether I thought it was correct or legitimate.
         21      Q.  Well, did you agree with their
14:51:08 22  decisions regarding downsizing?
14:51:11 23          MS. ELLIOTT: Which time frame are
14:51:13 24  you referring to?

23

14:51:14  1      Q.  Any time after January of 2000 until
14:51:19  2  you left.
14:51:21  3      A.  Agree? No. I can accept it. I
14:51:28  4  mean, again, this is a -- you know, a corporate
14:51:32  5  decision to downsize or right size the
14:51:37  6  organization.
14:51:37  7      Q.  Do you know who the decision-makers
14:51:40  8  were regarding all of those layoffs?
14:51:43  9      A.  I would assume it was held at the --
14:51:46 10  you know, the highest levels of the
14:51:48 11  corporation, Mr. Martino and Mr. Botticello.
14:51:52 12  You know, perhaps some involvement from Ilda.
14:51:55 13  I'm really not sure.
14:51:56 14      Q.  But you don't know for sure.
14:51:58 15      A.  No.
14:51:58 16      Q.  Or the reasons that those
14:52:01 17  individuals were selected for layoffs?
14:52:04 18          MS. ELLIOTT: Which individuals are
14:52:05 19  you referring to?
14:52:06 20          MR. SIGEL: Again the time period is
14:52:08 21  people laid off after January of 2000 and prior
14:52:11 22  to the time you left the company.
14:52:12 23      A.  The closest thing I ever heard to an
14:52:15 24  explanation about Alberghini, Brown, and Baker,

24

14:52:20  1  was at an impromptu meeting that Chip Holm, who
14:52:26  2  was now the vice president of manufacturing,
14:52:28  3  called, I believe, that -- the afternoon or the
14:52:30  4  very next morning after the three were let go.
14:52:36  5  And -- where he, number one I think it was a
14:52:39  6  courtesy to let the remaining staff know, you
14:52:42  7  know, before that -- maybe before the shop
14:52:45  8  floor knew, basically said that these three
14:52:48  9  people would be no longer with us.
14:52:49 10          He started to embark on an
14:52:54 11  explanation, but I think he came to the
14:52:58 12  conclusion that the less said, the better. I
14:53:00 13  mean, that's the way I interpreted it and we --
14:53:04 14  so -- I'd be hard-pressed to call it an
14:53:07 15  explanation. He basically said, you know,
14:53:10 16  "Lou, Barry, and Bill are no longer with us.
14:53:14 17  The engineering department now consists of
14:53:16 18  whoever is left," and that was pretty much it.
14:53:20 19      Q.  Okay. Now, you were involved with
14:53:30 20  the reorganization and reduction in force which
14:53:32 21  occurred in January of 2000, right?
14:53:34 22      A.  Yes.
14:53:34 23      Q.  Do you have any personal knowledge
14:53:36 24  that Simonds intentionally discriminated on the

25

```
14:53:38  1   basis of age in doing those layoffs?
14:53:40  2        A.    In 2000?
14:53:42  3        Q.    Correct.
          4        A.    No.
          5        Q.    Do you have any personal knowledge
14:53:47  6   that the company discriminated against anyone
14:53:49  7   on the basis of age regarding any layoffs after
14:53:53  8   January of 2000?
14:53:54  9        A.    No.
14:53:55 10        Q.    Do you feel generally that the
14:54:05 11   layoffs, including January 2000 and those after
14:54:08 12   during your employment, were -- and I'm using
14:54:12 13   your words now -- painful but necessary?
14:54:17 14        A.    Painful, yes. Necessary to achieve
14:54:21 15   the stated cost reduction goals. So yes.
14:54:28 16        Q.    I want to show you a document and
14:54:33 17   I'm going to show you an original, what I
14:54:35 18   believe to be an original, Mr. Jordan, and ask
14:54:38 19   you to take a look at this.
14:54:39 20        A.    Uh-huh (affirmative response).
14:54:40 21        Q.    I'm going to mark it as Exhibit 1 to
14:54:42 22   your deposition today.
         23              (Exhibit No. 1, Recap of termination
14:54:44 24   meetings; so marked.)
```

26

```
:54:44  1        Q.    Have you had a chance to review this
:55:18  2   document?
:55:30  3        A.    Yes.
:55:31  4        Q.    Do you recognize it?
:55:32  5        A.    Yeah.
:55:32  6        Q.    What do you recognize it to be?
:55:35  7        A.    A recap of the termination meetings
55:40   8   with Mr. Alberghini, Mr. Larson, and
55:44   9   Mr. Bourque on January 7th of 2000.
55:49  10        Q.    Is that your signature at the bottom
55:51  11   of the document?
55:51  12        A.    Yes.
55:51  13        Q.    Is that your original signature?
55:54  14        A.    Yeah, I -- I think so. Yes.
:6:00  15        Q.    And did you write that document
:6:09  16   yourself?
:6:10  17        A.    Yes.
:6:12  18        Q.    And did you sign it on January 10th,
:6:14  19   2000?
       20        A.    Yes.
       21        Q.    Did you prepare it on January 10th,
:6:18  22   2000?
:6:19  23        A.    Somewhere between the 7th and the
:6:21  24   10th.
```

27

```
14:56:21  1        Q.    Okay. And --
14:56:25  2        A.    Wouldn't have been the 7th.
14:56:27  3   Probably the 10th, yeah.
14:56:28  4        Q.    Okay. And are the statements
14:56:29  5   contained in that document true to the best of
14:56:32  6   your knowledge?
14:56:34  7        A.    Yes.
14:56:34  8        Q.    Why did you prepare that document?
14:56:43  9        A.    I can't actually recall.
14:56:48 10   Documentation. Documentation of the
14:56:50 11   proceedings of the 7th.
14:56:51 12        Q.    Was it your practice to document
14:56:56 13   exit interviews that you were involved with?
14:56:58 14        A.    I'm going to say no. Maybe more
14:57:06 15   accurately, I don't know. It was the first --
14:57:11 16   it was the first such letter that -- memo to
14:57:13 17   file that I'd been involved in.
14:57:15 18        Q.    Okay. But you don't remember why
14:57:17 19   you prepared it?
14:57:18 20        A.    Why I prepared it? I assume someone
14:57:21 21   asked for, you know, document the events of the
14:57:25 22   7th and, you know, try to explain yourself and
14:57:31 23   Ilda's role and briefly recap the proceedings.
14:57:36 24        Q.    I apologize if I asked you this
```

28

```
14:57:37  1   already, but is it your understanding that the
14:57:40  2   layoffs that affected employees in -- at
14:57:44  3   Simonds in January of 2000, were there layoffs
14:57:49  4   at that time in any other facilities that
14:57:51  5   you're aware of?
14:57:56  6        A.    I'd strongly suspect there were
14:57:58  7   given that, you know, the layoffs were -- at
14:58:03  8   least in the Fitchburg facility were the result
14:58:05  9   of, you know, some strenuous, you know,
14:58:09 10   budgeting cost reduction efforts. I can only
14:58:11 11   assume it was going on at every plant. So I'm
14:58:14 12   going to say yes, but I'd be hard-pressed to,
14:58:16 13   you know, give names.
14:58:17 14        Q.    Okay. If I could just direct your
14:58:21 15   attention to the third sentence in that first
14:58:25 16   paragraph.
14:58:27 17        A.    Yeah.
14:58:27 18        Q.    And ask if you could just explain
14:58:33 19   that, what you meant by that sentence.
14:58:35 20        A.    The one that starts with "I
14:58:37 21   briefly"?
14:58:37 22        Q.    Correct.
14:58:41 23        A.    That the -- yeah. There was a
14:58:47 24   reorganization for cost control, and part of
```

29

1  the -- you know, part of the budgeting process.
2  And it wasn't, you know, performance related.
3      Q.    And how long had there been
4  declining sales -- and by that you were
5  referring to the Fitchburg facility?
6      A.    Yes.
7      Q.    To your knowledge, how long had
8  there been declining sales at the company at
9  that time?
10     A.    I can't recall. I know there were
11 some, you know, recessionary pressure on the
12 metal band industry, you know, throughout '99.
13 And again, you know, we were -- it was, you
14 know, the 1990 -- 2000 pro forma budget, given
15 the sales level and the increased cost was
16 unacceptable. And we were told -- myself and
17 John Keifer (phonetic spelling) and others were
18 told that we needed to try to get -- somehow
19 get about a million dollars out of the
20 Fitchburg budget for 2000.
21     Q.    What were the rising costs?
22     A.    Negotiated wage increases for the
23 hourly, probably steel, certainly energy. I
24 would say that would be the three.

30

1      Q.    During your meeting with
2  Mr. Alberghini, did he tell you that he
3  believed he'd been discriminated against on any
4  basis?
5      A.    During the meeting?
6      Q.    Correct.
7      A.    During the layoff?
8      Q.    Exactly.
9      A.    No.
10     Q.    How about same question Mr. Larson?
11     A.    No.
12     Q.    At Mr. Alberghini's meeting, what do
13 you recall Ilda saying during that meeting,
14 Ms. Thibodeau?
15     A.    Well, we basically, you know, I had
16 the job of breaking the news that the -- you
17 know, the position was eliminated, with a brief
18 explanation about, as I stated here that, you
19 know, it was economic in nature not
20 non-performance, and try to keep it pretty
21 businesslike and straightforward.
22          At that point, Ilda would, you know,
23 kind of take over, explain the severance
24 package, you know, get some, you know, perhaps

31

1  get some signatures. And we try to keep it
2  very businesslike and brief. It went on --
3  then we went on to talk about the, you know,
4  the fact that there were some openings in the
5  company and that, you know, if you'd like to be
6  considered for these positions, we urged them
7  to apply.
8      Q.    And did Mr. Alberghini express any
9  interest in the positions you'd mentioned?
10     A.    Yes. He expressed interest in the
11 project engineering position.
12     Q.    And was that a position that had
13 recently been created or resurrected?
14     A.    No. It was the result of a
15 resignation in the engineering department.
16     Q.    And whose resignation was that?
17     A.    Eric De Rivera.
18     Q.    And what position did he hold --
19 what was his last position at the company?
20     A.    I believe it was senior
21 manufacturing engineer.
22     Q.    So he wasn't a project engineer.
23     A.    His title was -- well, senior
24 manufacturing engineers do projects. I mean --

32

1      Q.    Okay.
2      A.    Yeah.
3      Q.    And now I'm really asking about his
4  job title.
5      A.    Yeah.
6      Q.    It wasn't a project engineer, right?
7      A.    No. It was senior manufacturing
8  engineer.
9      Q.    When did he resign?
10     A.    I don't recall. Late '99.
11     Q.    So what happened to the duties of
12 his position, to the best of your memory? What
13 I mean by that is, did anyone assume those
14 duties?
15     A.    I'm going to say the time frame was
16 relatively short, so he was -- Eric was pretty
17 much focussed on a product group that didn't
18 have an awful lot of activity going on other
19 than day-to-day. So I'm going to say that the
20 duties were left, you know, vacant until a
21 replacement was brought on board.
22     Q.    Okay. So is it your testimony that
23 to the best of your memory, no one performed
24 any of his duties after he left the company?

53

1  engineer?
2     A.    Yes.
3     Q.    How is it different?
4     A.    It's probably less in the machine
5  design side of it and more in the operation
6  side, costing, quoting, job evaluations, job
7  descriptions, incentive systems. But, you also
8  need to be proficient enough to go to the shop
9  floor and make improvements to equipments and
10 processes. So I functioned as a manufacturing
11 engineer.
12    Q.    What's the difference between a
13 chemical engineer and a mechanical engineer?
14    A.    Oh, I did -- again, if you're a
15 chemical engineer in a process industry, you
16 probably get your -- you know, you probably get
17 your hands dirty working on the process. That
18 could be tantamount to saying a metallurgist.
19 I mean, the metallurgists at Simonds get
20 involved in what I consider manufacturing
21 engineering because they know the metallurgical
22 sides of the situation. Therefore, they can
23 have a fair amount of input in machine design
24 and machine installation from that viewpoint.

54

1     Q.    Is it important to have a background
2  in material science to do metallurgical work?
3     A.    It's critical.
4     Q.    Critical.
5     A.    Yeah.
6     Q.    What's the difference between a
7  mechanical engineer and project engineer? At
8  least as project engineer was used at Simonds.
9     A.    I think they are very comparable.
10    Q.    Could you be a -- strike that. When
11 you say someone's a mechanical engineer,
12 doesn't that generally -- isn't it generally
13 understood that they have a degree in
14 mechanical engineering?
15          MS. ELLIOTT: Objection.
16    A.    Simonds has had non-degreed
17 mechanical engineers.
18    Q.    Okay. And how about a chemical
19 engineer? Any understanding that -- what is
20 your understanding as to what the
21 qualifications are to be a chemical engineer?
22    A.    Probably because I have -- I don't
23 have a lot of experience in it, but I -- again
24 I expect that would be a degreed position more

55

1  often than not.
2     Q.    And how about being a mechanical
3  engineer? Is that a degreed position more
4  often than not in your experience?
5     A.    More often than not.
6     Q.    And is it advantageous to have a
7  mechanical engineering degree in order to be a
8  manufacturing engineer?
9     A.    Can't hurt, yeah. It's -- yes, it
10 would be advantageous.
11    Q.    And how about to be a product
12 engineer as that term was used at Simonds, if
13 you know what that phrase means. Same
14 question.
15    A.    The question being would it be
16 advantage --
17    Q.    Correct. Would it be advantageous
18 to have a mechanical engineering degree?
19    A.    Yes.
20    Q.    Mr. Alberghini wasn't responsible
21 for designing products during his employment up
22 to January of 2000, was he, to your knowledge?
23    A.    No.
24    Q.    And how about after January of 2000?

56

1     A.    I don't know.
2     Q.    At some point in time you said that
3  he was -- actually for approximately a ten-year
4  period Mr. Alberghini was in what position? I
5  think you said from '91 to 2000.
6     A.    Maintenance manager.
7     Q.    Who reported to him in that
8  position? Do you know?
9     A.    He had one direct report, Cary
10 Mansfield, maintenance foreman.
11    Q.    And what did Mr. Mansfield do?
12    A.    Well, he was basically the next step
13 down. He would have been the direct supervisor
14 of the crafts group, the trades and crafts
15 group. Doing, you know, typical foreman
16 things: Setting priorities, providing some
17 expertise and some direction to the work force,
18 getting involved with administering plant
19 rules, safety, the like.
20          There was also a -- he wasn't a
21 Simonds employee, but there was also a
22 housekeeping supervisor that was provided by an
23 off-site cleaning service which was essentially
24 a -- he wasn't on the Simonds payroll, but he

**Page 65**

```
 1  quality of his job performance?
 2       A.   No.  No, not really.  I mean, I
 3  assume it was acceptable.
 4       Q.   You said that you know that he had a
 5  mechanical engineering degree?
 6       A.   I knew he was a Worcester Tech grad.
 7  I wasn't sure about the degree.
 8       Q.   Okay.  Do you know about any of his
 9  other qualifications?
10       A.   I know he was functioning as a kind
11  of a backup to the plant metallurgist who
12  was --
13       Q.   Is that Ernie?
14       A.   Yeah, Ernie.  He was pondering
15  retirement.  So I think he was trying to pick
16  up some of the process metallurgy aspects of
17  it.
18       Q.   Did you -- strike that.  Do you know
19  whether Mr. Dexter had any education in
20  material science?
21       A.   I don't know.
22       Q.   But as you've testified before, you
23  thought that that would be critical to doing
24  metallurgical work?
```

**Page 66**

```
 1       A.   Yes.
 2       Q.   And was Mr. -- and it's Evancic?
 3       A.   Yeah.
 4       Q.   Ernie Evancic?
 5       A.   Yeah.
 6       Q.   Was he still at Simonds when you
 7  left the company in September of 2001?
 8       A.   At least part-time.  So yes.  He was
 9  still there.
10       Q.   Do you have any knowledge of the
11  quality of his job performance?
12       A.   Well, Ernie was one of the -- in the
13  group that I managed, one of the things that we
14  did from time to time need to call on was
15  metallurgical advice.  And his performance was
16  outstanding.
17       Q.   And he wasn't laid off at any time,
18  right?
19       A.   I don't believe so, no.
20       Q.   Do you have any knowledge as to why
21  the company retained Mr. Evancic?
22       A.   He was the primary and only resource
23  of metallurgical knowledge that is very
24  critical to the Simonds product.
```

**Page 67**

```
 1       Q.   And do you know whether the company
 2  valued his expertise?
 3       A.   I certainly did.  I believe he was
 4  well regarded.  He was certainly well regarded
 5  by the manufacturing people.
 6       Q.   Do you know Peter Duperry?
 7       A.   Not really.  I -- we overlapped for
 8  a pretty short time.
 9       Q.   Do you know what job he was hired to
10  do?
11       A.   One of the engineering positions.  I
12  don't think we ever even spoke.
13       Q.   Do you have any knowledge of his
14  educational background?
15       A.   I think he was a Worcester Tech
16  grad, but I'm not -- that's just on hearsay.
17       Q.   Okay.  Did you ever work with him at
18  all?
19       A.   No.
20       Q.   Did you ever work with Mr. Duperry
21  at all on any project -- I'm sorry, Mr. Dexter
22  on any projects?  I misspoke.
23       A.   On a project?  No.  I don't -- no.
24  I'm going to say no.
```

**Page 68**

```
 1       Q.   Do you know what Mr. Duperry's
 2  duties were for the company?
 3       A.   Not exactly, no.
 4       Q.   So with respect to Mr. Dexter,
 5  Mr. Duperry, do you have any personal knowledge
 6  of their qualifications to do their respective
 7  jobs?
 8       A.   Not beyond the fact that they
 9  presumably held engineering degrees from
10  Worcester Tech.
11       Q.   Did you see those as valuable
12  qualifications to have in those positions?
13       A.   Oh, sure, yeah.
14       Q.   Do you know a gentleman by the name
15  of Salvatore Santoro?
16       A.   Yes.
17       Q.   Who is he?
18       A.   He was hired as, I believe, quality
19  control manager.
20       Q.   Do you know if he was hired into
21  that position originally?
22       A.   I believe so.
23       Q.   Was he in the engineering group?
24       A.   I'm not sure about the reporting
```