# EXHIBIT 9

{}

*The Massachusetts Law Reporter*
Cite as 19 Mass. L. Rptr. No. 27, 611 (September 12, 2005)

which includes a patent prosecution bar, is attached as Exhibit A to SRU's Supplemental Brief in Support of its Motion for Entry of Protective Order. The contested language appears in the first part of Section 7 that deals with disclosure of confidential information. It reads:

> CONFIDENTIAL INFORMATION may be disclosed only to the following persons or entities and is limited as detailed below, with the exception that any individual, including Counsel, an advisor or an expert, who is given access to CONFIDENTIAL INFORMATION of another shall not counsel, assist or participate in any way in the preparation, filing, or prosecution of any patent application, protest, interference, public use proceeding, reissue, reexamination, citation of prior art under 35 U.S.C. sec. 301 or request for certificate of correction that is in the field of optical biosensors for a period of eighteen (18) months after this litigation has terminated.

At a hearing on June 28, 2005, it was revealed that one of the attorneys for the defendant Hobbs, Mr. Brian M. Dingman, who is acting as trial counsel in this case, also is a patent attorney who has been processing patent applications for Hobbs and one of Hobbs's assignees, CoHo Holdings, LLC., for several years. Mr. Dingman is said to be listed as the attorney of record on two U.S. Patents issued to Hobbs, and on a related patent application filed by Hobbs's business partner and assigned to CoHo Holdings, LLC. These patents, and others that Mr. Dingman is said to be prosecuting for Hobbs and CoHo Holdings, LLC., are related to biosensor technology, which is at the heart of this litigation.

Mass.R.Civ.P. Rule 26(c), for good cause shown, provides a vehicle for the issuance of protective orders during discovery which protect from harmful disclosure trade secrets or other confidential research, development, or commercial information. Here, SRU argues that disclosure to Hobbs's trial counsel, who is also his patent counsel and actively involved in patent prosecution, is the kind of situation that warrants protection.

In *Motorola, Inc. v. Interdigital Tech. Corp.*, No. 93-488-LON, 1994 U.S. Dist. LEXIS 20714 (D.Del., Dec. 19, 1994), U.S. District Court Judge Joseph J. Longobardi, of the District of Delaware, set forth the conflicting and difficult situation that arises when trial counsel also acts as a patent prosecutor:

> [Trial counsel] is currently prosecuting applications relating to the very patents at issue in this litigation. Attorneys who were to view Motorola's voluminous confidential information and then later prosecute the patents would have to consistently challenge the origin of every idea, every spark of genius. This would be a sisyphean task, for as soon as one idea would be stamped "untainted," another would come to mind. The level of introspection that would be required is simply too much to expect, no matter how intelligent, dedicated, or ethical the . . . attorneys may be.

*Id.* at *14-*15. See also *Commissariat a L'Energie Atomique v. Dell Computer Corporation*, No. 03-484-KAJ, 2004 U.S. Dist. LEXIS 12782 (D.Del., May 25, 2004); *Akamai Technologies, Inc. v. Speedera Networks, Inc.*, No. 02-10188-RWZ, (D.Mass., August 18, 2003).

This Court concurs that Mr. Dingman, and possibly other patent attorneys at his law firm, in this case is faced with the same sisyphean task as that described in *Motorola*. Hobbs and his counsel must, therefore, select another trial attorney than Mr. Dingman for this case, either from within the Mirick O'Connell law firm, or from an outside firm, or, alternatively, Mr. Dingman may remain and litigate this case but, if that is the choice made, for a reasonable period he must turn over any responsibilities for prosecuting patent applications related to biosensors, and related work, to another patent attorney or patent agent within or outside of the Mirick O'Connell law firm.

*ORDER*

The Plaintiff's Emergency Motion for Entry of Protective Order, Paper #12, is *ALLOWED* to the extent that the Protective Order, in essentially the identical form as that attached as Exhibit A to SRU's Supplemental Brief in Support of its Motion for Entry of Protective Order, shall hereby become an Order of this Court.

With the Protective Order now in place, insofar as SRU's Motion to Compel Defendant to Comply With Discovery, Paper #14, is concerned, as well as any other discovery matters affected by the entry of the Protective Order, the parties are directed to confer, consistent to Superior Court Rule 9C, and attempt to resolve any differences that may remain.

---

## Harold Saposnik v. Babcock Borsig Power, Inc.
Superior Court, Worcester, SS
No. 040366B
Memorandum Dated July 5, 2005

**Master and Servant – Discrimination Claims – Age Discrimination – Opinion Grants Summary Judgment for the Defendant in a Reduction in Force Age Discrimination Action.** This opinion grants summary judgment for the defendant employer on an age discrimination claim brought by a 60-year-old employee terminated as part of a reduction in force, for failure to satisfy the fourth element of a prima facie case of age discrimination as applied to reduction-in-force cases: that the layoff occurred in circumstances raising a reasonable inference of unlawful discrimination. The opinion relies in part on the facts that the mean age of employees and the number of employees over the age of forty changed from before to after the layoff from only 47.2 to 47.3 years, and 85% to 81%, respectively; and that, although the plaintiff had a satisfactory employment record, the retained employees all had slightly better performance ratings.

### The Massachusetts Law Reporter

*612*

Cite as 19 MASS. L. RPTR. No. 27, 612 (September 12, 2005)

CONNOR, JOHN P., J. This case involves an employer's reduction in force that resulted in a sixty-year-old employee's termination. The defendant employer, Babcock Borsig Power, Inc. ("Babcock") terminated the plaintiff Harold Saposnik ("Saposnik"), from his position as a Senior Buyer in November 2002. Saposnik filed suit alleging that his termination was the result of Babcock's unlawful discriminatory practices, specifically age discrimination. Babcock has moved for summary judgment on the grounds that Saposnik cannot establish a prima facie case of age discrimination. Alternatively, Babcock argues that even if Saposnik could establish a prima facie case, Babcock has articulated a legitimate non-discriminatory reason for Saposnik's termination and that Saposnik cannot produce evidence to show that Babcock's action was merely a pretext for age discrimination.

#### BACKGROUND

Considered in a light most favorable to the plaintiff, the non-moving party, the facts and reasonable inferences drawn from them follow. Mass.R.Civ.Proc. 56(c). Babcock hired Saposnik on March 1, 1999 as a Senior Buyer when he was fifty-six years old and terminated him at age sixty in 2002.[1] From 1999 to 2002 Babcock's business designing, developing, installing and servicing coal-fired utility boilers grew. At the time Babcock hired Saposnik, there were two other Senior Buyers in purchasing, Hinkley ("Hinkley") and Packard ("Packard"), both of whom were fifty-two years old. Paul Cummins ("Cummins") was the Director of Purchasing. After hiring Saposnik, Cummins hired two additional Senior Buyers in Purchasing: Sal Cilluffo ("Cilluffo"), age fifty-one was hired into a temporary position and Dana Hatch ("Hatch"), age forty-seven, was hired into a permanent position in April 2001. In addition, Cummins hired other people into the Purchasing Department ("Purchasing"). In all, eight of the ten people hired were forty-years old or older. Cummins hired other individuals for different Purchasing positions including Buyer and Program Buyer/Expeditor. Three Program Buyer/Expeditor were hired: Shane Wood ("Wood"), who was twenty-six at the time of the layoff; David Bernard ("Bernard"), who was forty-four; and Inge Thompson ("Thompson"), who was fifty-one, all of whom survived the layoff. Jason Rudman ("Rudman"), who was in his twenties, transferred into Purchasing as a Program Buyer/Expeditor in May 2002.

By fall 2002, Purchasing had twenty-one employees: one Director, four Managers (Procurement, Logistics and Expediting, Project Procurement, and Procurement Environmental Systems), five Senior Buyers, one Buyer, four Program Buyer/Expeditors, two Purchasing Expeditors, a Senior Secretary, one Cost Analyst, one Purchasing Administrator/Buyer, and one Project Assistant.[2] They ranged in age from twenty-three to sixty years old. Brian Kennedy ("Kennedy") and Lewis Lausten ("Lausten") were managers,

each over forty years old. In all, eighteen employees in Purchasing were over forty years old.

Purchasing positions were differentiated by grade classification. A Senior Buyer was a Grade 14, a Buyer was a Grade 13, and a Program Buyer/Expeditor was a Grade 12. In addition, the qualifications for each job were different. Senior Buyers were required to have a Bachelor's degree in Business Administration, be a certified purchasing manager or have a minimum of five years purchasing background, two to three of which had to have been in the boiler industry, and possess leadership and negotiation skills, and have a knowledge of business law and accounting. Buyers were required to have a "college education, preferably with a degree in Business or Engineering and three to five years purchasing experience." Program Buyer/Expeditors were required to have a Bachelor's degree or 3-5 years working experience as a Buyer.

Job responsibilities and objectives were different among the various Purchasing positions. According to Babcock job descriptions, during 2002, Senior Buyers were responsible to formulate procurement strategies, create bidding packages, negotiate costs, establish a minimum of three new suppliers, implement work packages to ensure performance-based material and equipment purchases, reduce costs by ten percent, establish "supplier of choice" agreements, provide commodity costs, develop and maintain supplier relationships, recover charges attributable to suppliers, provide bid evaluations to management, and proficiently use conformed contracts and negotiations of terms and conditions purchase. In addition, Senior Buyers had a "signing limit" of $175,000.00. Program Buyers/Expeditors, on the other hand, ensured continuity and coordination of information and activities, monitored supply priorities, performed supply audits, executed, tracked and expedited purchase orders, and apprised project and purchasing management of project status and data. A Program Buyer/Expeditor had a $75,000.00 "signing limit." No verbatim overlaps in job responsibilities or objectives exist between the Senior Buyer and Program Buyer/Expeditor job descriptions, although the descriptions acknowledge that the Program Buyer/Expediter was to collaborate with and support the Senior Buyer. A dispute exists as to whether the procurement responsibilities were interchangeable among the various purchasing positions as Saposnik contends or whether the responsibility to purchase certain commodities was based on the level of complexity, the managers being responsible for the most complex, followed by Senior Buyers, Buyers, and Program Buyer/Expeditors as responsible for the progressively less complex as Babcock argues.

In addition to specific job responsibilities, each Manager, Senior Buyer, Program Buyer/Expeditor, or Buyer was assigned specific commodities to procure. As of May 8, 2002, six months prior to the layoff,

Case 4:04-cv-40092-FDS    Document 28-13    Filed 10/27/2005    Page 4 of 4

*The Massachusetts Law Reporter*                    613
Cite as 19 Mass. L. Rptr. No. 27, 613 (September 12, 2005)

Saposnik was specifically responsible to procure twenty-two different commodities including air heaters, burners, evaporators, fuel supply equipment, sonic and vibrating horns, heat exchangers/condensers, heaters, ignitors, instrument and controls, reheaters, scanners, soot cleaning equipment, thermocouples supports, thermocouples, thermometers and thermowells, valves, and valve and duct silencers. Following the layoff, Saposnik's procurement commodities were distributed among Lausten, Kennedy and Wood.

During Saposnik's tenure, Babcock conducted annual employee performance evaluations. Saposnik received three annual evaluations as a Senior Buyer from the time period covering March 1999 to March 2002. In each evaluation he scored an overall "3," meeting most of his goals but not meeting other goals, particularly in the 2000-2001 evaluation period.[3] In each instant when he did not meet a goal, Saposnik's evaluator, a manager, identified issues that Saposnik needed to improve. Saposnik noted his disagreement with the unmet goals as "constructive criticism," attributing it as a misread on the part of Babcock as to his "quiet demeanor" and performance with "little fanfare." Saposnik also received annual monetary bonuses.

Saposnik's colleagues were also evaluated. Hinkley had three annual evaluations from 1999 to 2002. While Hinkley scored an overall "3" in the first of those evaluations and met his goals, he scored an overall "4" in the subsequent evaluation periods, 2000-2001 and 2001-2002. In addition, Hinkley frequently exceeded his goals. Packard, another Senior Buyer, also received three annual evaluations, from August 1999 through July 2002. Packard's overall performance, initially a "4" in 2000, slipped to a "3" in 2001 and 2002. While he had one or two unmet goals in each of the last two evaluations periods, Packard also exceeded some of his goals. Hatch, newly hired in 2001, had only one annual evaluation prior to the layoff. He scored an overall "4" and exceeded all of his goals, save for one. The fifth Senior Buyer, Ciluffo, did not receive an annual review because he was laid off prior to his first annual evaluation date. Shane Wood, hired in 2000, received one annual evaluation in December 2001 (his second being due after the layoff in December 2002). He was evaluated in the position of "Program Buyer/Expeditor" and received an overall score of "4," meeting three goals and exceeding the remaining five goals. Saposnik had no basis to determine his job performance relative to that of his co-workers nor did he believe that his performance appraisals were the result of age discrimination.

In fall 2002, Babcock was met with a decreased demand for its products and services. Cummins knew of a downturn in business activity and was informed of the planned layoff in October 2002 by two company executives, Jim Doherty and Tom Ogiba. The executives told Cummins that the layoff would be company wide and include Purchasing. The executives instructed Cummins to evaluate the activity or lack of activity of any commodities, the performance of an individual, and future business as reasons for eliminating any individual in the layoff. Saposnik was aware that there were "not as many projects in the pipeline" in 2002 as there had been.

Cummins had a conversation with Saposnik about the downturn in business activity and informed Saposnik that he would be laid off. Cummins told Saposnik that the "layoff was not [because] of anything [he] did wrong" and that "it was not performance-related." Cummins provided Saposnik with a severance agreement that contained a separation and release agreement, which included a paragraph that advised Saposnik to consult an attorney. At no time during Saposnik's tenure did Saposnik hear comments directed to him or others that he considered to be age-discriminatory.

Babcock reduced its overall workforce by 66 employees, from 457 to 391. Prior to the layoff the mean age was 47.11 years for all employees. After the layoff the mean age was 47.27 years. Within Purchasing, the mean age prior to the layoff was 48.1 years for twenty-one employees. After the layoff, the mean age was 46.56 years for sixteen employees. After the layoff, sixteen people remained in Purchasing: 1) as Director—Cummins; 2) as Managers—Lausten, and Kennedy, John Jaworski ("Jaworski") and Thomas Bruback; 3) as Senior Buyers—Hinkley, Packard, and Hatch; 4) as a Buyer—Wood; 5) as Program Buyer/Expeditors—Bernard, Rudman, and Thompson and Douglas Ward; 6) as a Purchasing Administrator/Buyer—Georgianna Mazzone ("Mazzone"); and 7) a cost analyst and a secretary. Five people in purchasing were laid-off, ranging in age from forty-seven to sixty.[4] Babcock retained two sixty-year-old employees, Jaworski, a manager, and Mazzone, as well as the only three employees who were under forty years of age.

### DISCUSSION

Summary judgment is appropriate when the moving party shows that there are no genuine issues of material fact and it is entitled to judgment as a matter of law. *Cassesso v. Comm'r of Correction*, 390 Mass. 419, 422 (1983). When evaluating a summary judgment motion, the court looks at the evidence in the light most favorable to the non-moving party. See Mass.R.Civ.P. 56(c); *O'Sullivan v. Shaw*, 431 Mass. 201, 203 (2000). The moving party bears the burden of establishing the absence of a triable issue. *Pedersen v. Time, Inc.*, 404 Mass. 14, 17 (1989). Once the moving party meets this burden, the burden shifts to the non-moving party to allege specific facts establishing the existence of a general issue or issues of material facts; he may not rest merely on the pleadings. *Correllas v. Viveiros*, 410 Mass. 314, 317 (1991);