*Godbout v. Cousens*, 396 Mass. 254, 261 (1985). Bare assertions and conclusions regarding one's understanding, beliefs, and assumptions are not enough to withstand a well-pleaded motion for summary judgment. *Polaroid Corp v. Rollins Environmental Serv. (N.J.), Inc.*, 416 Mass. 684, 696 (1993).

"Summary judgment is generally disfavored in the context of discrimination cases based on disparate treatment." *Brunner v. Stone & Webster Eng'g Corp.*, 413 Mass. 698, 705 (1992) (where motive, intent or state of mind questions are at issue, summary judgment is often inappropriate because they are factual questions) (quoting *Flesner v. Technical Communication Corp.*, 410 Mass. 805, 809 (1991); *Anderson v. Bessemer City*, 470 U.S. 564, 572-73 (1985)). A defendant's motion for summary judgment has been upheld when the plaintiff's evidence of intent, motive, or state of mind has been found insufficient to support a judgment in the plaintiff's favor. *Blare v. Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 440 (1995).

When a plaintiff alleges discrimination based on indirect or circumstantial evidence, the legal analysis to support his claim must satisfy a burden-shifting, three-prong paradigm. *Sullivan v. Liberty Mutual Ins. Co.*, 444 Mass. 34, 44 (2005) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973)). In most situations, to establish a prima facie case of termination based on unlawful discrimination under G.L.c. 151B, the plaintiff must show: 1) that he was a member of a protected class; 2) that he performed his job satisfactorily; 3) that he was terminated; and 4) that the employer sought to hire a person outside the protected class with similar qualifications. *Abramian v. Fellows of Harvard College*, 432 Mass. 107, 116 (2000). In a reduction in force case, the first three elements are generally easy to establish because: 1) the age of the employee is not disputed; 2) termination generally is not the result of an employee's poor performance, *per se*, because an employee who was not performing well presumably would have been discharged before the layoff; and 3) the employee was, in fact, terminated. *Sullivan*, 444 Mass. at 41.

The fourth element, however, requires a revised standard which has recently been articulated in *Sullivan*, 444 Mass. at 45. The plaintiff must produce "some evidence" that the "layoff occurred in circumstances that would raise a reasonable inference of unlawful discrimination." A plaintiff in a protected class cannot establish a prima facie case merely because he was laid off. *Sullivan*, 444 Mass. at 41, 44. Retaining an employee outside the plaintiff's protected class in the plaintiff's same position may or may not give rise to a reasonable inference of impermissible discrimination. *Id.* at 44. Even during a legitimate reorganization, an employer is forbidden from reducing its work force on unlawful discriminatory grounds. *Id.* at 42. Retaining younger workers who ranked lower in performance evaluations in the "same position" as the terminated employee is indirect evidence of discriminatory intent that allows a plaintiff to establish a prima facie case. *Id.* at 46. In addition, probative statistical evidence showing a disparate impact on members of the protected class may also help establish a prima facie case. *Id.* at 46, n.16.

In the present case, no dispute exists to the first three elements. Saposnik was sixty years old when he was terminated in November 2002, clearly a member of the protected class. His job evaluations reveal that he performed at least satisfactorily, achieving an overall score of "3" to remain employed prior to the layoff despite some noted deficiencies in his performance. In addition, he received monetary bonuses in some years. Thus, he was not laid off specifically because of "poor performance."

As to the fourth element, however, Saposnik has not shown that Babcock "retained other employees outside the plaintiff's protected class in the same position." Babcock presented admissible evidence within its affidavits that Wood, a twenty-six year old, was not in the same position as Saposnik. First, Saposnik was a Senior Buyer and Wood was a Buyer, each position being qualified by different educational preparation and prior experience, as well as different job responsibilities and job grade, as revealed in Babcock's job descriptions. In addition, Babcock submitted each of the Senior Buyers and Wood's job performance evaluations as evidence to show that Saposnik's job performance was inferior to that of the retained employees.

With such evidence before him, Saposnik has the obligation to respond with evidence, by affidavits or was otherwise provided in the rule, to set forth facts to show that there is a genuine issue for trial. *Correllas*, 410 Mass. at 317 (citing Mass.R.Civ.P. 56(e)). To support his allegation of age discrimination, Saposnik baldly asserts that all the Senior Buyers, Buyers, and Program Buyer/Expeditors performed their job interchangeably. He adduces no evidence to substantiate this allegation relying instead on mere conclusions which he cannot do. *Polaroid Corp.*, 416 Mass. 696. Saposnik has not shown that Babcock retained Wood in place of him. Wood was a Program Buyer/Expeditor, not a Senior Buyer as Saposnik had been. He has offered no evidence to show that Wood was promoted to Senior Buyer after the layoff. While he acknowledges that Wood assumed some of his commodities purchasing responsibilities he has not shown that only Wood assumed all of his purchasing responsibilities. Babcock, in its affidavit, identifies Saposnik's purchasing responsibilities as being distributed among Wood and two managers, Lausten and Kennedy, both of whom were over forty years old.[5] Saposnik offers no evidence to controvert the purchasing assignment.

Furthermore, Babcock retained the youngest Senior Buyer who was forty-eight, clearly a member of

the protected class. In addition, the oldest Senior Buyer was fifty-six following the lay off. That Saposnik was merely the oldest Senior Buyer terminated, without more, is not sufficient evidence to support a reasonable inference that age was a motivating factor in Babcock's decision to terminate him. Thus, Saposnik has offered no evidence to show that the layoff occurred in circumstances that would raise a reasonable inference of unlawful discrimination.

Nor has Saposnik demonstrated by probative statistical evidence discriminatory animus directed toward him. Although the sample size is small, eighty-five (18/21) percent of employees in Purchasing were over age forty prior to the layoff and eighty-one (13/16) percent were over age forty after the layoff, the mean age dropping to 46.56 years from 48.1 years. In addition, within Purchasing, Babcock retained two sixty-year-old employees. Furthermore, the mean age for all employees rose ever so slightly, across the entire organization, from 47.11 years to 47.27 years, following a reduction from 467 employees to 391 employees (nearly fifteen percent). Thus, the statistical evidence is insufficient to prove discriminatory animus. Accordingly, Saposnik has not satisfied the fourth element as articulated in *Sullivan* to establish a prima facie case of age discrimination in a reduction in force case.

Even if Saposnik could establish a prima facie case for discrimination, for purposes of analysis, the employer may rebut the presumption if it can articulate "a legitimate, nondiscriminatory reason for its hiring decision" backed by "credible evidence [showing] that the reason or reasons advanced were the real reasons." *Blare v. Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 441-42 (1995) (quoting *Wheelock College v. Massachusetts Comm'n Against Discrimination*, 371 Mass. 130, 138 (1973)). Babcock's business activity had slowed down. Saposnik knew the "pipeline was not as busy." Babcock reduced its overall workforce by nearly fifteen percent and its purchasing workforce by over twenty percent. Cummins was instructed to consider activity or lack of activities of any commodities, the performance of an individual, and future business as reasons for eliminating any individual in the layoff. While Babcock has not produced any evidence of what specific commodities lacked activity or what specific future business were to be effected, it did identify weakness in Saposnik's performance relative to his colleagues as a basis for the layoff. In addition, none of these factors directly or indirectly implicates age as a factor in deciding which positions to eliminate.

Babcock relies upon the performance evaluations of three other Senior Buyers, Hatch, Packard and Hinkley, all over the age of forty, as evidence to support its position that Saposnik was the weakest performer in the Senior Buyer group. Clearly, the evidence evinces that conclusion when one compares Hatch and Hinkley, each of whom scored "4" in their evaluations overall. As to comparison between Packard and Saposnik, Babcock's argument that Packard was slightly better than Saposnik is also born out by the evidence as Packard received the same overall score of "3" in the last of the evaluations but was a better performer in some categories because he exceeded his goals and had no unmet goals. Moreover, Saposnik concedes that he has no basis upon which to judge whether his performance was better than, worse than, or similar to others in his department. Thus, Babcock has met its burden to overcome a presumption of discrimination against Saposnik by articulating a legitimate, non-discriminatory reason for terminating Saposnik.

Because Babcock has met its burden to rebut the presumption of a prima facie case of discrimination if one did exist, which, as explained *supra*, does not, Saposnik would bear the burden to produce evidence that Babcock's rationale is merely a pretext for its action. Evidence relevant to a plaintiff's showing of pretext may include: 1) application of certain criteria to employees of different [ages]; 2) the employer's general practices and policies concerning employment of employees of [different age groups]; 3) and the employer's treatment of the plaintiff during his employment. *Lewis v. Area II Homecare for Senior Citizens, Inc.*, 397 Mass. 761, 767 (1986). This Saposnik is unable to do.

First, employee evaluations for Senior Buyers were generic, applying the same performance criteria to all who were evaluated. Babcock's position descriptions contained different qualifications, experience, and responsibilities among the Senior Buyers, Buyers, and Program Buyer/Expediters. Senior Buyers had to have a college degree or purchasing experience specific to the industry, or be certified. While one could reasonably infer that Babcock's preference was to hire older individuals because of the need for a college degree or specific experience, the job appraisal criteria among the positions differed solely on job responsibilities and objectives.

Second, the evidence supports Babcock's non-discriminatory practices in general employment practices as well. Babcock hired Saposnik at age fifty-six. He joined other Senior Buyers who were in the protected class. Babcock continued to hire other individuals over the age of forty both as Senior Buyers and into other positions, too. The mean age of all employees before and after the layoff was well over forty years, hovering around forty-seven years of age. Moreover, only three employees in Purchasing were outside the protected class before and after the layoff. Thus, one can reasonably infer that Babcock's general employment practices and policies did not discriminate against those over forty years old.

Finally, Saposnik concedes that he heard no remarks during his employment that could be cast in an age discriminatory light. He acknowledges that his

Case 4:04-cv-40092-FDS   Document 28-14   Filed 10/27/2005   Page 3 of 3

616   *The Massachusetts Law Reporter*
Cite as 19 Mass. L. Rptr. No. 27, 616 (September 12, 2005)

annual performance evaluations were not based on age-related factors. Furthermore, Babcock hired him at age fifty-six, retained him for four years, and provided an annual bonus. All of these factors negate an inference of discriminatory animus toward him based on age.

In summary, Saposnik's claim that his termination at age sixty is evidence of age discrimination, in the absence of any probative evidence, is insufficient as a matter of law, to prevail in this matter. Accordingly, Babcock's motion for summary judgment is ALLOWED.

### ORDER

For the foregoing reasons, the Defendant's Motion for Summary Judgment is ALLOWED.

---

[1] Saposnik was born on August 24, 1942.

[2] The Purchasing Department ("Purchasing") consisted of the following people, by job classification and age at the time of the layoff: 1) Paul Cummins, Director, age 44; 2) John Jaworski, Manager, age 60; 3) Lewis Lausten, Manager, age 55; 4) Brian Kennedy, Manager, age 51; 5) Richard Hinkley, Senior Buyer, age 56; 6) Sal Cilluffo, Senior Buyer (temporary), age 52; 7) Robert Packard, Senior Buyer, age 56; 8) Harold Saposnik, Senior Buyer, age 60; 9) Dana Hatch, Sr., Senior Buyer, age 48; 10) Shane Wood, Buyer, age 26; 11) Georgiana Mazzone, Purchasing Administrator/Buyer, age 60; 12) Joseph Martini, Purchasing Expeditor, age 53; 13) Carl Hubbard, Purchasing Expeditor, age 54; 14) Thomas Bruback, Project Procurement Manager, age 48; 15) Monique Maher-LeSabre, Cost Analyst, age 51; 16) Jason Rudman, Program Buyer Expediter, age 23; 17) Douglas Ward, Program Buyer Expediter, age 41; 18) David Bernard, Program Buyer Expediter, age 44; 19) Inge Thompson, Program Buyer Expediter, age 51; 20) Donna Jean Hazen, Senior Secretary, age 47; and 21) Paula Chapman, Project Assistant, age 31.

[3] Each performance evaluation required a description of "overall . . . performance" as denoted by a whole number, with "1" being the lowest and "5" being the highest.

[4] In addition to Saposnik, Babcock laid off: 1) Sal Cilluffo; 2) Joseph Martini; 3) Carl Hubbard; and 4) Donna Jean Hazen.

[5] Wood assumed procurement responsibilities for instrument and controls, thermocouple supports and thermocouples, valves, and valve silencers. Kennedy assumed purchasing responsibilities for burners, evaporators, fuel supply equipment, ignitor, and scanners. Lausten assumed buying responsibilities for air heaters, sonic and vibrating horns, heat exchangers/condensers, repeaters and soot cleaning.

---

### Commonwealth of Massachusetts v. Junet Antonio Corniel

Superior Court, Essex, SS
No. ESCR20040571
Memorandum Dated June 23, 2005

**Criminal Law and Procedure – Evidence – Scientific Evidence – Prosecution Must Provide Expert Scientific Testimony to Support Officer's Testimony to Have Detected the Presence of Cocaine During a Vehicle Stop Through the Use of the Officer's Sense of Smell.** Evidence of probable cause to search a vehicle based on an odor detected by the arresting officer thought to be unique to street cocaine, allegedly based on the officer's knowledge that chemicals used in the processing of normally odorless pure cocaine causes a distinctive odor that is independent of the particular chemicals used and cannot be suppressed by bagging, must be supported by expert testimony to establish that processed cocaine has a distinctive odor, how the odor is acquired and whether that odor can be detected and identified by humans. The opinion notes that the officer could testify to having detected an odor commonly experienced during cocaine arrests, but not as to how the odor is acquired by the cocaine and whether the odor is unique to cocaine.

---

AGNES, PETER W., J.

### INTRODUCTION

The defendant, Junet Antonio Corniel, is charged with trafficking in cocaine. He has filed a motion to suppress evidence consisting of seven hundred (700) grams of cocaine found in the back seat of his car. Based on the credible evidence presented at the hearing on the motion to suppress, I make the following findings of fact and rulings of law.

### FINDINGS OF FACT

Around 11p.m. on March 29, 2004, the Lawrence police arrested Miguel Rivera after he sold more than fourteen grams of cocaine to Officer Mark Rivet. Rivera agreed to cooperate with the police by providing information to them. He said that the name of his supplier, the defendant, was "J," and that he was a chubby Hispanic male who was about five-feet, six-inches tall. He further told the police J's street address and said that J would be traveling from his home on Graynard Terrace to South Lawrence for a drug pick-up in a maroon Dodge Stratus that night. Rivera was neither released from custody, nor did the police make any promises to Rivera in exchange for this information.

The police set up surveillance around Graynard Terrace at the alleged address of the defendant. The police observed a chubby Hispanic male, who was about 5'6" exit the house and enter a maroon Dodge Stratus. The Hispanic male did not have anything in his hands. Officer Rivet followed the car from Graynard Street to Bailey Street in South Lawrence. The defendant exited the car and entered a house. After a short period of time, the defendant exited the house with what appeared to be an opaque plastic bag. The bag was offered into evidence as exhibit 1.

The defendant started driving back towards North Lawrence, but the police stopped his vehicle. At this time, there were about four police cars with a total of four to five officers involved in the stop. As Rivet approached, the defendant rolled down his window. Rivet saw the opaque bag in the backseat of the car and he testified that he smelled a strong odor, an odor that he claimed were adulterants emanating from the bag. Officer Rivet told the defendant to get out of the