# EXHIBIT 10

Page 1

```
                    COMMONWEALTH OF MASSACHUSETTS
                    COMMISSION AGAINST DISCRIMINATION

     SPRINGFIELD, SS.

     LOUIS P. ALBERGHINI,        )
                    Complainant  )
                                 )
          vs.                    ) C.A. 01SEM10657
                                 )
     SIMONDS INDUSTRIES, INC.,   )
                    Respondent   )


          DEPOSITION OF JOHN JORDAN, taken at the
     request of the defendant pursuant to Rule 30
     of the Massachusetts Rules of Civil Procedure
     before Avis P. Crescitelli, a Notary Public in
     and for the Commonwealth of Massachusetts, on
     Thursday, October 3, 2002, commencing at 2:08
     P.M. at the offices of Bowditch & Dewey, 311 Main
     Street, Worcester, Massachusetts.

     A P P E A R A N C E S:

     FOR THE PLAINTIFF:
       ELLIOTT LAW OFFICE
       307 Central Street
       Gardner, Massachusetts 01440
         BY: MARCIA L. ELLIOTT, ESQ.

     FOR THE DEFENDANT:
       BOWDITCH & DEWEY
       311 Main Street
       Worcester, Massachusetts 01615-0156
         BY: DAVID M. FELPER, ESQ.

              BAY STATE REPORTING AGENCY
       76 MILL STREET, WORCESTER, MASSACHUSETTS 01603
                    (508) 753-4121
```

Page 2

```
                    I N D E X
          DEPONENT: JOHN JORDAN
                                                PAGE
  EXAMINATION BY MR. FELPER           3/103
  EXAMINATION BY MS. ELLIOTT          71



                    EXHIBITS
  NUMBER                              PAGE
  1    Subpoena                       20
  2    Letter, 8/21/00                36
  3    Affidavit of John Jordan       49
  4    Household manufacturing        88
  5    Job Description                91
```

Page 3

1   STIPULATION
2   The parties stipulate that the sealing,
3 certification and filing of the deposition are
4 waived, and that all objections except as to the
5 form of the question and all motions to strike
6 are reserved until the time of trial.
7       MR. FELPER: Do you want to use the
8 usual stipulations.
9       MS. ELLIOTT: Yes.
10      MR. FELPER: I'd like the witness to
11 read and sign, and we'll waive the requirement of
12 a notary. Basically what that means, Mr. Jordan,
13 you'll have the opportunity to review the
14 deposition transcript, make any corrections that
15 you deem appropriate or necessary and then sign
16 off saying that you've read it and you accept it
17 as true.
18      THE WITNESS: Okay.
19      JOHN JORDAN, SWORN
20 EXAMINATION BY MR. FELPER:
21  Q. State your full name, please?
22  A. John W. Jordan.
23  Q. What is your current address, Mr.
24 Jordan?

Page 4

1   A. 80 Mabel Lane, Northboro, Mass.
2   Q. What is your date of birth?
3   A. July 30th, 1947.
4   Q. Ever given a deposition before,
5 Mr. Jordan?
6   A. I'm going to say no. I've testified
7 at some arbitrations on behalf of Simonds or some
8 workman's compensation cases on behalf of
9 Simonds, but I don't believe any would be called
10 a deposition.
11  Q. Have you ever testified at any type of
12 court proceeding?
13  A. An accident case when I was 20 years
14 old.
15  Q. Other than perhaps in that accident
16 case, have you ever sued anyone?
17  A. No.
18  Q. Have you ever been sued?
19  A. No.
20  Q. Are you represented by counsel today?
21  A. No.
22  Q. Let me just explain a few ground rules
23 that I plan to follow for today's deposition.
24  A. Sure.

Case 4:04-cv-40092-FDS   Document 28-15   Filed 10/27/2005   Page 3 of 4

Alberghini vs. Simonds                                    Condenselt!                                     John Jordan 10/3/02

Page 37

1  A. Yes.
2  Q. You just had an opportunity to read
3  that document, correct, Mr. Jordan?
4  A. Yeah.
5  Q. Any statements in that document that
6  you do not believe are true and accurate?
7  A. No, it's factually correct.
8  Q. What position did David Whitman hold
9  when you wrote this letter?
10 A. Legal counsel to Simonds.
11 Q. While you and Mr. Larsen both worked
12 at Simonds, did you consider him a friend?
13     MS. ELLIOTT: A what?
14 Q. A friend.
15 A. I'll answer that by saying we had a
16 tight-knit group with a lot of camaraderie. I
17 didn't see Ron socially, so I'm going to say no.
18 Q. You were not part of that group that
19 went to lunch together periodically?
20 A. Rarely.
21 Q. Were you a member of the group that
22 went golfing?
23 A. No, I don't play golf. Much to the
24 detriment of my career.

Page 38

1  Q. At the time you wrote this letter, did
2  you consider Mr. Alberghini to be a friend?
3  A. I would say we had -- I'd say our
4  relationship was friendlier than it was with Ron,
5  just based on personalities. Again, Lou was
6  probably -- not probably -- Lou is less involved
7  with the -- with the click than I was. We had --
8  we had a good working relationship, but we didn't
9  have any social, you know, social time together.
10 Q. I want to ask you a few questions
11 about some of the statements in this letter. You
12 mentioned in the fourth paragraph, the one that
13 starts, "the change" --
14 A. Yeah.
15 Q. -- you mentioned the annual budget
16 planning process. Do you see that?
17 A. Yes.
18 Q. What was the annual budget planning
19 process at Simonds while you were there,
20 particularly in 1999?
21 A. In '99, well, it's always a fairly
22 rigorous, formal event whereby all of the
23 departments based on the sales forecast prepare
24 their operating plans for the upcoming year. The

Page 39

1  financial people look at cost versus sales and
2  determine if the proforma profit and loss
3  statement is acceptable, and quite typically we
4  in manufacturing are asked to go back and see if
5  we can trim some costs out of next year's
6  budget.
7      However, in 1999, the cost reduction
8  pressure was extreme because our new management
9  team had deemed that one of their goals was to
10 have an actual reduction in cost year-over-year
11 from 1999 to 2000, and the first budget, despite
12 our first pass of the budget, probably provided
13 for a two or three percent increase in the
14 capital budget, and it was sent back to us saying
15 that we needed some reductions; hence, the
16 million dollar reduction that needed to come out
17 of the operating budget for 2000. So it was
18 clearly the most extreme and intense budget
19 process that I'd been through in 15 years.
20 Q. Is it fair for me to say you were
21 actively involved in the entire process?
22 A. Yes.
23 Q. Who else was involved in that process
24 in 1999?

Page 40

1  A. Oh, Ron Owens, John Kifer, the plant
2  controller, plus all the direct reports that were
3  feeding me, you know, supporting data, but I
4  would say myself, John Kifer, and Ron Owens were
5  the guys that had to, you know, massage it and
6  get creative and look for savings.
7  Q. You go on to say in that same
8  paragraph, "It became obvious that a significant
9  amount of cost reduction needed to be achieved in
10 2000." How did that become obvious?
11 A. Because of the stated goal that the
12 year 2000 was to have lower cost than the year
13 1999. Given that we knew some costs were going
14 to go up, you know, labor agreement, wage
15 increases, cost of steel, the cost of
16 electricity, it meant that we not only had to --
17 we had to counteract cost increases with cost
18 reductions elsewhere, and with the $30 million
19 annual operating budget, looking for a three
20 percent reduction, we needed about a million
21 dollars of savings.
22 Q. Was it ever explained to you why there
23 had to be an actual reduction in cost from 1999
24 to 2000?

Page 41

```
 1    A. It was just one of the cornerstones of
 2  Ray Martino's management style, that
 3  year-over-year cost reductions were an important
 4  part of managing the business.
 5    Q. How did you go about personally
 6  identifying over $1 million in annual operating
 7  expenses that could be eliminated?
 8    A. We did an account-by-account
 9  line-by-line charge of accounts analysis.
10    Q. When you say "we," who are you
11  referring to?
12    A. Myself and John Kifer and maybe --
13  maybe the foremen involved. Simonds categorizes
14  every major type of expense, whether it be a
15  perishable tool or lubrication fluids or
16  electricity as a line item in the budget, and we
17  basically went through the budget with a
18  fine-tooth comb looking for outside services or
19  cost reductions that we felt we could count on,
20  and most importantly, head count to get to the
21  million dollars.
22    Q. How did you determine which salary
23  positions should be eliminated?
24    A. That was very -- as I said at the end
```

Page 42

```
 1  of it -- very painful process, but we ultimately
 2  came to a decision to eliminate the level of
 3  management right below the plant manager and
 4  flatten out the organization and have a foreman
 5  report to me in those areas where there were
 6  foremen.
 7    Q. When you say "we" again, referring to
 8  Mr. Kifer, Mr. Owens and yourself?
 9    A. That would have been Mr. Owens and
10  Mr. Martino and myself.
11    Q. You go on to say you personally
12  identified over $1 million in annual operating
13  expenses that could be eliminated which included
14  salaried positions, correct?
15    A. Right.
16    Q. So did you personally identify the
17  salaried positions that should be eliminated?
18    A. I personally was able to put a cost on
19  them once I was told who to eliminate.
20    Q. You don't say you were told who to
21  eliminate in this?
22    A. I'm not sure the letter was really
23  about that. The letter was in answer to
24  Mr. Larsen's charge.
```

Page 43

```
 1    Q. You say in this letter you personally
 2  identified over $1 million in annual operating
 3  expenses that could be eliminated which included
 4  salaried positions, correct?
 5    A. Right.
 6    Q. And you said concurrently that you and
 7  Mr. Owens were envisioning an organization which
 8  featured direct communication, accountability and
 9  efficiency, correct?
10    A. Yes.
11    Q. You say "we," which refers back to you
12  and Mr. Owens, concluded that an organization in
13  which the frontline supervisors reported directly
14  to the plant manager would accomplish this
15  directive, correct?
16    A. Correct. But I was told who to
17  eliminate by Mr. Martino.
18    Q. In other words, you and Mr. Owens were
19  envisioning this new organization, correct?
20    A. We were envisioning what to do with
21  what was left of the organization.
22    Q. Mr. Jordan, you wrote in this letter,
23  Mr. Owens and I were envisioning an organization
24  which featured direct communication,
```

Page 44

```
 1  accountability and efficiency, correct? That's a
 2  correct statement?
 3    A. Yes. But that doesn't say that I was
 4  responsible for the new organization.
 5    Q. You then go on to state in your letter
 6  "We" -- and that we refers to you and Mr. Owens,
 7  correct?
 8    A. Right.
 9    Q. -- "jointly concluded that an
10  organization in which the frontline supervisors
11  reported directly to the plant manager would
12  accomplish this objective," correct?
13    A. True.
14    Q. You were present at the meetings in
15  which Mr. Larsen, Mr. Bourque and Mr. Alberghini
16  were terminated, correct?
17    A. Yes.
18    Q. And during those meetings, you
19  explained that the intense budget/cost reduction
20  activity resulted in the elimination of salaried
21  positions at Fitchburg and elsewhere?
22    A. Yes.
23    Q. And the reason you told them that was
24  because it was true, correct?
```