# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————
)
LOUIS ALBERGHINI,                     )
                                      )
        Plaintiff,                    )
                                      )        **Civil Action No.**
        v.                            )        **04-40092-FDS**
                                      )
SIMONDS INDUSTRIES, INC.,             )
                                      )
        Defendant.                    )
———————————————————————)


## MEMORANDUM AND ORDER ON DEFENDANT'S
## MOTIONS FOR SUMMARY JUDGMENT AND TO STRIKE

**SAYLOR, J.**

This is an age discrimination case brought by plaintiff Louis Alberghini against his

former employer, defendant Simonds Industries, Inc.  Pending before the Court are Simonds's

motions for summary judgment and to strike plaintiff's statement of material facts pursuant to

Local Rule 56.1.  For the reasons set forth below, the Court will deny the motion to strike but

grant summary judgment.

## I.    Background

The Court will review the record in the light most favorable to Alberghini, the non-

moving party, drawing all reasonable inferences in his favor.

### A.    Alberghini's Job Tenure and Duties

Simonds is a manufacturer of cutting tools with facilities in both the United States and

abroad.  It is headquartered in Fitchburg, Massachusetts, where it also has a manufacturing plant.

Alberghini, who holds a bachelor's degree in electrical engineering, began working for Simonds in its Fitchburg plant in 1983. From about 1990 until January 2000 he was the Manager of Manufacturing Services. In this position, he oversaw plant services, such as maintenance, and was responsible for plant layout, such as plant moves and installations. He supervised several employees and attended to other managerial duties, including labor relations, employee reviews, and the preparation of budgets and capital expenditure proposals.

Alberghini was laid off from his managerial position on January 7, 2000. He was rehired approximately one month later into the position of Project Engineer. In that position, he worked on projects related to the manufacturing process and plant maintenance, such as improving processes, designing and installing machines, trouble-shooting manufacturing problems, and reducing costs. He did not supervise any employees.

### B.    Simonds's Decision to Reorganize and Reduce its Workforce

According to Simonds, management concluded in the last quarter of 1999 that the company employed more people than was standard for manufacturing companies of comparable size. It began analyzing all sectors of the company in an effort to make operations more efficient, increase productivity, and reduce costs. The company concluded that many positions needed to be eliminated worldwide, which was projected to result in an annual cost savings of more than $1.5 million without decreasing productivity.

As a result, in January 2000, Simonds began implementing a company-wide reorganization and reduction in force ("RIF"). The company reduced all operating departments, including engineering, to the lowest staffing level that would allow it to perform essential

functions.  The entire salaried manufacturing sector, including the engineering department, was

reorganized, and the surplus positions were eliminated.  This reorganization and RIF continued

into 2003, with 300 jobs eliminated throughout all of the company's facilities.  As a part of the

process, the company also closed its manufacturing facilities in California and the United

Kingdom.  From 1999 through 2001, the company suffered decreasing sales and rising costs; as a

result, it defaulted on its $5 million semi-annual interest payment on its public bond issue.

### 3.     Alberghini's Layoff

In May 2001, the company determined that the function of the Project Engineer position

could be absorbed by the manufacturing sector as a whole, and that the engineering workforce

would instead focus on product-related engineering (such as metallurgy, product development

and quality, and machine design).  Therefore, the company's CEO, Raymond Martino

(apparently with some input from Ron Owens, the Vice President of Manufacturing) decided to

eliminate the Project Engineer position.

Alberghini was laid off on May 31, 2001.  He was 60 years old at the time.  According to

the company, he was the only employee with the title of Project Engineer at the Fitchburg plant

as of the date of his layoff.  According to Alberghini, however, at the time there was another

Project Engineer—a relatively recent college graduate in his twenties named Jeremy

Dexter—who was not laid off.  At some point around or after the time of Alberghini's layoff,

Dexter assumed the job of "Manufacturing Engineer/Process Metallurgist."  Approximately two

months after Alberghini's layoff, the company hired Peter Duperry, a recent college graduate

with a mechanical engineering degree—who was also in his twenties—as a "Product Engineer."

3

C.    **Procedural History**

Alberghini filed a complaint against Simonds with the Massachusetts Commission Against Discrimination ("MCAD") on November 23, 2001, alleging age discrimination in violation of Mass. Gen. Laws ch. 151B, § 4. The MCAD issued a lack of probable cause finding, and Alberghini then brought suit in this Court on May 28, 2004.

The complaint alleges discrimination on the basis of age in four counts: violation of Mass. Gen. Laws ch. 151B (Count I); violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*(Count II); violation of the Older Workers Benefit Protection Act (Count III); and violation of the Civil Rights Act of 1991 (Count IV).[1] Simonds answered and counterclaimed on July 19, 2004.[2] Simonds moved for summary judgment on August 8, 2005, and then, on October 27, 2005, to strike Alberghini's statement of material facts. Alberghini opposes summary judgment on Counts I, II, and IV, but concedes that Count III should be dismissed.

II.    **Motion to Strike**

Simonds's motion to strike concerns two items: Alberghini's Concise Statement of Material Facts in Dispute Pursuant to Local Rule 56.1 and a document submitted with his memorandum in opposition as "Appendix 14."

---

[1] The complaint does not identify what right of action Alberghini purports to assert under the Older Worker's Benefit Protection Act, Pub. L. 101-433, 104 Stat. 983 (codified as various sections of Title 29, U.S.C.) or the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (codified as amended in various sections of Title 42, U.S.C.).

[2] Simonds's counterclaims are for breach of contract and rescission in connection with a release of claims signed by Alberghini in exchange for four months of separation compensation. The counterclaims are not the subject of any motion.

### A.    Alberghini's Statement under Local Rule 56.1

Simonds first argues that Alberghini's statement contains "merely arguments and conclusions," not facts, and does not otherwise conform to the requirements of Local Rule 56.1.[3] L.R. 56.1 states, in relevant part:

> Opposition to motions for summary judgment shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation. . . .  Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties.

This rule "aims to make the parties organize the evidence rather than leaving the burden upon the district judge." *Alsina-Ortiz v. LaBoy*, 400 F.3d 77, 80 (1st Cir. 2005) (rule violated where party "simply dump[ed] an undigested record on the judge, expecting him to do counsel's job.").

Alberghini's statement is by no means in full compliance with the rule:  it includes argument in most, if not all, paragraphs, and sets forth as "facts" a number of statements without record support.  Nonetheless, the Court need not decide whether the statement fails to comply with the rule and whether the Court should deem the facts contained in Simonds's statement to be admitted.  *See United States v. Roberts*, 978 F.2d 17, 25 (1st Cir. 1992).  For the reasons set forth below, even considering only those facts in the record that are supported by competent evidence—and viewing them, as the Court must, in the light most favorable to Alberghini—his claims cannot withstand summary judgment.

---

[3] Simonds argues in the alternative that at least 21 of the 35 paragraphs in Alberghini's statement should be struck.

5

B.    **Appendix 14**

The second issue presented in the motion involves the admissibility of Appendix 14 to

Alberghini's opposition memorandum.[4]  Appendix 14 consists of one page of lined paper with

handwriting on it.  It contains a list of eleven names; next to each name is a number ranging from

"45" to "61."  Each name is followed by an arrow that extends horizontally and ends beneath one

of two column headings:  one labeled "keep," or one (apparently) labeled "remove."  Next to the

arrows that end beneath the "remove" heading is a notation comprised of two lengths of time,

separated by an equal sign (*e.g.*, "42 yrs = 16 wks").[5]

The document is not dated, titled, or signed.  It was not authenticated by an affidavit, but

was simply appended to Alberghini's memorandum.  However, after Simonds filed its motion to

strike, Alberghini submitted an affidavit of his attorney, who attested that Simonds produced

Appendix 14 to her law office during discovery while the case was pending either before the

MCAD or this Court.[6]  Simonds argues that Appendix 14 has not been authenticated and is

therefore inadmissible.

In general, evidence submitted in connection with motions for summary judgment (other

than affidavits) must be in a form that is admissible at trial.  *Garside v. Osco Drug, Inc.*, 895

F.2d 46, 49-51 (1st Cir. 1990).  For a document to be admissible, it must be self-authenticating

---

[4] Although Appendix 14 as filed contained two documents, Alberghini has withdrawn the first of the two documents (a typewritten spreadsheet), leaving only the second (a handwritten document) in contention.  The term "Appendix 14" as used in this memorandum refers only to this second document.

[5] Beneath the list of names and the corresponding numbers and arrows are other notations; no party has argued that they are relevant to the dispute.

[6] Although Alberghini requested leave to file a surreply to the motion to strike, he never requested leave to file the supplemental affidavit pursuant to L.R. 7.2(B)(3).  Simonds has not, however, objected to consideration of the affidavit.  Simonds apparently concedes that it did produce the document, but argues that it did so "more than three years ago in the [MCAD] action which preceded this litigation."

or authenticated by extrinsic evidence. Fed. R. Evid. 901, 902. A document is authentic if there is "evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901.

Although evidence that Simonds produced Appendix 14 in discovery is probative as to its authenticity, it is at least debatable whether that evidence is sufficient. *See, e.g.*, *Lexington Ins. Co. v. Western Penn. Hosp.*, 423 F.3d 318, 328 (3d Cir. 2005); *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1423 (10th Cir. 1991); *see also* 5 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 901.04 & n.22 (Joseph M. McLaughlin, ed. 2d ed. 2006). For present purposes, however, the Court will not resolve the issue, but will simply assume that the document is authentic and admissible. Furthermore, the Court will assume that a jury could conclude that the employees whose names precede arrows that end in the "remove" column were selected for layoff; that they were laid off near to the time of Alberghini's layoff; that the number next to each name is the employee's age; and that the lengths of time correspond to years of service and the number of weeks or months of severance pay that they would receive.

## III.    Motion for Summary Judgment

### A.    Standard

Summary judgment may be entered if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The evidence must be viewed in the light most favorable to the non-moving party. *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991). Nonetheless, summary judgment may be entered "even where elusive concepts such as motive or intent are involved." *Id.* at 822. For "summary judgment [to retain] its usefulness as a means of avoiding full-dress

7

trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways," the Court must focus on the genuine disputes of material facts. *Id.* "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Morrissey v. Boston Five Cents Sav. Bank*, 54 F.3d 27, 31 (1st Cir. 1995).

### B.    Analysis

To prevail on an age discrimination claim, a plaintiff must prove four elements: (1) membership in a protected class (age 40 or over); (2) harm; (3) discriminatory animus; and (4) causation. *Lewis v. City of Boston*, 321 F.3d 207, 213 (1st Cir. 2003); *Lipchitz v. Raytheon Co.*, 434 Mass. 493, 507 (2001); *see also Sullivan v. Liberty Mutual Ins. Co.*, 444 Mass. 34, 39 (2005). As to the fourth element, the evidence must be sufficient to show that discriminatory animus was the determinative cause. *Lewis*, 321 F.3d at 213; *Knight v. Avon Products*, 438 Mass. 413, 425-26 (2003).[7]

Where no direct evidence of discriminatory animus and causation exists, a plaintiff may establish those elements circumstantially, using a three-stage burden-shifting method of proof. *Lewis*, 321 F.3d at 213-14; *Sullivan*, 444 Mass. at 39-40; *cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). In the first stage, the plaintiff must establish a prima facie case by a preponderance of the evidence. In a case in which the plaintiff was discharged as a part of a

---

[7] Simonds has also moved for summary judgment on Count IV, contending that there is no cause of action for unlawful age discrimination under the Civil Rights Act of 1991. In general, this statute amended Title VII to include a right to jury trial where compensatory and punitive damages are sought; codified Supreme Court precedent on the doctrine of adverse impact; and modified certain statutes of limitations under Title VII and ADEA. *See, e.g.*, BARBARA LINDEMANN & PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 1 (3d ed. 1997). The only authority Alberghini cites in support of his contention that there is a separate cause of action for age discrimination under the Civil Rights Act of 1991 is *Pomales v. Celulares Telefonica, Inc.*, 342 F.3d 44 (1st Cir. 2003). However, *Pomales* did not involve age discrimination (the discrimination claim was one of gender discrimination brought under Title VII), and did not even address the issue of whether a cause of action under the act was viable. Therefore, summary judgment on this count will be granted.

reduction in force, the plaintiff may establish a prima facie case by proving four elements: (1) that plaintiff is a member of a protected class; (2) that he performed his job at an acceptable level; (3) that he was laid off; and (4) that younger persons were retained in the same position or that the employer otherwise did not treat age neutrally in its layoff decision. *Currier v. United Tech. Corp.* 393 F.3d 246, 254 (1st Cir. 2004); *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 844 (1st Cir. 1993); *see Sullivan*, 444 Mass. at 43.[8]

The employer may rebut the presumption of discrimination created by the prima facie case by articulating a legitimate, non-discriminatory reason for the termination and producing some credible evidence to support that reason. *Currier*, 393 F.3d at 254; *Sullivan*, 444 Mass. at 50. In a layoff case, this means explaining why it chose to reduce its workforce and why it selected plaintiff for the layoff. *Sullivan*, 444 Mass. at 51. Finally, the plaintiff may submit evidence to show that the defendant's articulated reason for the termination was a pretext to hide discrimination. *Lewis*, 321 F.3d at 214; *Sullivan*, 444 Mass. at 54-55. If the plaintiff proffers sufficient evidence at the final stage, the jury may infer that the defendant's termination decision was made because of discrimination in violation of law. *Lewis*, 321 F.3d at 214, 220; *Lipchitz*, 434 Mass. at 501.

### 1.    Prima Facie Case

Simonds concedes, for purposes of its motion, that Alberghini has proffered sufficient evidence to meet the first three prongs of the prima facie case. It argues, however, that

---

[8] The Massachusetts Supreme Judicial Court recently stated the fourth element in a RIF case as follows: that the plaintiff's "layoff occurred in circumstances that would raise a reasonable inference of unlawful discrimination." *Sullivan*, 444 Mass. at 45. Although Alberghini has cited this standard in his briefing, he does not further explicate its meaning or explain whether the evidence should be analyzed any differently under one or the other standard. Because the Court holds that, in any event, Alberghini has not marshaled sufficient competent evidence at the pretext stage, the Court need not explore the matter further.

Alberghini has not established the fourth prong: that younger persons were retained in the same position or that the employer did not treat age neutrally in its layoff decision.

"The mere termination of a competent employee when an employer is making cutbacks due to economic necessity is insufficient to establish a prima facie case." *Sullivan*, 444 Mass. at 44-45 (quoting *LaGrant v. Gulf & Western Mfg. Co.*, 748 F.2d 1087, 1090 (6th Cir. 1984)) (internal quotation marks removed); *see Che v. Massachusetts Bay Transp. Auth.*, 342 F.3d 31, 38 (1st Cir. 2003). However, Alberghini has proffered sufficient evidence from which a jury could find that Simonds retained a substantially younger person in the same position.

As noted, Alberghini had been re-hired by Simonds as a Project Engineer in February 2000.[9] At that time, there were two individuals who held the title of Project Engineer: Alberghini and Jeremy Dexter, a college student in his twenties who was working as an intern.[10]

Alberghini was laid off more than a year later, in May 2001. Alberghini contends that he and Dexter held the same job at the time of the layoff. The evidence as to that issue is ambiguous; at some point, Dexter's job title changed to "Manufacturing Engineer/Process Metallurgist," but the record does not indicate when that occurred.

It is true that job titles alone are not necessarily determinative of the question of whether two employees held the same position; the issue depends upon "the duties and responsibilities assigned to each." *Lewis*, 321 F.3d at 215; *cf. LeBlanc*, 6 F.3d at 846. Nonetheless, Dexter testified at his deposition that he performed all of the job duties listed under the description for "Project Engineer." Furthermore, there is evidence that the company viewed the job duties at a

---

[9] The job description of Project Engineer had not been used since the 1980's; it was re-established in 2000 to accommodate the engineering department.

[10] Dexter became a full-time employee in July 2000 with the title of "Project Engineer."

10

high level of generality; according to the company, the job was intended "as a kind of engineering reserve to handle engineering projects when they arose."[11]

Thus, a jury could reasonably infer that Dexter, who was a substantially younger employee, was retained in the same position at the time that Alberghini was laid off. Accordingly, Alberghini has satisfied the fourth prong of the prima facie case under federal law. *Currier*, 393 F.3d at 254. The Court assumes, without deciding, that he has likewise met his burden under state law.

### 2.    Simonds' Legitimate Nondiscriminatory Reason

As described above, the company has produced evidence that it undertook a reorganization and course of layoffs in order to achieve cost reductions to counteract challenging financial conditions; that it concluded as part of that process that the position of Project Engineer could be eliminated and the duties absorbed by the manufacturing section as a whole; and that Alberghini was selected to be laid off as a result. This satisfies defendant's duty to produce evidence of a legitimate, nondiscriminatory reason for the decision.

### 3.    Pretext

The question then becomes whether plaintiff has put forth sufficient evidence that the proffered reason is merely a pretext for age discrimination. At this stage, the Court must consider all circumstantial evidence probative of age bias to determine whether, given the totality of the evidence, the plaintiff has proffered sufficient evidence from which a jury could

---

[11] There is evidence in the record of differences between Dexter's and Alberghini's duties while they were employed by Simonds. For example, Dexter's job duties changed at some point—again, the record does not indicate when—such that he was no longer acting as a "generalist" (that is, Project Engineer), but instead began to "focus[] on his duties as a metallurgist." However, there is insufficient evidence in the record for the Court to draw meaningful comparisons at a detailed level.

find that the employer's justification was a pretext for discrimination. *Feliciano de la Cruz v. El Conquistador Resort and Country Club*, 218 F.3d 1, 6-8 (1st Cir. 2000).

Alberghini's theory of pretext, in essence, is that he was not laid off due to financial problems at the company, but for the purpose of replacing him with younger workers.   He contends that he was not told that his layoff was due to financial issues; that his job duties were assumed by Jeremy Dexter and Peter Duperry, both of whom were substantially younger; that around the time of his layoff, Dexter and Duperry obtained new positions that he was qualified to fill; and that he was not offered either of those positions.

Alberghini has no direct evidence of pretext or discriminatory animus, and his indirect evidence is woefully thin.  He has attempted to bolster his case with four pieces of evidence that purport to show improper animus on the part of the company:  (1) a statement by Simonds CEO Raymond Martino in 1999 to the effect that the company had promoted too many people from within; (2) testimony by a former human resources employee, Patricia Jearman, that age was considered in connection with past layoffs at the company; (3) Appendix 14, which Alberghini contends shows improper age consideration; and (4) an expert report concluding that the average age of workers who were laid off at the company was greater than the average age of the those who were hired during the same period.

For the reasons set forth below, the evidence is not sufficient to establish a claim of pretext, and therefore summary judgment for defendant is appropriate.  Among other things, the undisputed evidence shows that the company was in fact in financial distress; that the assumption of Alberghini's duties by others was a normal part of the layoff process; and that the company was not required to offer Alberghini a different position after he was selected for

12

layoff.  In addition, the evidence purporting to show discriminatory intent is either irrelevant (e.g., it involves a different time frame and different decision makers), lacking in foundation, or simply insufficient to prove unlawful intent.[12]

### a.    The Financial Condition of the Company

Alberghini first argues that Simonds was not, in fact, suffering financially.  He cites the testimony of Jordan, the former Fitchburg plant manager, that the company was doing "fine" financially in 2001, and to the fact that in 2001 the company paid bonuses to two managers, hired a CFO and three vice presidents, and acquired certain new businesses.[13]

The record, however, contains overwhelming evidence of financial problems, which Alberghini does not attempt to refute:  (1) in September 2001, the company defaulted on a $5 million interest payment; (2) around the same time, the company made preparations for bankruptcy, although it did not ultimately file for protection; (3) for several years, the company experienced declining sales, reduced profitability, and rising costs; and (4) although it made several acquisitions, the company also divested itself of unprofitable lines of business.[14]

In any event, the issue is not the soundness of the company's decision making—that is, whether the company was correct in its assessment that it needed to make layoffs to reduce

---

[12] The Court observes that the sheer volume of evidence mustered by plaintiff, by itself, tends to suggest the existence of a disputed issue of material fact.  Nonetheless, there is less to that evidence than initially meets the eye. Upon careful examination, the evidence proffered by plaintiff—whether taken individually, or considered as a whole—is not sufficient to create a triable issue of fact as to pretext.

[13] Jordan's testimony is entirely conclusory and based on a doubtful foundation.  He admitted that he did not have complete access to company-wide financial information (especially as to profitability) after January 2001, when he was demoted.  He also admitted that the company was in fact experiencing rising costs and declining sales, and that the 2000 layoffs were necessary to achieve the cost reduction goals.

[14] The company also submitted evidence that, although it did hire the executives noted by Alberghini, it reduced its total executive force for the period of 1999 to 2003 by seven.

costs—but whether that decision masked discriminatory animus.  *See Mesnick*, 950 F.2d at 825; *Sullivan*, 444 Mass. at 56.  There is no evidence that it did.

Alberghini also argues that he was not told that the reason for his layoff was the restructuring of the engineering department or as a result of financial problems experienced by the company.  However, he also states that "vaguely economic reasons may have been mentioned."  In any event, there is no requirement that an employer provide a reason to an employee upon layoff, and there is no evidence that the company provided contradictory or inconsistent reasons to Alberghini or anyone else.

### b.      Alberghini's Layoff and Rehire in 2000

Alberghini was initially laid off in January 2000 from his position as Manager of Manufacturing Services, then rehired in February as a Project Engineer, and ultimately laid off permanently in May 2001.  He contends that the circumstances of the original layoff and rehiring are evidence of discriminatory animus.

Alberghini first notes that all five managerial and administrative employees who were laid off from the Fitchburg plant in January 2000 were over the age of 40.  However, that statistic is meaningless in the absence of evidence of the age composition of the workforce at the time.  Alberghini himself argues that the "management team in Fitchburg was predominantly older managers, many of whom were near 60 or more"; it would be reasonable to expect that any layoff in the management ranks of such a workforce would include "predominantly" "older managers."

Alberghini further contends that the position of Project Engineer was a demotion.  The position, however, carried the same salary and benefits as his previous position (although he did

14

not supervise others in the new position) and the circumstances as a whole do not suggest that it

would be objectively viewed as such.  *See MacCormack v. Boston Edison Co.*, 423 Mass. 652,

663-64 (1996); *see also Gu v. Boston Police Dep't*, 312 F.3d 6, 14-15 (1st Cir. 2002) (loss of

supervisory authority as part of restructuring not suggestive of a materially adverse action under

the circumstances).  Furthermore, if the company wanted to get rid of him, it could have simply

failed to re-hire him.  Finally, and in any event, Alberghini testified that he liked the new

position; he did not file a complaint of discrimination based on his initial layoff and rehiring; and

he continued to work for Simonds for fourteen more months after those events occurred.  Under

the circumstances, the evidence will not support a claim of pretext.

### c.    Assumption of Alberghini's Duties by Others

Alberghini next contends that the fact that younger workers assumed his duties after his

layoff shows pretext for discriminatory intent.  He points to evidence that one of his duties was

assumed by Jeremy Dexter and another was assumed by Peter Duperry, who was a recent college

graduate hired as a Product Engineer approximately two months after Alberghini was laid off.[15]

There is no evidence that those two duties constituted Alberghini's entire work

responsibilities.  Furthermore, even if that were true, the mere redistribution of the duties of a

laid-off employee does not give rise to an inference of discrimination.  Alberghini was

presumably performing *some* work for the company, and therefore it would be normal to have

his duties transferred to others.  *See Lewis,* 321 F.3d at 216 (in a typical RIF, the company

"generally reorganizes its workforce and reassigns responsibilities to reduce headcount and save

---

[15] He also argues that one of his duties was assumed by Richard Brault, who was at that time a 49-year-old Senior Manufacturing Engineer.  However, Brault testified that, although they worked together on one project, it was primarily Brault's responsibility and Alberghini's role in it had largely come to an end by the time he was laid off.

money") (internal citation removed); *Cruz-Ramos*, 202 F.3d at 384 ("When the functions of a [laid-off] employee are absorbed into the responsibilities of existing employees, who perform these duties along with their own, no legally cognizable 'replacement' occurs."). A person is replaced, as opposed to laid off, "only when another employee is hired or reassigned to perform the plaintiff's duties" and not when "another employee . . . perform[s] the plaintiff's duties in addition to other duties." *LeBlanc*, 6 F.3d at 846.

Of course, an employer may not "mask unlawful discrimination by simply transferring all of an employee's duties to another employee during a reduction in force." *Lewis*, 321 F.3d at 216. However, a plaintiff must prove more than the "inevitable transfer" of his responsibilities to others to give rise to an inference of discrimination. *Cf. id.* Here, Alberghini has not established anything other than the normal, and inevitable, fact that other employees assumed his duties in addition to their own after he was laid off.[16]

### d.    Failure to Consider Alberghini for Other Positions

Alberghini also contends that he was not considered for two positions that younger employees obtained close to the time he was laid off. The two positions were Product Engineer (which was assumed by Duperry) and Manufacturing Engineer/Process Metallurgist (which was assumed by Dexter). Alberghini contends that his substantial experience at the company and degree in electrical engineering qualified him to hold these positions. He also cites the following testimony of John Jordan, the former Fitchburg plant manager:

---

[16] Alberghini also argues that the engineering department was restructured after, and not before, his layoff. Brault testified that the duties of the engineers were redistributed along product, rather than functional, lines in approximately June 2001, after Alberghini's layoff. This is entirely consistent with the company's contentions that the Project Engineer job functions were absorbed by the department as a whole and that this decision was made in May 2001.

16

I can think of no reason why Mr. Alberghini could not have performed any manager of engineering position or Product Engineer or Manufacturing Engineer position, which would be centered on one product line utilizing design techniques and his other specialized engineering knowledge to assist in producing a quality product.  It is basically what he did for his 20 years of employment at the company.[17]

It appears that Alberghini was qualified for the Product Engineer position filled by Duperry.[18]  It is highly doubtful, however, that he was qualified for the position filled by Dexter.  Alberghini was not a qualified metallurgist and, unlike Dexter, had no formal training in materials science.[19]  There is no evidence as to who made the hiring decision; whether the decision-maker considered Alberghini before hiring one of the younger workers; whether Alberghini was looking for such a position at that time; whether Alberghini was aware the positions were open; or whether he would have accepted one of the positions if offered.

In any event, an employer is not obligated to transfer an employee selected for layoff to a different position which is open and for which the employee is qualified.  *See Webber v. Int'l Paper Co.*, 417 F.3d 229, 240 (1st Cir. 2005); *Varela Teron v. Banco Santander de Puerto Rico*, 257 F. Supp. 2d 454, 461 (D.P.R. 2003).  It is possible, of course, that the failure to do so, in conjunction with other actions or statements, could be proof of discrimination, but no such evidence is present in the record.  The mere failure to consider or hire Alberghini for either of the two positions is not by itself sufficient proof of pretext.  *See Webber*, 417 F.3d at 240 (fact

---

[17] Jordan was the plant manager until January 2001 with oversight for all functions in the plant, and whose employment continued, although in a lesser capacity, until September 2001.

[18] The company argues that, with a mechanical engineering degree, Duperry was better qualified than Alberghini for this position.  The job description for Product Engineer created by the company in May 2001, states only that a "two year (Associates Degree) college or university certificate, or five years of related experience and/or training or equivalent combination of education or experience" was required for the position.

[19] It is unclear whether Jordan considered the "Manufacturing Engineer" position to be the same one filled by Dexter, which was "Manufacturing Engineer/Process Metallurgist."

that plaintiff, selected for layoff, was not transferred to open position for which he as apparently qualified, was not indicative of discrimination even where two employees not in his protected class received transfers).

    e.  **<u>Statement by the CEO</u>**

In October 1999—shortly after he became the CEO of Simonds and eighteen months before Alberghini was laid off—Martino stated that one of the "negatives" of the company was that it promoted people from within and that this had resulted in some "conventional wisdom mentality" and a "lack of diversity in the management ranks."[20]  Alberghini argues that this statement is evidence that the company did not treat age neutrally in the RIF and that Martino harbored age animus.

The Court discerns nothing in this statement indicative of age-related bias.  Even taken in the light most favorable to plaintiff, the remark is directed to perceived conventionality and conformity, not age.  *See Sullivan*, 444 Mass. at 50 n.24 (the plaintiff was told that he was a "part of the old guard" who "never adapted to the new system" of business at the company; even in the light most favorable to the plaintiff, this was a facially ambiguous statement that "may reflect managerial concerns regarding an employee who declines to adapt to changed business practices" rather than the employer's preference for more youthful workers); *see also Shorette v. Rite Aid of Maine*, 155 F.3d 8, 13 (1st Cir. 1998) (company official asked plaintiff his age and when he planned to retire; this was a "textbook example of an isolated remark which demonstrates nothing").  There is no evidence that any other comments by Martino or anyone else at the company were age-related.

---

[20] Alberghini did not provide admissible evidence of this statement with his opposition; however, the testimony was later submitted in admissible form by Simonds in reply to Alberghini's argument.

**f.**    **Testimony of Patricia Jearman**

Alberghini has submitted an affidavit from a former Simonds employee named Patricia Jearman, who was employed from May 1989 until January 1996 as a Payroll/Benefits Clerk. She attested that, during her employment, the company had a "practice of reducing its workforce of older well-qualified employees and replacing them with newly hired younger, less qualified employees with no experience."

The centerpiece of Jearman's testimony is her claim that she was twice required to prepare a list of employees by age in connection with layoffs. As she stated in her affidavit:

> On two specific occasions, Ms. Thibodeau [her supervisor] instructed me to sort the employees by age for the purpose of conducting reductions in force. This was done on computer spreadsheets prepared by me. . . . The first time she asked me to sort the employees by age, I objected to it and told her that it constituted age discrimination. I asked her who the order came from that we were required to do it and she stated that 'it came from the top.'

She testified to the same effect at her deposition and at a trial involving another employee.[21]

The relevance of this evidence is not at all clear. Jearman left the company in January 1996, more than five years before Alberghini was laid off in March 2001. She admitted that she had no relevant knowledge of matters occurring after her employment ended. Moreover, the individuals who participated in the layoff decision, Martino and Owens, were not even employed by the company in 1996. Under certain circumstances, of course, a past act of discrimination may be admissible to prove that the challenged decision emanated from the same discriminatory animus. In the present case, however, there is no evidence of any meaningful connection

---

[21] During her deposition, taken in March 2005, Jearman testified that she was asked to provide specific information regarding names and ages of employees to Thibodeau. She also stated that the replacements she observed were "much younger." She testified similarly in May 2005 in the trial of *Larsen v. Simonds*, CA No. 01-40059-NMG, another age discrimination case brought against the company that concerned the layoff of Ronald Larsen in January 2000.

between the 1996 decisions of one set of decision-makers and the 2001 decision of an entirely

different set. *See Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 10 (1st Cir. 1990)

("The biases of one who neither makes nor influences the challenged personnel decision are not

probative in an employment discrimination case."); *Lee v. President & Fellows of Harvard Coll.*,

60 Mass. App. Ct. 836, 841-42 (2004) (no evidence that individual who demonstrated age bias

was involved in the employment decision at issue).[22]

Furthermore, and in any event, it is a commonplace, and indeed laudable, practice for a

company to compile lists of employees by age in connection with a layoff in order to ensure that

the layoff decision does not have an unfairly discriminatory impact on the protected group.[23]

The undisputed evidence is that the company followed that practice here.[24]

Jearman admitted that she did not know how the age-related information was used.  She

also admitted that she did not conduct the analysis herself and that she only provided the data to

Thibodeau.  She did not indicate whether she provided the information before or after the

employees were selected for layoff.  Finally, she admitted that she compiled similar lists for her

---

[22] Although Thibodeau was employed by Simonds at all relevant times, nothing suggests that she had any input into the selection of Alberghini for layoff.  Moreover, Jearman testified that Thibodeau told her that the decision to compile age information came "from the top," implying that the decision was not hers.

[23] Prudence would suggest, of course, that the company make its decisions first, and compare them against the lists afterward, to avoid the appearance of discrimination; but there is nothing inherently unlawful or sinister about the practice.

[24] Martino testified that the company first identified employees for layoff, then listed all employees who were affected with their demographic information, and then reviewed the list to determine whether the impact of the decisions was unlawful.  He also testified that it was "a common practice to make sure that [the company] was reviewing the impact of [its] decisions to make sure that [it] was abiding by the law and being fair to all employee groups."  He also testified that he did not know the age of any of the employees selected for layoff before they were laid off, and that the analysis was performed in the human resources department, without any involvement from him.  Thibodeau testified to the same effect.

current employer for entirely benign reasons.[25]  Under the circumstances, Jearman's evidence does not support a finding of pretext.

### g.    Appendix 14

As described above, Appendix 14 is a handwritten document that includes the names and ages of eleven employees and indicates which were to be "kept" and which "removed."  The ages of the employees range from 45 to 61.[26]  If authenticated and admitted into evidence, a jury could conclude that three of the eleven employees were laid off; that those three were aged 45, 47, and 54; and that they were laid off on November 30, 2001.  The others on the list were apparently retained; their ages ranged from 47 to 61, and included two who were 58.

Again, the relevance of this document is not clear.  Alberghini's name is not on the list. The document bears no author or date, and it is not clear when or why it was created.  There is no evidence that the individual who chose to lay off these three employees was the same one who selected Alberghini for layoff six months earlier.[27]

The contents of the document itself does not suggest discriminatory intent.  At least with respect to the employees listed, the youngest person, aged 45, was laid off, and the oldest one, aged 61, was retained.  The average age of the group as a whole is 53.4; the average age of the

---

[25] Jearman testified that, in her position as human resources manager with her current employer, she compiles age information to analyze potential layoffs at her company to "mak[e] sure that there wasn't any type of adverse impact done."  She further explained that she wanted to "make sure that a particular group, protected group, wasn't being targeted."

[26] The number corresponding to one name, "Edmunds," has been crossed out and is not legible.

[27] Furthermore, the listed employees had titles suggesting that they were managers, not engineers:  "Mgr Lean Mfg," "Unit Manager," and "Production Supervisor."

three laid-off employees is 48.6.[28]

It is true that the document appears to reflect a compilation of age-related data by the company in connection with a layoff decision. But, as noted, the company had a legitimate purpose in compiling that data, and according to the undisputed evidence, it was the company's practice (at least after Martino became the CEO) to consider age information after layoff decisions to assess any possible adverse impact on the age-protected workforce.

In short, while the document appears to reflect age consciousness, it does not reflect age animus. That is far removed from proof of pretext as to the decision by Martino and Owen to lay off Alberghini in May 2001.[29]

### h.     Statistical Evidence

Finally, Alberghini has submitted a statistical report prepared by George W. Cobb, Ph.D. In his report, Dr. Cobb compared the ages of two groups of employees: those managers and professionals who were selected for layoff as a part of Simonds's RIF from January 2000 until approximately August 2001, and those managers and professionals who were hired by Simonds during that same period.[30] He found that the average age of the former group was higher than the average age of the latter group, and that the difference was statistically significant.

_____

[28] The sample size is, of course, very small, and the statistics are not particularly meaningful without a complete factual context.

[29] The only authority that Alberghini cites in support of his interpretation of Appendix 14 is *Hamilton v. 1st Source Bank*, 895 F.2d 159, 162 (4th Cir. 1990). In *Hamilton*, a manager prominently recorded the plaintiff's age on his employee appraisal documents, asked him about his retirement plans, and commented on his baldness. Here, Appendix 14 does not even include Alberghini's name, much less his age. Moreover, evidence supporting the jury's finding of discrimination in *Hamilton* included evidence that his termination was not approved until *after* he filed a charge of discrimination against the company.

[30] The laid-off employee group was actually defined three ways to account for a discrepancy or a gap in the evidence as to whether certain employees were actually selected for the RIF or were terminated for other reasons.

Simonds responded to this report with a litany of objections, only two of which need be mentioned.  First, and most significantly, Cobb compared the laid-off group to a population of newly hired employees, but failed to account for the characteristics of the relevant labor market and the applicant pool.  The fact that recently hired managerial and professional employees are younger "may simply reflect a younger available workforce."  *LeBlanc*, 6 F.3d at 848.  If the vacancies were mainly entry-level positions, for example, they are likely to have attracted primarily younger applicants.  Second, Cobb's definition of laid-off employees is potentially both overinclusive and underinclusive.  It includes all managers and professionals laid off from the Fitchburg facility without regard to who selected them for layoff, and it includes only employees from the Fitchburg facility without regard to whether the decision-makers who chose those employees for layoff also chose employees for layoff at other sites.  At a minimum, Cobb failed to account for either possibility.

Statistical evidence "rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its decision to dismiss an individual employee . . . .  This is because a company's overall employment statistics will, in at least many cases, have little direct bearing on the specific intentions of the employer when dismissing a particular individual."  *Id.* at 848 (internal citation removed); *see Hillstrom v. Best Western TLC Hotel*, 354 F.3d 27, 32 (1st Cir. 2003) ( "Valid statistical evidence may play a helpful role even in disparate treatment cases, but only if it tends to prove the discriminatory intent of the decision makers involved.").  In the present case, Cobb's report does not provide meaningful conclusions sufficient to support a claim of pretext.

### 4. <u>Summary</u>

In summary, the evidence in this case, even when viewed in the light most favorable to

Alberghini, and even when viewed in its entirety, is insufficient to support a finding that the company's stated reasons for his May 2001 layoff were pretextual.  The Court will therefore grant summary judgment in favor of the defendant as to all claims.

**IV.**    <u>**Conclusion**</u>

      For the foregoing reasons, Simonds's motion to strike is DENIED, and its motion for summary judgment is GRANTED.

**So Ordered.**

                                                 /s/ F. Dennis Saylor
                                               F. Dennis Saylor IV
Dated:  August 14, 2006                    United States District Judge